UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VITTORIO AMUSO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1935 (RJL) |
| | ) | |
| DEPARTMENT OF JUSTICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, through counsel, respectfully move this Court for summary judgment on the ground that there is no genuine issue of material fact regarding the documents already processed and that the defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56. In support of this motion, Defendants respectfully submit the attached memorandum of points and authorities, statement of material facts not in genuine dispute, and declarations from the agency components involved in processing Plaintiff's requests under the Freedom of Information Act with exhibits attached thereto and a proposed order.

Plaintiff will please take notice that any factual assertions contained in the accompanying declaration and other attachments in support of Defendants' motion will be accepted by the Court as true unless Plaintiff controverts them with his own affidavit or other documentary evidence. See Neal v. Kelly, 963 F.2d 453 (D.C. Cir. 1992), and LCvR 7.1. As stated in Fed. R. Civ. P. 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be

attached thereto or served therewith.  The court may permit
affidavits to be supplemented or opposed by depositions, answers
to interrogatories, or further affidavits.  When a motion for
summary judgment is made and supported as provided in this rule,
an adverse party may not rest upon the mere allegations or denials
of the adverse party's pleading, but the adverse party's response, by
affidavits or as otherwise provided in this rule, must set forth
specific facts showing that there is a genuine issue for trial.  If the
adverse party does not so respond, summary judgment, if
appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

Respectfully submitted,

 /s/
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

 /s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

 /s/
CHARLOTTE A. ABEL., D.C. BAR #388582
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, NW
Washington, D.C. 20530

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VITTORIO AMUSO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1935 (RJL) |
| | ) | |
| DEPARTMENT OF JUSTICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

This case arises under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the

Privacy Act ("PA"), 5 U.S.C. § 552a, and concerns the processing of Plaintiff's FOIA requests by

the United States Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI").

The Federal Bureau of Prisons ("BOP") has also been involved in processing Plaintiff's request

as a result of referrals from the FBI.  The attached declaration of David M. Hardy, Section Chief

of the Records /Information Dissemination Section ("RID"), Records Management Division

("RMD"), at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington DC, is

filed in support of this motion.  In addition, the Declaration of Wilson J. Moorer (Exhibit J), of

the BOP is filed in support of this motion.  For the reasons set forth below, the defendants are

entitled to summary judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

By letter dated April 10, 2007 to FBIHQ, plaintiff submitted a Freedom of Information

and Privacy Act (FOIA/PA) request for:

any and all documents, records, memoranda, notes, statements and other information or
data in what ever form maintained by your agency that relates to and/or makes reference
to Amuso directly or indirectly.  More specifically, any data or information in the
possession or control of your agency related to and/or generated by the criminal
investigation and prosecution of Amuso by federal authorities in and around the U.S.
Federal Districts of New York.

Declaration of David Hardy ("Hardy Decl.") ¶ 6.  Plaintiff specifically requested information

dated from January 1980 to the present.  Id. and Exhibit A attached thereto.

By letter dated April 16, 2007 from the plaintiff to the FBI Albany Field Office, plaintiff

submitted an identical FOIA/PA request for any and all records pertaining to himself.  See ¶ 6

supra.; Hardy Decl. ¶ 7 and exhibit B attached thereto.  By letter dated May 3, 2007 from FBIHQ

to the plaintiff, FBIHQ acknowledged receipt of plaintiff's FOIPA request and advised that his

case was assigned FOIPA number 1076768-000.  Hardy Decl. ¶8.   In addition, plaintiff was

advised that his FOIPA request to the Albany field office was forwarded to FBIHQ for handling.[1]

Id. and Exhibit C attached thereto.

By letter dated May 7, 2007 from FBIHQ to the plaintiff, acknowledgment was made of

plaintiff's Albany FOIPA request and was assigned FOIPA number 1076768-000.  Hardy Decl. ¶

9 and Exhibit D attached thereto.  By letter dated May 21, 2007 from FBIHQ to the plaintiff, the

plaintiff was advised that records which may be responsive to his Albany FOIPA request were

destroyed (date unknown).[2]   Hardy Decl. ¶ 10.  Plaintiff was advised that if he desired a check

of FBI field office files, he must write directly to the appropriate field office(s).[3]   Id.  In addition,

---

[1]  A second acknowledgment letter was sent to the plaintiff by letter dated May 7, 2007.

[2]  The search of the indices to the CRS for FBIHQ main files located no record.

[3]  28 CFR §§ 16.3(a), 16.41(a) 2007.

2

plaintiff was informed that he could file an administrative appeal with the Office of Information and Privacy ("OIP"), United States Department of Justice, Washington, DC. Id. and Exhibit E attached thereto.  By letter dated June 20, 2007 from OIP to the plaintiff, plaintiff was advised of the receipt of his appeal and its assigned number.  Hardy Decl. ¶ 11. and Exhibit F attached thereto.

By letter dated July12, 2007 from the plaintiff to FBIHQ, plaintiff inquired about the "status of my two FOIA/PA requests sent to your office for referral to Scranton, PA.; and New York City, NY FBI field offices".  Hardy Decl.  ¶ 12.  Plaintiff's letter contested the referral of his Scranton letter to FBIHQ.  Id.  Plaintiff provided copies of certified mail receipts dated April 11, 2007 and April 26, 2007 as documentation for the above FOIPA requests.  Id. and Exhibit G attached thereto.

By letter dated August 8, 2007, from OIP to the plaintiff, OIP advised plaintiff that they were affirming the actions of the FBI that resulted in his appeal for access to records pertaining to himself at the Albany Field Office and FBIHQ. Hardy Decl. ¶ 13 and Exhibit H attached thereto.

The Bureau of Prisons FOIA Office received a three page referral of information from the FBI on May 2, 2008.  Moorer Decl., Attachment A (Exhibit J, Attachment A).  The BOP Central Office responded to the referral from the FBI on June 20, 2008.  A determination was made to withhold the 3 pages of information in their entirety.  The withholding of the 3 pages of information was made pursuant to 5 U.S.C. § 552(b)(7)(C) and (b)(7)(F).  Moorer Decl., Attachment B (Exhibit J, Attachment B.)

On  October 25, 2007, plaintiff filed a Complaint in the U.S. District Court for the District of Columbia, seeking a release of all records responsive to his April 10, 2007 FOIA/Privacy Act request and seeking a "Vaughn" index.  Hardy Decl. ¶ 14.

3

### III.  STANDARD FOR SUMMARY JUDGMENT

Where no genuine dispute exists as to any material fact, summary judgment is required. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  A genuine issue of material fact is one that would change the outcome of the litigation.  *Id.* at 247.  "The burden on the moving party may be discharged by 'showing' -- that is, pointing out to the [Court] -- that there is an absence of evidence to support the non-moving party's case."  *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987).

Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Thus, to avoid summary judgment, the plaintiff must present some objective evidence that would enable the court to find he is entitled to relief.  In *Celotex Corp. v. Catrett*, the Supreme Court held that, in responding to a proper motion for summary judgment, the party who bears the burden of proof on an issue at trial must "make a sufficient showing on an essential element of [his] case" to establish a genuine dispute.  477 U.S. 317, 322-23 (1986).

The Courts have held that FOIA cases should ordinarily be disposed of by motions for summary judgment. *Cappabianca v. Commissioner, U.S. Customs Serv.*, 847 F. Supp. 1558, 1562 (M.D. Fla. 1994) ("once documents in issue are properly identified, FOIA cases should be handled on motions for summary judgment") (*citing Miscavige v. IRS*, 2 F.3d 366, 368 (11th Cir. 1993)).  In a FOIA lawsuit,  an agency is entitled to summary judgment once it demonstrates that no material facts are in dispute and that each document that falls within the class requested either has been produced, not withheld, is unidentifiable, or is exempt from disclosure.  *Students Against Genocide v. Dept. of State*, 257 F.3d 828, 833 (D.C. Cir. 2001); *Weisberg v. U.S. Dept.*

4

*of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980).

An agency satisfies the summary judgment requirements under Rule 56 in a FOIA case by providing the Court and the plaintiff with affidavits or declarations and other evidence which show that the documents are exempt from disclosure. *Hayden v. National Security Agency Cent. Sec. Serv., 608 F.2d 1381, 1384, 1386 (D.C. Cir. 1979), cert. denied*, 446 U.S. 937 (1980); *Church of Scientology v. U.S. Dept. of Army*, 611 F.2d 738, 742 (9th Cir. 1980). Summary judgment may be awarded to an agency in a FOIA case solely on the basis of agency affidavits [or declarations] "when the affidavits describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Trans Union LLC v. Federal Trade Commission*, 141 F. Supp. 2d 62, 67 (D.D.C. 2001) (*quoting Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)); *see also Public Citizen, Inc. v. Dept. of State*, 100 F. Supp. 2d 10, 16 (D.D.C. 2000); *McGhee v. Central Intelligence Agency*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *Citizens Commission on Human Rights v. FDA*, 45 F.3d 1325, 1329 (9th Cir. 1995); *Bowen v. FDA*, 925 F.2d 1224, 1227 (9th Cir. 1991). When the pleadings, supplemented by affidavits or declarations, show no genuine issue as to any material fact and the defendant is entitled to judgment as a matter of law, summary judgment should be granted to the defendant. *Perry v. Block*, 684 F.2d 121 (D.C. Cir. 1982).

In the case at bar, the FBI and the BOP have submitted declarations in support of this motion for summary judgment. In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), the declarations provides the Court and plaintiff with an explanation for the procedures used in  reviewing and processing the FBIHQ records responsive to plaintiff's FOIA/Privacy Act

request, and provides a justification for the FBI information which has been withheld from disclosure in full or in part pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. § 552(a) (j)(2) and FOIA Exemptions  2, 6, 7(C), 7(D), 7(E) and 7(F), 5 U.S.C. §§ 552 (b)(2), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F).  *Id.*  ¶ 4.  *See Miller v. Department of Justice*, —F. Supp. 2d—, 2008 WL 2544659 (D.D.C.).  The withholding of the 3 pages of information by the BOP was made pursuant to 5 U.S.C. § 552(b)(7)(C) and (b)(7)(F).  Moorer Decl., Attachment B (Exhibit J, Attachment B.)

## IV.  ARGUMENT

### A.     The FBI's Search for Records is Adequate

The FBI has performed an adequate search in response to Plaintiff's direct FOIA requests. In responding to a FOIA request, an agency is under a duty to conduct a reasonable search for responsive records.  *Oglesby v. U.S. Dept. of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *Cleary, Gottlieb, Steen & Hamilton v. Dept. of Health, et al.*, 844 F. Supp. 770, 776 (D.D.C. 1993); *Weisberg v. U.S. Dept. of Justice*, 705 F.2d 1344, 1352 (D.C. Cir. 1983). This "reasonableness" standard focuses on the method of the search, not its results, so that a search is not unreasonable simply because it fails to produce relevant material.  *Id.* at 777 n.4.  An agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located.  *Oglesby*, 920 F.2d at 68.  Simply stated, the adequacy of  the search is "dependent upon the circumstances of the case."  *Truitt v. Dept. of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

The search standards under FOIA do not place upon the agency a requirement that it prove that all responsive documents have been located.  *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995).  It has been held that "'the search need only be

reasonable; it does not have to be exhaustive.'" *Miller v. Dept. of State*, 779 F.2d 1378, 1383 (8th Cir. 1985) *citing National Cable Television Association v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973). Even when a requested document indisputably exists or once existed, summary judgment will not be defeated by an unsuccessful search for the document so long as the search was diligent. *Nation Magazine*, 71 F.3d at 892 n.7. Additionally, the mere fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it. *Maynard v. CIA*, 982 F.2d 546, 564 (1st Cir. 1993).

The burden rests with the agency to establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68; *see SafeCard Servs. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991). "An agency may prove the reasonableness of its search through affidavits of responsible agency officials so long as the affidavits are relatively detailed, non-conclusory and submitted in good faith." *Miller,* 779 F.2d at 1383; *Goland*, 607 F.2d at 352. Though the "affidavits submitted by an agency are 'accorded a presumption of good faith,'" *Carney v. Dept. of Justice*, 19 F.3d 807, 812 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (*quoting SafeCard Servs. v. SEC*, 926 F.2d at 1200), the burden rests with the agency to demonstrate the adequacy of its search. Once the agency has met this burden through a showing of convincing evidence, the burden shifts to the requester to rebut the evidence by a showing of bad faith on the part of the agency. *Miller*, 779 F.2d at 1383. A requester may not rebut agency affidavits with purely speculative allegations. *See Carney*, 19 F.3d at 813; *SafeCard*, 926 at 1200; *Maynard v. CIA*, 986 F.2d 547, 559-560 (1st Cir. 1993). The fundamental question is not "whether there might exist any other documents responsive to the request, but rather whether the

7

search for those documents was adequate." *Steinberg v. Dept. of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (*quoting Weisberg v. Dept. of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).

      In response to plaintiff's FOIPA request, a de novo search of the CRS indices was conducted for HQ records responsive to plaintiff's request.  Hardy Decl. 23.  RIDS personnel conducted a search of the automated indices for responsive documents at FBIHQ.  Hardy Decl. ¶ 22.  RIDs personnel identified several responsive cross-references.  *Id.*  A search of the indices at the Albany Field Office revealed that records which may have been responsive to plaintiff's FOIPA request were destroyed (date unknown).  *Id.*  ¶24.   The FBI released some records to the plaintiff, withheld other records pursuant to FOIA exemptions, and referred some records to the Bureau of Prisons for direct response to the plaintiff.  Hardy Decl. ¶ 81.  Specifically, by letter dated August 14, 2008, FBIHQ forwarded a referral package to BOP for processing and direct response to plaintiff for Exhibit I pages AMUSO- 45,46, 47, and 48.  *Id.*  The exemptions asserted by the FBI are Exemption (j)(2) of the Privacy Act and FOIA Exemptions  2, 6, 7(C), 7(D), 7(E) and 7(F).  *Id*.  The paragraphs that follow explain defendant's rationale for withholding each particular category of information under the specific exemption categories described above.  *Id*.  ¶28.

      **B.**    **The FBI Properly Withheld Records Pursuant to FOIA Exemptions**

          **1.**    **FBI Properly Applied Exemption 2**

      Title 5, United States Code, Section 552 (b)(2) ("Exemption 2") exempts from mandatory disclosure records "related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  Exemption 2 applies primarily to two types of materials:  (1) internal agency matters so routine or trivial that they could not be "subject to . . . a genuine and significant public interest;" and (2) internal agency matters of some public interest "where

disclosure may risk circumvention" of statutes or agency regulations. *Dept. of Air Force v. Rose*, 425 U.S. 352, 369-70 (1976); *National Treasury Employees Union v. U.S. Customs Service*, 802 F.2d 525, 528-30 (D.C. Cir. 1986); *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 670 F.2d 1051, 1073-74 (D.C. Cir. 1981). Depending upon the nature of the information, documents will fall within either the "high (b)(2) category" or the "low (b)(2) category."

Exemption "high (b)(2)" exempts from mandatory disclosure documents relating to more substantive internal matters. *See Schiller v. NLRB*, 964 F.2d 1205, 1207 (D.C. Cir. 1992). Withholding is permitted in this category to the extent that disclosure would reveal techniques and procedures for law enforcement investigations or prosecutions, would disclose guidelines for law enforcement investigations, or would risk circumvention of an agency statute or impede the effectiveness of an agency's law enforcement activities. *See Crooker*, 670 F.2d 1051 (D.C. Cir. 1981) (*en banc*); *Hardy v. Bureau of Alcohol, Tobacco and Firearms*, 631 F.2d 653, 656 (9th Cir. 1980).

"Low (b)(2)" information refers to internal procedures and practices of an agency the disclosure of which would constitute an administrative burden unjustified by any genuine and significant public benefit. *Martin v. Lauer*, 686 F.2d 24, 34 (D.C. Cir. 1982). "Low b(2)" information can be protected only if the information qualifies as a personnel rule or internal practice of an agency or is sufficiently related to such a rule or practice. *See Schwaner v. Dept. of the Air Force*, 898 F.2d 793, 795 (D.C. Cir. 1990). Thus, trivial administrative data, such as file numbers, mail routing stamps, initials, data processing notations, brief references to previous communications, and similar administrative markings are exempt from disclosure. The reason is that administrative agencies should not be burdened by responding to requests for

trivial information unlikely to be the subject of public interest. *Martin v. Lauer*, 686 F.2d at 34.

Deference has been accorded to law enforcement matters under Exemption 2. Courts have interpreted this exemption to apply to a wide range of information, including general guidelines for conducting investigations (*See, e.g. PHE, Inc. v. Dept. of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993)); guidelines for conducting post-investigation litigation (*Schiller v. NLRB*, 964 F.2d at 1207)); a training manual with information pertaining to surveillance techniques (*Crooker*, 670 F.2d at 1073); criteria for prison gang-member classification (*Jimenez v. FBI*, 938 F. Supp. 21, 27 (D.D.C. 1996)); and DEA's drug-violator codes (*Albuquerque Publishing Co. v. Department of Justice*, 726 F. Supp. 851, 854 (D.D.C. 1989).

This exemption protects routine internal administrative matters and functions of the FBI which have no effect on the public at large. Disclosure of this information could impede the effectiveness of the FBI's internal law enforcement procedures. Hardy Decl. ¶ 32.

### (b)(2)-1        Source File Numbers

Exemption (b)(2)-1 has been asserted in conjunction with Exemption (b)(7)(D)-2 to protect the informant file numbers of permanent confidential symbol number sources of the FBI. Hardy Decl. ¶ 33. Similar in usage to the confidential source symbol number, these confidential source file numbers are also assigned in sequential order to confidential informants who report information to the FBI on a regular basis pursuant to an express assurance of confidentiality. *Id.* The confidential source file is unique to the particular confidential informant and is used only in documentation relating to that particular informant. *Id.* In this instance, confidential source file numbers were used to document information provided by various sources. *Id.*

Disclosure of confidential source file numbers at various times and in various documents could ultimately identify these sources since it would reveal the connections of confidential

informants to the information provided by them. *Id.* ¶ 34.  Repeated release of confidential

source file numbers along with the information provided by these confidential informants would

narrow the possibilities of their true identities. *Id.*  This is especially true since each

confidential source file number is assigned to only one confidential informant. *Id.*

     The disclosure of the identity of confidential sources would have a chilling effect on the

activities and cooperation of other FBI confidential informants. *Id.* ¶ 35. It is only with the

understanding of complete confidentiality that the aid of such informants can be enlisted, and

only through this assurance of confidentiality that these informants can be persuaded to continue

their assistance in providing information to the FBI in the future. *Id.*  Accordingly, the

disclosure of this confidential source file number could reasonably be expected to identify a

permanent confidential source of the FBI. *Id.*  Therefore, this information has been

appropriately protected from disclosure pursuant to Exemption (b)(2)-1. *Id.*  Exemption (b)(2)-

1 is invoked on the following pages of Exhibit I: *Id.*  AMUSO-53, 56, 60, 64, 67, 71, 72, 76,

77, 117, and 126. *Id.*

     **(b)(2)-2**       **Source Symbol Numbers**

     Exemption (b)(2)-2 has been asserted in conjunction with Exemption (b)(7)(D)-3 to

protect the permanent source symbol numbers of FBI sources. *Id.* ¶ 36.  Permanent symbol

numbers are assigned to confidential informants who report information to the FBI on a regular

basis pursuant to an "express" grant of confidentiality. *Id.*  The symbol number is used as an

administrative reporting tool to protect the actual, sensitive identity of an informant in

documents generated by the FBI. *Id.*  A symbol number consists of a two-letter abbreviation

which identifies the particular FBI field office where the symbol-numbered source is operating

or has operated, followed by a sequentially assigned number. *Id.*  For example, using a

fictitious symbol number, "NY 1234" for informant "JOHN DOE," the two letter abbreviation "NY" reveals that this is a source of the New York Field Office and the source is the 1234 symbol-numbered source of that office.  *Id.*  The symbol number would be used in all written reports in which JOHN DOE provided information to the FBI.  *Id.*  Therefore, every time "NY 1234" was  released, the reader of the document would know that the source behind the symbol number was the same individual reporting.  *Id.*  Thus, every time "NY 1234" was used by the FBI in a record, the number would always identify JOHN DOE.  *Id.*

Release of these source symbol numbers would indicate both the scope and location of FBI informant coverage within a particular geographic area.  *Id.*  ¶ 37.  If a particular symbol number such as "NY 1234" is released to the public at repeated times and in various documents, the identity of the source could be determined.  *Id.*  Each release of information in which the symbol number is disclosed reveals connections to dates, times, places, events and names from which the source's identity could be deduced.  *Id.*  A person familiar with the facts being reported by JOHN DOE could easily identify "NY 1234's" identity as being JOHN DOE given enough instances in which "NY 1234" provided information to the FBI.  *Id.*  Releasing the symbol number, along with information provided by the source from the source's personal perspective concerning the matters being investigated by the FBI, would allow an individual with knowledge of such matters to extrapolate the source's true identity.  *Id.*  This is especially true given the fact that regardless of the law enforcement investigative file in which the symbol number appears, "NY 1234" would always be the symbol number used to protect the true identity of informant JOHN DOE.  *Id.*  Thus, a confidential source symbol number is protected under FOIA Exemption (b)(2) since it is an internal administrative tool used by the FBI to protect informants' identities.  *Id.*  The protection of these identifiers is essential to maintaining

12

the integrity of the FBI's confidential source program where release could endanger the lives of informants or discourage cooperation by confidential sources. *Id.* Accordingly, because these source symbol numbers are related solely to the FBI's internal practices, disclosure would not serve any public interest, and would impede the FBI's effectiveness. *Id.* This information has been appropriately protected from disclosure pursuant to Exemption (b)(2)-2. *Id.* Exemption (b)(2)-2 is invoked on the following pages of Exhibit I: *Id.* AMUSO-56, 117, 126, 135, and 136. *Id.*

### (b)(2)-3    FBI Internal Investigative Techniques/Procedures and Information Pertaining to Undercover Activities

Exemption (b)(2)-3 is cited, in conjunction with (b)(7)(E)-1, to withhold certain techniques and procedures the FBI uses when it is conducting criminal investigations and undercover operations. *Id.* ¶ 38. Exemption (b)(2)-3 is cited here to protect such information as instructions to cooperating witnesses, the amount of money used to purchase evidence, and specific investigatory techniques used during the investigation. *Id.* Accordingly, because this information relates solely to the FBI's internal practices, because disclosure would not serve any public interest, and because disclosure would impede the FBI's effectiveness by providing plaintiff and other potential lawbreakers with information they could use to circumvent the techniques at issue, the FBI properly withheld this information pursuant to Exemption (b)(2)-3. *Id.*

Exemption (b)(2)-3 has also been asserted to protect the logistical details of an FBI undercover operation. *Id.* ¶ 39. If this internal administrative information were disclosed, it could provide insight into how the FBI conducts undercover operations. *Id.* This information could be used to predict how the FBI will conduct similar operations in the future. *Id.* The information could be used as means by which to exhaust the FBI's funding of a particular

13

investigation, which in turn could impede the effectiveness of the FBI's internal law enforcement procedures. *Id.* Accordingly, the FBI properly protected this information pursuant to Exemption (b)(2)-3. *Id.* Exemption (b)(2)-3 is invoked on the following pages of Exhibit I: AMUSO-1-2, 138-144, and 145-147. *Id.*

### 2.    FBI Properly Asserted Exemption 6

Exemption 6 of the FOIA protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The Supreme Court has interpreted the phrase 'similar files' to include *all information* that applies to a particular individual." *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999), (emphasis supplied), quoting *Department of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982). The Court has also emphasized that "both the common law and the literal understanding of privacy encompass the individual's control of information concerning his or her person." *U.S. Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 763 (1989).

In order to determine whether there would be a "clearly unwarranted invasion of personal privacy," the court must balance the interests of protecting "an individual's private affairs from unnecessary public scrutiny," and "the public's right to governmental information." *Lepelletier*, 164 F.3d at 46 (interior quotation marks omitted), citing *United States Dept. of Defense Dept. of Military Affairs v. FLRA*, 964 F.2d 26, 29 (D.C. Cir. 1992), quoting *Department of Air Force v. Rose*, 425 U.S. 352, 372 (1976). In determining how to balance the private and public interests involved, the Supreme Court has sharply limited the notion of "public interest" under the FOIA: "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an

14

agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Lepelletier*, 164 F.3d at 46 (editing by the court, emphasis supplied, interior quotation marks omitted), quoting *United States Dept. of Defense v. FLRA*, 510 U.S. 487, 497 (1994). *See also Reporters Committee*, 489 U.S. at 773. Information that does not directly reveal the operation or activities of the federal government "falls outside the ambit of the public interest that the FOIA was enacted to serve." *Id.* at 775. Further, "something, even a modest privacy interest, outweighs nothing every time." *National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989); *but see Lepelletier*, 164 F.3d at 48 (in extraordinary circumstance where the individuals whose privacy the government seeks to protect have a "clear interest" in release of the requested information, the balancing under Exemption 6 must include consideration of that interest).

        In asserting this exemption, each piece of information was scrutinized to determine the nature and strength of the privacy interest of any individual whose name and/or identifying information appears in the documents at issue. Hardy Decl. ¶ 41. In withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure. *Id.* In making this analysis, public interest information was determined to be information which would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. *Id.* In each instance where information was withheld, it was determined that individual privacy rights outweighed the public interest. *Id.*

        **(b)(6)-1       Names and/or Identifying Information of FBI Special Agents and Support Personnel**

Exemption (b)(6)-1 has been asserted in conjunction with Exemption (b)(7)(C)-1 to protect the names and/or identifying information of FBI SAs and support personnel responsible for conducting, assisting with and/or supervising the investigative activities reported in the documents concerning plaintiff and others. *Id.* These responsibilities include interviewing cooperating witnesses or sources and reviewing materials complied as a result of the investigation of plaintiff and others. *Id.* FBI SAs are not assigned to investigations or administrative duties by choice. *Id.* Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. *Id.* The privacy consideration is also to protect FBI SAs as individuals, from unnecessary, unofficial questioning as to the conduct of this and other investigations, whether or not currently employed by the FBI. *Id.*

FBI SAs conduct official inquiries into various criminal and national security cases. *Id.* ¶ 43. They come into contact with all strata of society. *Id.* They conduct searches and make arrests, both of which constitute reasonable, but nonetheless serious intrusions into peoples' lives. *Id.* Many of these people carry grudges which last for years and they may seek any excuse to harass the SA deemed responsible for these intrusions. *Id.* The publicity associated with the release of the SA's identity in connection with a particular law enforcement investigation could trigger hostility toward the SA. *Id.* Accordingly, FBI SAs referenced in the responsive records maintain a substantial privacy interest in not having their identities disclosed. *Id.* In addition, the FBI asserted Exemption (b)(6)-1 to protect the names and telephone numbers of FBI support employees. *Id.* These individuals were assigned to handle tasks relating to the investigation concerning plaintiff and others. *Id.* These FBI employees were, and possibly still are, in a position to access information regarding official law enforcement

investigations, and therefore could become the target of harassing inquiries for unauthorized access to investigative materials if their identities were disclosed.  *Id.*

The FBI next examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the FBI SAs and support employees.  *Id.*  ¶ 44.  The FBI could not identify any discernible public interest.  *Id.*  There have been no allegations that the FBI SAs or the professional support employees engaged in any type of significant misconduct which would establish a public interest in the disclosure.  *Id.*  Ultimately, disclosure of the names of the FBI SAs and the professional support employees would shed no light on the performance of the FBI's mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.  *Id.*  Thus, disclosure of the identities of these employees would constitute a clearly unwarranted invasion of their personal privacy; therefore, the FBI has properly asserted Exemption (b)(6)-1.  *Id.*  Exemption (b)(6)-1 is invoked on the following pages of Exhibit I:  AMUSO-1, 3, 6, 9, 15, 22, 27, 31, 33, 39, 45, 49, 52, 53, 56, 57, 59, 60, 64, 67, 71, 76, 77, 78, 85, 93, 103, 106, 117, 118, 121, 126, 127, 129, 132, and 134.  *Id.*

### (b)(6)-2          Names and/or Identifying Information of Third Parties Who Provided Information To FBI

Exemption (b)(6)-2 has been asserted to protect the names and/or identifying data of individuals who assisted the FBI by providing information within the records responsive to plaintiff's request.  *Id.*  ¶ 45.  Information provided by individuals during an interview is one of the most productive tools utilized by law enforcement agencies.  *Id.*  The largest roadblock in

successfully obtaining the desired information through an interview is the fear by the

interviewee that his or her identity could possibly be exposed and, consequently, they could be

harassed, intimidated or threatened with legal or economic reprisal, or possible physical harm.

*Id.* In order to surmount these obstacles, persons interviewed must be assured that their

identities will be held in the strictest confidence.  *Id.*  The FBI has attempted to release all

segregable portions of the information provided by these individuals without revealing their

identities.  *Id.*  The continued access to persons willing to provide pertinent facts bearing on a

particular investigation outweighs any benefits derived from releasing the identities of these

individuals.  *Id.*  Furthermore, there is no legitimate public interest to be served by releasing the

identities of persons who provided information to the FBI because it will not shed light on the

operations and activities of the FBI.  See supra at *Id.*  This information has been appropriately

protected from disclosure pursuant to Exemption (b)(6)-2.  *Id.*  Exemption (b)(6)-2 is invoked

on the following pages of Exhibit I:  AMUSO-1, 10, 49-55, 59-77, 79-116, 119, and 137.  *Id.*

    **(b)(6)-3**        **Names and/or Identifying Information of Third Parties**
                                **Merely Mentioned**

Exemption (b)(6)-3 has been asserted in conjunction with Exemption (b)(7)(C)-3 to

withhold the names and personal identifying information of third parties who were merely

mentioned in the documents responsive to plaintiff's request.  *Id.*  ¶46.  These individuals are

not of investigative interest to the FBI, but are mentioned in these communications.  *Id.*

The third parties merely mentioned maintain strong privacy interests in not having their

identities disclosed.  *Id.*  ¶ 47.  Disclosure of these third parties' names and identifying

information in connection with the investigation of plaintiff carries a strong negative

connotation.  *Id.*  In addition, disclosing the identities of these individuals could subject them to

possible harassment and could focus derogatory inferences and suspicion on them.   *Id.* Accordingly, the FBI has determined that these third parties maintain a substantial privacy interest in not having their identity disclosed.   *Id.*  After identifying the substantial privacy interests these individuals maintain, the FBI balanced their right to privacy against the public interest in the disclosure.   *Id.*  Because disclosure of the names of these third parties would not shed light on the FBI's performance of its statutory duties, the FBI determined that there is no public interest in the disclosure, and that disclosure of the names of these third parties would constitute a clearly unwarranted invasion of their personal privacy.   *Id.*  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(6)-3.   *Id.*  Exemption (b)(6)-3 is invoked for the following pages of Exhibit I:  AMUSO-2, 4, 59, 62, 63, 65, 69, 75, 86-88, 94-100, 104, 105, 107, 124, 125, and 137.   *Id.*

### (b)(6)-4        Names and/or Identifying Information Concerning Local Law Enforcement Personnel

Exemption (b)(6)-4 has been asserted in conjunction with Exemption (b)(7)(C)-4 to withhold the name and rank of a law enforcement officer of the Morris County, NJ Prosecutor's Office and a law enforcement officer of the New York City Police Department.   *Id.*  ¶ 48. These officers were acting in their official capacity and assisted in the interview of a confidential source.   *Id.*  The rationale for protecting the identities of FBI SAs and support personnel found at paragraphs 42 and 43 supra, also pertains to withholding the name and identifying information of these two police officers.   *Id.*  To release the identity of these officers could subject them as individuals to unnecessary, unwarranted harassment which would constitute a clearly unwarranted invasion of privacy.   *Id.*  Furthermore, the officers could become a prime target for compromise if their identities were known.   *Id.*

Disclosure of these individuals' identities could seriously jeopardize their effectiveness in the performance of their official duties. *Id.* ¶ 49. There is no public interest to be served by releasing this information as this information does not shed light on the FBI's performance of it mission. *Id.* Thus release would constitute a clearly unwarranted invasion of their personal privacy; therefore, the FBI has properly asserted Exemption (b)(6)-4. *Id.* Exemption (b)(6)-4 is invoked for the following pages of Exhibit I: AMUSO-60, 71, and 85. *Id.*

### (b)(6)-5    Names and/or Identifying Information of Third Parties of Investigative Interest

Exemption (b)(6)-5 has been asserted in conjunction with Exemption (b)(7)(C)-5 to protect the names and identifying information of third party individuals who are of investigative interest to the FBI and/or other law enforcement agencies. *Id.* ¶ 50. Identifying information withheld concerning these third parties includes individual names and other personal information. *Id.* Being linked with any law enforcement investigation carries a strong negative connotation and a stigma. *Id.* To release the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. *Id.* Accordingly, the FBI has determined that these individuals maintain a substantial privacy interest in not having their identities disclosed. *Id.* In making a determination whether to release the names and personal information concerning these third parties, the public's interest in disclosure was balanced against the individual's right to privacy. *Id.* It was determined that this information would not enlighten the public on how the FBI conducts its internal operations and investigations. *Id.* Thus, release of this information would be a clearly unwarranted invasion of privacy and the FBI has properly asserted Exemption (b)(6)-5. *Id.* Exemption (b)(6)-5 is invoked for the following pages of Exhibit I:  AMUSO-1-4, 49-52, 54, 55, 57, 58, 60-

63, 65, 66, 69-80, 81-84, 86-116, 119-125, 127-131, 134, 135, and 138-147.  *Id.*

### 3.   FBI Meets the Threshold Requirements of Exemption 7

Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  *Id.*  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.  *Id.*  The various records at issue in this case were compiled for criminal law enforcement purposes during the course of the FBI's performance of its law enforcement mission, including the investigation of criminal activities.  *Id.*

Because the records clearly meet the Exemption 7 threshold, the remaining inquiry is whether their disclosure would invade personal privacy, reveal the identities of confidential sources, reveal sensitive law enforcement techniques, and/or reveal information which if released could reasonably cause harm and/or endanger the life or physical safety of any individual.  *Id.*  ¶ 52.  In this investigation, the harm that could reasonably be expected to result from disclosure is invasion of personal privacy, revealing the identities of confidential sources, revealing a sensitive law enforcement technique, and endangering the life or physical safety of individuals.  Hardy Decl. ¶ 51.

### 4.   FBI Properly Applied Exemption 7(C)

FBI  properly applied Exemption 7(C).  The FOIA, 5 U.S.C. § 552, does not apply to matters that are:

> (7)  records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy. . . .

This exemption protects the identities of suspects and other persons of investigatory interest who are identified in agency records in connection with law enforcement investigations. *Reporters Comm. for Freedom of the Press v. U.S. Dept of Justice*, 816 F.2d 730, 780 (D.C. Cir. 1987), *modified on other grounds*, 831 F.2d 1124 (D.C. Cir. 1987), *rev'd on other grounds*, 489 U.S. 749 (1989); *Computer Prof'ls for Social Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996). Indeed, an agency in a FOIA case may categorically assert Exemption 7(C) to protect the identities of witnesses or other persons mentioned in law enforcement files in such a way as to associate them with criminal activity. *Reporters Comm. for Freedom of the Press*, 489 U.S. at 780; *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 893, 895-896 (D.C. Cir. 1995); *SafeCard Services*, *Inc. v. S.E.C.*, 926 F.2d 1197, 1206 (D.C. Cir. 1991).

The names of law enforcement officers who work on criminal investigations have also traditionally been protected against release by Exemption 7(C). *Davis v. U.S. Dept. of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992); *Lesar v. U.S. Dept of Justice*, 636 F.2d 472, 487-488 (D.C. Cir. 1980). Similarly, individuals who provide information to law enforcement authorities, like the law enforcement personnel themselves, have protectable privacy interests in their anonymity. *Computer Prof'ls for Social Responsibility*, 72 F.3d at 904; *Farese v. U.S. Dept. of Justice*, 683 F. Supp. 273, 275 (D.D.C. 1987). The fact that the requester might be able to ascertain the individuals' identities through other means, or that their identities have been disclosed elsewhere, does not diminish those individuals' privacy interests. *Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990); *Weisberg v. Dept. of Justice*, 745 F.2d 1476, 1491 (D.C. Cir. 1984).

Once a privacy interest has been established, as here, it must be balanced against the

public interest, if there is any, that would be served by disclosure. *Albuquerque Publ'g Co. v. Dept. of Justice*, 726 F. Supp. 851, 855 (D.D.C. 1989). The public interest in disclosure is limited to the FOIA's "core purpose" of shedd[ing] light on an agency's performance of its statutory duties." *Reporters Comm. for Freedom of the Press*, 489 U.S. at 773. This standard is not easily satisfied when law enforcement information pertaining to individuals is sought, for there "is no reasonably conceivable way in which the release of one individual's name . . . would allow citizens to know 'what their government is up to.'" *Fitzgibbon v. CIA,* 911 F.2d 755, 768 (D.C. Cir. 1990). *See also Albuquerque Publ'g Co.*, 726 F. Supp. at 855-56 (no public interest in disclosure of sensitive information DEA obtained about individuals and their activities, where such material would not shed light on DEA's conduct with respect to the investigation). In order to overcome legitimate privacy interests, the requester must demonstrate not only the existence of a public interest, but also that the public interest is both significant and compelling. *Senate of Puerto Rico v. Dept. of Justice*, 823 F.2d 574, 588 (D.C. Cir. 1987); *Stone v. FBI*, 727 F. Supp. 662, 667-69 (D.D.C. 1990).

When withholding information from disclosure pursuant to this exemption, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. Hardy Decl. ¶ 54. In asserting this exemption, each piece of information was scrutinized to determine the nature and strength of each individual's privacy interest. *Id.* The FBI identified the public interest in disclosure of the information to be whether the information in question would inform plaintiff or the general public about the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States and to provide

23

leadership and criminal justice services to federal, state, municipal and international agencies and partners. *Id.* In this case, every effort has been made to release all reasonably segregable information contained in these pages without infringing upon the privacy rights of the individuals mentioned in the documents. *Id.* As explained below, there is no legitimate public interest in the information that has been withheld pursuant to Exemption (b)(7)(C). *Id.*

### (b)(7)(C)-1     Names and/or Identifying Information of FBI Special Agents and Support Employees

Exemption (b)(7)(C)-1 has been asserted in conjunction with Exemption (b)(6)-1 to protect the names and/or identifying information of FBI SAs and support personnel responsible for conducting, assisting with and/or supervising the investigative activities reported in the documents concerning plaintiff and others. *Id.* ¶ 55. These responsibilities include interviewing cooperating witnesses, sources and reviewing materials compiled as a result of the investigation of plaintiff and others. *Id.* FBI SAs are not assigned to investigations or administrative duties by choice. *Id.* Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. *Id.* The privacy consideration is also to protect FBI SAs as individuals, from unnecessary, unofficial questioning as to the conduct of this and other investigations, whether or not currently employed by the FBI. *Id.*

FBI SAs conduct official inquiries into various criminal and national security cases. They come into contact with all strata of society. *Id.* ¶ 56. They conduct searches and make arrests, both of which constitute reasonable, but nonetheless serious intrusions into peoples' lives. *Id.* Many of these people carry grudges which last for years and they may seek any excuse to harass the SA deemed responsible for these intrusions. *Id.* The publicity associated

24

with the release of the SA's identity in connection with a particular law enforcement investigation could trigger hostility toward the SA. *Id.* Accordingly, FBI SAs referenced in the responsive records maintain a substantial privacy interest in not having their identities disclosed. *Id.* In addition, the FBI asserted Exemption (b)(7)(C)-1 to protect the names of FBI support employees. *Id.* These individuals were assigned to handle tasks relating to the investigation concerning plaintiff and others. *Id.* These FBI employees were, and possibly still are, in a position to access information regarding official law enforcement investigations, and therefore could become the target of harassing inquiries for unauthorized access to investigations if their identities were disclosed. *Id.*

The FBI next examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the FBI SAs and support employees. *Id.* ¶57. The FBI could not identify any discernible public interest. *Id.* There have been no allegations that the FBI SAs or the professional support employees engaged in any type of significant misconduct which would establish a public interest in the disclosure. *Id.* Ultimately, disclosure of the names of the FBI SAs and the professional support employees would shed no light on the performance of the FBI's mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. *Id.* Thus, disclosure of the identities of these employees could constitute an unwarranted invasion of their personal privacy; therefore, the FBI has properly asserted Exemption (b)(7)(C)-1. *Id.* Exemption (b)(7)(C)-1 is invoked on the following pages of Exhibit I: AMUSO-1, 3, 6, 9, 15, 22, 27, 31, 33, 39, 45, 49, 52, 53, 56,

25

57, 59, 60, 64, 67, 71, 76, 77, 78, 85, 93, 103, 106, 117, 118, 121, 126, 127, 129, 132, and 134. *Id.*

####      **(b)(7)(C)-2      Names and/or Identifying Information of Third Parties Who Provided Information to FBI**

Exemption (b)(7)(C)-2 has been asserted in conjunction with (b)(6)-2 to protect the names and/or identifying data of individuals who assisted the FBI by providing information within the records responsive to the plaintiff's request. *Id.* ¶ 58. Information provided by individuals during an interview is one of the most productive tools utilized by law enforcement agencies. *Id.* The largest roadblock in successfully obtaining the desired information through an interview is the fear by the interviewee that his or her identity may possibly be exposed and, consequently result in being harassed, intimidated or threatened with legal or economic reprisal, or possible physical harm. *Id.* In order to surmount these obstacles, persons interviewed must be assured that their identities will be held in the strictest confidence. *Id.* The FBI has attempted to release all segregable portions of the information provided by these individuals without revealing their identities. *Id.* The continued access to persons willing to provide pertinent facts bearing on a particular investigation outweighs any benefits derived from releasing the identities of these individuals. *Id.* Balancing this privacy interest against the public interest, the FBI found no legitimate public interest to be served by releasing the identities of private citizens who provided information to the FBI because it would not shed light on the operations and activities of the FBI. *Id.* The FBI has properly withheld the identities of these third party individuals providing information pursuant to Exemption (b)(7)(C)-2. *Id.* Exemption (b)(7)(C)-2 is invoked on the following pages of Exhibit I:

AMUSO-1, 10, 49-55, 59-77, 79-116, 119, and 137.   *Id.*

> **(b)(7)(C)-3     Names and/or Identifying Information**
> **of Third Parties Merely Mentioned**

Exemption (b)(7)(C)-3 has been asserted in conjunction with Exemption (b)(6)-3 to withhold the names and personal identifying information of third parties who were merely mentioned in the documents responsive to plaintiff's request.   *Id.*  ¶ 59.  These individuals are not of investigative interest to the FBI, but are mentioned in these communications.   *Id.*

The third parties merely mentioned maintain strong privacy interests in not having their identities disclosed.   *Id.* ¶ 60.  Disclosure of these third parties' names and identifying information in connection with the investigation of plaintiff carries a strong negative connotation.   *Id.*  In addition, disclosing the identities of these individuals could subject them to possible harassment and could focus derogatory inferences and suspicion on them.   *Id.* Accordingly, the FBI has determined that these third parties maintain a substantial privacy interest in not having their identities disclosed.   *Id.*  After identifying the substantial privacy interests these individuals maintain, the FBI balanced their right to privacy against the public interest in the disclosure.   *Id.*  Because disclosure of the names of these third parties would not shed light on the FBI's performance of its statutory duties, the FBI determined that there is no public interest in the disclosure, and that disclosure of the names of these third parties could constitute an unwarranted invasion of their personal privacy.   *Id.*  Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(C)-3.   *Id.*  Exemption (b)(7)(C)-3 is invoked on the following pages of Exhibit I:  AMUSO-2, 4, 59, 62, 63, 65, 69, 75, 86-88, 94-100, 104, 105, 107, 124, 125, and 137.   *Id.*

27

**(b)(7)(C)-4    Names and/or Identifying Information of Local Law Enforcement Personnel**

Exemption (b)(7)(C)-4 has been asserted in conjunction with Exemption (b)(6)-4 to withhold the names and ranks of law enforcement officers of the New Jersey and New York City Police Departments. *Id.* ¶ 61. The officers were acting in their official capacity and assisted in the investigation of plaintiff and others. *Id.* The rationale for protecting the identities of FBI SAs and support personnel found at paragraphs 42 and 43, supra, also pertains to withholding the names and identifying information of local police officers. *Id.* To release the identity of law enforcement employees could subject them to unnecessary, unwarranted harassment which could constitute an unwarranted invasion of privacy. Furthermore, these officers could become a prime target for compromise if their identities were known. *Id.*

The disclosure of these individuals' identity could seriously jeopardize their effectiveness in the performance of their official duties. *Id.* ¶ 62. There is no public interest to be served by releasing this information as this information does not shed light on the FBI's performance of it mission. *Id.* Thus, release could constitute an unwarranted invasion of their personal privacy; therefore, the FBI has properly asserted Exemption (b)(7)(C)-4. Exemption (b)(7)(C)-4 is invoked on the following pages of Exhibit I: AMUSO-60, 71, and 85. *Id.*

**(b)(7)(C)-5    Names and/or Identifying Information About Third Parties of Investigative Interest**

Exemption (b)(7)(C)-5 has been asserted in conjunction with Exemption (b)(6)-5 to protect the names and identifying information of third party individuals who were of investigative interest to the FBI and/or other law enforcement agencies. *Id.* ¶ 63. Identifying information withheld concerning these third parties include addresses, and other personal

28

information.  *Id.*  Being linked with any law enforcement investigation carries a strong negative

connotation and a stigma.  *Id.*  To release the identities of these individuals to the public could

subject them to harassment or embarrassment, as well as undue public attention.  *Id.*

Accordingly, the FBI has determined that these individuals maintain a substantial privacy

interest in not having their identities disclosed.  *Id.*  In making a determination whether to

release the names and personal information concerning these third parties, the public's interest

in disclosure was balanced against the individual's right to privacy.  *Id.*  It was determined that

this information would not enlighten the public on how the FBI conducts its internal operations

and investigations.  *Id.*  Thus, release of this information could be an unwarranted invasion of

privacy and the FBI has properly asserted Exemption (b)(7)(C)-5.  *Id.*  Exemption (b)(7)(C)-5 is

invoked on the following pages of Exhibit I:  AMUSO-1-4, 49-52, 54, 55, 57, 58, 60-63, 65, 66,

69-80, 81-84, 86-116, 119-125, 127-131, 134, 135, and 138-147.  *Id.*

     **5.**    **<u>FBI Properly Applied Exemption 7(D)</u>**

     Title 5, United States Code,  § 552 (b)(7)(D) (hereinafter Exemption 7(D)), exempts
from disclosure material that:

> could reasonably be expected to disclose the identity of a
> confidential source including a State, local or foreign agency or
> authority or any private institution which furnished information on
> a confidential basis, and, in the case of a record or information
> compiled by a criminal law enforcement authority in the course of
> a criminal investigation, or by an agency conducting a lawful
> national security intelligence investigation, information furnished
> by a confidential source.

     Exemption 7(D) recognizes that information furnished by third parties cooperating with

federal, state, or local law enforcement investigations is, by its very nature, confidential.

Significantly, the statute affords protection from disclosure to all the information furnished by

<center>29</center>

third-party sources, as well as the actual identity of the cooperating individual, if there has been an explicit assurance of confidentiality, or circumstances exist from which such an assurance could reasonably be inferred.  *U.S. Dept. of Justice v. Landano*, 508 U.S. 165 (1993).

This exemption recognizes the distinct likelihood that the identity of a source may often be determined from an analysis of the information furnished by the source himself.  Indeed, this becomes more inevitable when the analysis is made by a person familiar with the facts and circumstances on which the investigation was predicated.  Thus, to disclose the identity of a cooperating individual under such circumstances could be more than an unwarranted invasion of his/her privacy; it would breach the confidentiality under which he/she cooperated.

The *Landano* Court acknowledged that "[t]here may . . . be . . . generic circumstances in which an implied assurance of confidentiality fairly can be inferred."  *Landano*, 508 U.S. at 181.  The Court should take into consideration the informant's relation to the crime and the character of the crime for which information has been provided in determining implied grants of confidentiality.  Since *Landano*, courts have identified various crimes which warrant an implied assurance of confidentiality.  In *Mays v. Drug Enforcement Administration*, 234 F.3d 1324 (D.C. Cir. 2000), the Court of Appeals for this Circuit held that the crime of trafficking in cocaine is inherently so dangerous that individuals supplying information about such crimes generally should be entitled to an implied grant of confidentiality.

Numerous confidential sources report to the FBI on a regular basis and are "informants" in the common meaning of the term.  Hardy Decl. ¶ 65.  Some of the sources provide information under an express assurance of confidentiality.  *Id.*  Further, during the course of an investigation, other individuals are interviewed under circumstances from which an assurance of

30

confidentiality can reasonably be inferred. *Id.* These individuals are considered to be confidential informants or sources since they furnish information only with the understanding that their identities and the information provided will not be divulged outside the FBI. Information provided by these individuals is singular in nature, and if released, could reveal their identity. *Id.*

During the course of the FBI's investigation, FBI SAs sought the assistance of numerous individuals in obtaining information to aid its investigation. *Id.* ¶ 66. Information was provided by FBI symbol number sources and by other third parties under an implied or express grant of confidentiality *Id.*

These individuals were placed directly in positions that could subject them to acts of reprisal, harassment, or an unnecessary amount of public attention if the FBI disclosed their cooperation. *Id.* ¶ 67. The FBI has learned through experience that individuals who provide information about subjects under investigation must be free to do so without fear of reprisal. *Id.* Individuals who provide the investigative information must be free to furnish that information with complete candor and without the understandable tendency to hedge or withhold information out of fear that their names or their cooperation with the FBI will later be made public. *Id.* Those who provide information in these investigations must be secure in the knowledge that their assistance and their identities will be held in confidence. *Id.*

### (b)(7)(D)-1    Names and/or Identifying Data and Information Provided by Third Parties under an "Implied" Assurance of Confidentiality

Exemption (b)(7)(D)-1 has been asserted in conjunction with (b)(6)-2 and (b)(7)(C)-2 to protect the names, identifying information and information provided by third parties to the FBI under an implied grant of confidentiality during the course of the FBI's investigation of the

31

plaintiff and others. *Id.* ¶68. These individuals were interviewed under circumstances from which an assurance of confidentiality may be implied since the individuals were reporting on activities of organized crime families. *Id.* Interviews conducted under such assurances of confidentiality warrant the protection of the interviewee's name as well as the information the interviewee provided, but only to the extent that the information could identify the interviewee. *Id.* In the processing of the records concerning plaintiff, the objective was to release as much segregable information as possible without revealing the identities of the individuals interviewed. *Id.* Therefore, the primary concern in processing interviews became the protection of the interviewees' identities. *Id.* If the interviewees' identities were released, it could subject him or her to embarrassment, humiliation or possible physical harm not only for themselves, but also for their families. *Id.* Protection extends beyond the name of the interviewee, and includes all other possible identifying information about the interviewee. *Id.*

The FBI protected the contents of the interview conducted with the third parties because individuals who have knowledge of the activities that gave rise to the investigation of the plaintiff and others could clearly determine his/her identity. *Id.* ¶ 69. The sources provided valuable information that is detailed and singular in nature. *Id.* The disclosure of the identity of these individuals could have disastrous consequences. *Id.* Given the violent nature of the crimes reportedly committed by plaintiff, disclosure of the identities of the informants could subject him/her to violent reprisals. *Id.* In addition, disclosure of the identities of confidential sources who are expressly promised confidentiality has wider implications. *Id.* If the FBI disclosed the identities of confidential sources that entered into express agreements, that revelation would have a chilling effect on the activities and cooperation of other FBI

32

confidential sources.   *Id.*   The FBI has found that it is only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future.   *Id.* Thus, the identity of, and the information provided by the sources who were expressly promised confidentiality are properly withheld pursuant to FOIA Exemption (b)(7)(D)-1.   *Id.*   Exemption (b)(7)(D)-1 is invoked on the following pages of Exhibit I:   AMUSO-1, 2, 49-57, 59-78, 80-116, 131, 137, and 146.   *Id.*

### (b)(7)(D)-2     Source File Numbers

Exemption (b)(7)(D)-2 has been asserted in conjunction with Exemption (b)(2)-1 to protect the informant file numbers of  permanent confidential symbol number sources of the FBI.   *Id.*   ¶ 70.   Similar in usage to the confidential source symbol number, these confidential source file numbers are also assigned in sequential order to confidential informants who report information to the FBI on a regular basis pursuant to an express assurance of confidentiality. *Id.*   The confidential source file is unique to the particular confidential informant and is used only in documentation relating to that particular informant.   *Id.*

Disclosure of confidential source file numbers at various times and in various documents could ultimately identify these sources since it would reveal the connections of confidential informants to the information provided by them.   *Id.*   ¶ 71.   Repeated release of confidential source file numbers along with the information provided by these confidential informants would narrow the possibilities of their true identities.   *Id.*   This is especially true since each confidential source file number is assigned to only one confidential informant.   *Id.*

The disclosure of the identities of the confidential sources would have a chilling effect

on the activities and cooperation of both current and future FBI confidential informants.  *Id.* ¶ 72.  It is only with the understanding of complete confidentiality that the aid of such informants can be enlisted, and only through this assurance of confidentiality that these informants can be persuaded to continue their assistance in providing information to the FBI in the future.  *Id.* Accordingly, the disclosure of the confidential source file numbers could reasonably be expected to identify  permanent confidential sources of the FBI.  *Id.*  Therefore, this information has been appropriately protected from disclosure pursuant to Exemption (b)(7)(D)-2.  *Id.* Exemption (b)(7)(D)-2 is invoked on the following pages of Exhibit I:  AMUSO-53, 56, 60, 64, 67, 71, 72, 76, 77, 79, 117, and 126.  *Id.*

<u>(b)(7)(D)-3</u>     **Source Symbol Numbers and Information Furnished by Symbol Numbered Sources**

Exemption (b)(7)(D)-3 has been asserted in conjunction with Exemption (b)(2)-2 to withhold FBI source symbol numbers and information provided by the symbol numbered sources.  *Id.* ¶ 73.  Paragraphs 36 and 37, <u>supra</u>, describe the administrative aspect of using a source symbol number to protect the identity of an FBI source.  *Id.* ¶ 73.   Source symbol numbers are assigned to confidential sources who have been developed, instructed, closely monitored and in many cases paid for his/her services.  *Id.*  These sources report information to the FBI under an express grant of confidentiality.  *Id.*  Within the FBI, knowledge of these sources' identities is limited to those FBI employees who have a legitimate need for the information.  *Id.*  Also, sources to whom the FBI has provided source symbol numbers are not referred to by name in any document which contains information they provided.  *Id.*

Considerable harm to the informants and to ongoing FBI operations could result from releasing the identity of the symbol numbered sources.  *Id.* ¶ 74.  The sources provided

34

valuable information concerning plaintiff and other persons who were of investigative interest to the FBI or other law enforcement agencies during the course of this investigation. *Id.* Information provided was detailed and singular in nature concerning certain criminal activity. *Id.* The source names are not referenced, but the source symbol numbers are cited where the sources are referred to in the responsive records. *Id.* The fact that these individuals were assigned source symbol numbers is a positive indicium that supports an express assurance of confidentiality. *Id.* If the FBI disclosed the informants' source symbol numbers, the sources' identity could be ascertained by a person knowledgeable of the events that gave rise to the FBI's investigation of plaintiff and other subjects. *Id.* If the FBI disclosed the informants' identity, the informants as well as his/her family could be subjected to embarrassment, humiliation, and physical/mental harm. *Id.* In addition, such a disclosure has wider implications. *Id.* If the FBI disclosed the identity of these confidential sources who entered into an express confidentiality agreement, that revelation could have a chilling effect on the activities and cooperation of other FBI confidential sources. *Id.* It is only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through assurances of this confidence, that these sources can be persuaded to continue providing valuable assistance in the future. *Id.* Thus, the FBI has properly withheld this information pursuant to FOIA Exemption (b)(7)(D)-3. *Id.* Exemption (b)(7)(D)-3 is invoked on the following pages of Exhibit I: AMUSO-56, 117, and 126. *Id.*

### (b)(7)(D)-4    Identifying Data and Information Provided by Source Symbol Numbered Informants

Exemption (b)(7)(D)-4 was asserted to withhold the identifying data and information received from symbol numbered sources with the understanding that it would be held in confidence. *Id.* ¶ 75. As a matter of policy and practice, all symbol numbered sources are

given an express grant of confidentiality.  *Id.*  Illustrative of this express assurance of

confidentiality is the manner in which we treat such information within the FBI.  *Id.*  The

identities of such sources are not referred to by name in the FBI document which records the

information they furnished.  *Id.*  The identities of these sources are known to very few FBI

employees and are available only on a "need to know" basis.  *Id.*  These special precautions are

needed because of the sensitive nature of the information being provided and harm that may

befall these sources if their identities were revealed.  *Id.*  The manner in which the FBI actually

obtains information from these sources is also demonstrative of the expressed assurance of

confidentiality under which it is received.  *Id.*  The information is received only under

conditions which guarantee the contact will not be jeopardized.  *Id.*  It is only with the

understanding of complete confidentiality that the aid of such people can be enlisted, and only

through this confidence that such individuals can be persuaded to continue providing valuable

assistance in the future.  *Id.*  The FBI has properly withheld this information pursuant to FOIA

Exemption (b)(7)(D)-4.  *Id.*  Exemption (b)(7)(D)-4 is invoked on the following pages of

Exhibit I: AMUSO-4, 57, 58, 117-128, 135, and 136.  *Id.*

### (b)(7)(D)-5    Foreign Government Agency Information (Express Confidentiality)

Confidential source material protected in the 92A-HQ-1020655-C1-5 file by the

assertion of exemption (b)(7)(D) includes information provided to the FBI from a foreign

agency or authority with an explicit understanding of confidentiality.  *Id.*  ¶ 76.  The FBI, in

connection with a wide variety of criminal and national security investigations, solicits and

receives information regularly from state, local, and foreign agencies and authorities.  *Id.*

Inherent in the cooperative effort is the mutual understanding that the identity of such a source

and the information provided by it will be held in confidence by the FBI, and not released

pursuant to FOIA and Privacy Act requests.   *Id.*   If disclosure of information provided in

confidence were to be made public pursuant to FOIA and Privacy requests, cooperation between

the FBI and the foreign agencies and authorities would be greatly diminished, causing great

detriment to effective law enforcement.   *Id.*   The FBI has properly withheld this information

pursuant to FOIA Exemption (b)(7)(D)-5.   *Id.*   Exemption (b)(7)(D)-5 is invoked on AMUSO-

4, Exhibit I.   *Id.*

### 6.   **FBI Properly Applied Exemption 7(E)**

Exemption 7(E) of the FOIA provides protection for all information compiled for law

enforcement purposes when release "would disclose techniques and procedures for law

enforcement investigations or prosecutions, or would disclose guidelines for law enforcement

investigations or prosecutions if such disclosure could reasonably be expected to risk

circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

The first clause of Exemption 7(E) affords "categorical" protection for "techniques and

procedures" used in law enforcement investigations or prosecutions. *Smith v. Bureau of*

*Alcohol, Tobacco and Firearms,* 977 F. Supp. 496, 501 (D.D.C. 1997) (citing *Fisher v. U.S.*

*Dept. of Justice*, 772 F. Supp. 7, 12 n. 9 (D.D.C. 1991), aff'd, 968 F.2d 92 (D.C. Cir. 1992)).

While Exemption 7(E)'s protection is generally limited to techniques or procedures that are not

well known to the public, even commonly known procedures may be protected from disclosure

if the disclosure could reduce or nullify their effectiveness. *See, e.g., Coleman v. FBI*, 13 F.

Supp. 2d. 75, 83 (D.D.C. 1998) (applying 7(E) to behavioral science analysis and details of

polygraph examination); *Perrone v. FBI*, 908 F. Supp. 24, 28 (D.D.C. 1995) (applying 7(E) to

type of polygraph test, type of machine used, and polygraph questions and sequence).  In

justifying the application of Exemption 7(E), the agency may describe the general nature of the

technique while withholding the full details.  *See e.g. Bowen v. FDA*, 925 F.2d 1225, 1228 (9th

Cir. 1991).  The agency is not, however, required to describe secret law enforcement techniques, even in general terms, if the description would disclose the very information sought to be withheld.  *Coleman*, 13 F. Supp. 2d at 83; *Smith*, 977 F. Supp. at 501.

Exemption 7(E)'s second clause separately protects "guidelines for law enforcement investigations or prosecutions if [their] disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  Accordingly, this clause of the Exemption protects any "law enforcement guideline" that pertains to the prosecution or investigative stage of a law enforcement matter whenever its disclosure "could reasonably be expected to risk circumvention of the law."  *See, e.g., PHE, Inc. v. U.S. Dept. of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993) ("release of FBI guidelines as to what sources of information are available to its agents might encourage violators to tamper with those sources of information and thus inhibit investigative efforts"); *Jimenez v. FBI*, 938 F. Supp. 21, 30 (D.D.C. 1996) (applying 7(E) to gang-validation criteria used by Bureau of Prisons to determine whether individual is gang member).

## (b)(7)(E)-1     Internal Techniques and Procedures and Information Pertaining to FBI Undercover Operation

Exemption (b)(7)(E)-1 has been asserted in conjunction with Exemption (b)(2)-3 to protect procedures and techniques used by FBI Special Agents during the investigation of plaintiff.  Hardy Decl. ¶ 78.  If the FBI were to disclose the procedures as to how it conducts undercover operations and release details of the specific techniques used during the undercover operation it could jeopardize any future criminal investigations and undercover operations conducted by the FBI.  *Id.*  Release of these techniques could reasonably be expected to alert

38

the subjects in other criminal investigations to how the FBI conducts undercover operations and risk circumvention of the law.    *Id.*  Exemption (b)(7)(E)-1 is invoked on the following pages of Exhibit I:  AMUSO-1-2, 135, and 138-147.    *Id.*

       **7.**     **FBI Properly Applied Exemption 7(F)**

      Exemption (b)(7)(F) is cited to protect symbol number informants and the names and identifying information concerning cooperating witnesses who provided information to the FBI concerning the criminal activities of plaintiff and/or other individuals of investigative interest in the records responsive to plaintiff's request.  The exemption has been asserted to protect information, the release of which could reasonably be expected to endanger the life and/or physical safety of these cooperating individuals in light of the crimes reportedly committed by plaintiff and other members of organized crime families.  It is reasonable to expect that release of their identities would place them at great risk.  The FBI has properly withheld this information pursuant to FOIA Exemption (b)(7)(F).  Exemption (b)(7)(F) is invoked on the following pages of Exhibit I:   AMUSO-1, 49-55, 57-117, 120-128, 135, 137, and 146.

       **C.**     **FBI has Released All Segregable Information**

      The Court of Appeals for the District of Columbia Circuit has held that a District Court considering a FOIA action has "an affirmative duty to consider the segregability issue *sua sponte*." *Trans-Pacific Policing Agreement v. United States Customs Service*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).  The FOIA requires that, if a record contains information that is exempt from disclosure, any "reasonably segregable" information must be disclosed after deletion of the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions." 5 U.S.C. § 552(b); *Mead Data Cent., Inc. v. United States Dept. of the Air Force*,

566 F.2d 242, 260 (D.C. Cir. 1977).

In order to demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" rather than "conclusory statements." *Mead Data*, 566 F.2d at 261. The agency is not, however, required "to provide such a detailed justification" that the exempt material would effectively be disclosed. *Id.* All that is required is that the government show "with 'reasonable specificity'" why a document cannot be further segregated. *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996). Moreover, the agency is not required to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Mead Data*, 566 F.2d at 261, n.55.

FBIHQ has processed and released all segregable information from the documents responsive to plaintiff's request. Hardy Decl. ¶ 82. The FBI has carefully examined those documents responsive to plaintiff's FOIA request for records on himself and released 147 pages with redactions. *Id.* Furthermore, the FBI carefully examined the responsive material and determined that the information withheld from plaintiff, if disclosed, could reasonably be expected to impede the effectiveness of the FBI's internal law enforcement procedures and practices, cause unwarranted invasions of the privacy interests of numerous individuals, disclose confidential sources and the information they provided to the FBI, disclose techniques and procedures for law enforcement investigations and endanger the safety of third parties. *Id.*

## V. CONCLUSION

Defendants have demonstrated that they responded properly to Plaintiff's FOIA request, releasing to him all records and portions thereof not exempted from disclosure. Accordingly,

Defendants request that their motion for summary judgment be granted.

Respectfully submitted,

/s/
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

/s/
CHARLOTTE A. ABEL, D.C. Bar #388582
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
Tel. No. (202) 307-2332


JAMES PAXTON
Paralegal Specialist

41

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27ʰ day of August, 2008, I caused a true and correct

copy of the foregoing Defendants' Motion for Summary Judgment, statement of material facts

not in genuine dispute, declarations of David M. Hardy and Wilson Moorer with exhibits

attached thereto, and proposed order to be served by first class mail, postage prepaid, on:

VITTORIO AMUSO
R38740-079
Big Sandy
U.S. Penitentiary
Inmate Mail/Parcels
P.O. Box 2068
Inez, KY 41224


__/s/_____
CHARLOTTE A. ABEL, D.C. Bar #388582
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
Tel. No. (202) 307-2332

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VITTORIO AMUSO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1935 (RJL) |
| | ) | |
| DEPARTMENT OF JUSTICE, <u>et</u> <u>al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE ISSUE

Pursuant to LCvR 7(h), defendants, U.S. Department of Justice ("DOJ")and the Federal Bureau of Investigation ("FBI") respectfully submit this statement of material facts as to which there are no genuine dispute. The attached declaration of: David M. Hardy , Section Chief of the Records /Information Dissemination Section ("RID"), Records Management Division ("RMD"), at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington DC, support this statement.

1.    By letter dated April 10, 2007 to FBIHQ, plaintiff submitted a Freedom of Information and Privacy Act (FOIA/PA) request for

> any and all documents, records, memoranda, notes, statements and other information or data in whatever form maintained by your agency that relates to and/or makes reference to Amuso directly or indirectly. More specifically, any data or information in the possession or control of your agency related to and/or generated by the criminal investigation and prosecution of Amuso by federal authorities in and around the U.S. Federal Districts of New York.

Declaration of David Hardy ("Hardy Decl.") ¶ 6. Plaintiff specifically requested information dated from January 1980 to the present. *Id*. and Exhibit A attached thereto.

1

2.      By letter dated April 16, 2007 from the plaintiff to the FBI Albany Field Office, plaintiff submitted an identical FOIA/PA request for any and all records pertaining to himself. See ¶ 6., supra.  Hardy Decl. ¶ 7. and exhibit B attached thereto.

3.      By letter dated May 3, 2007 from FBIHQ to the plaintiff, FBIHQ acknowledged receipt of plaintiff's FOIPA request and advised that his case was assigned FOIPA number 1076768-000.  Hardy Decl. ¶8.   In addition, plaintiff was advised that his FOIPA request to the Albany field office was forwarded to FBIHQ for handling.[1]  Id. and Exhibit C attached thereto.

4.      By letter dated May 7, 2007 from FBIHQ to the plaintiff, acknowledgment was made of plaintiff's Albany FOIPA request and was assigned FOIPA number 1076768-000. Hardy Decl. ¶ 9 and Exhibit D attached thereto.

5.      By letter dated May 21, 2007 from FBIHQ to the plaintiff, the plaintiff was advised that records which may be responsive to his Albany FOIPA request were destroyed (date unknown).[2]  Hardy Decl. ¶ 10.  Plaintiff was advised that if he desired a check of the field office files, he must write directly to the appropriate field office(s).[3]   Id.  In addition, plaintiff was informed that he could file an administrative appeal with the Office of Information and Privacy ("OIP"), United States Department of Justice, Washington , DC.  Id.  and Exhibit E attached thereto.

6.      By letter dated June 20, 2007 from OIP to the plaintiff, plaintiff was advised of the receipt of his appeal and its assigned number.  Hardy Decl. ¶ 11. and Exhibit F attached

---

[1]  A second acknowledgment letter was sent to the plaintiff by letter dated May 7, 2007.

[2]  The search of the indices to the CRS for FBIHQ main files located no record.

[3]  28 CFR §§ 16.3(a), 16.41(a) 2007.

2

thereto**.**

7.     By letter dated July12, 2007 from the plaintiff to FBIHQ, plaintiff inquired about the "status of my two FOIA/PA requests sent to your office for referral to Scranton, PA.; and New York City, NY FBI field offices".  Hardy Decl. ¶ 12.  Plaintiff's letter contested the referral of his Scranton letter to FBIHQ.  *Id.*  Plaintiff provided copies of certified mail receipts dated April 11, 2007 and April 26, 2007 as documentation for the above FOIPA requests.  *Id.* and Exhibit G attached thereto.

8.     By letter dated August 8, 2007, from OIP to the plaintiff, OIP advised plaintiff that they are affirming the actions of the FBI that resulted in his appeal for access to records pertaining to himself at the Albany Field Office and FBIHQ. Hardy Decl. ¶ 13 and Exhibit H attached thereto.

9.      The Bureau of Prisons FOIA Office received a three page referral of information from the FBI on May 2, 2008.  Moorer Decl., Attachment A (Exhibit J, Attachment A).  The BOP Central Office responded to the referral from the FBI on June 20, 2008.  A determination was made to withhold the 3 pages of information in their entirety.  The withholding of the 3 pages of information was made pursuant to 5 U.S.C. § 552(b)(7)(C) and (b)(7)(F).  Moorer Decl., Attachment B (Exhibit J, Attachment B.)

10.     On  October 25, 2007, plaintiff filed a Complaint in the U.S. District Court for the District of Columbia, seeking a release of all records responsive to his April 10, 2007 FOIA/Privacy Act request and that the FBI provide a "Vaughn" index regarding the records at issue. Hardy Decl. ¶ 14.

Respectfully submitted,

___/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


___/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


___/s/_____
CHARLOTTE A. ABEL, DC BAR # 388582
Assistant United States Attorney

JAMES PAXTON
Paralegal Specialist

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| VITTORIO AMUSO,<br># 38740-079<br>USP-BIG SANDY<br>P.O. BOX 2068<br>INEZ, KY 41224 | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) <br> ) | Civil Action No. 07-CV-01935 |
| v. | ) <br> ) | |
| U.S. DEPARTMENT OF JUSTICE,<br>FEDERAL BUREAU OF INVESTIGATION | ) <br> ) <br> ) | |
| Defendants. | ) <br> ) <br> ) | |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C. I have held this position since August 1, 2002.

Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge

Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom

of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From

October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and

routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law

in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 194

1

employees who staff a total of ten (10) FBIHQ units and a field operational service center unit whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA; Privacy Act; Executive Order 12958, as amended; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the treatment which has been afforded the FOIA/Privacy Act request of Vittorio Amuso which seeks access to records pertaining to himself dated from January 1980 to the present maintained by FBIHQ.

(4)    In accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), this declaration, which is being submitted in support of defendant FBI's motion for summary judgement, will provide the Court and plaintiff with an explanation for the procedures used in reviewing and processing the FBIHQ records responsive to plaintiff's FOIA/Privacy Act request, and provide a justification for the FBI information which has been withheld from disclosure in full or in part pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. § 552(a) (j)(2) and FOIA Exemptions 2, 6, 7(C), 7(D), 7(E) and 7(F), 5 U.S.C. §§ 552 (b)(2), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F).

2

## CRIMINAL HISTORY OF VITTORIO AMUSO

(5)    Vittorio Amuso is a ruling figure of the Luchese LCN Family.  His organized

crime involvement includes narcotics, labor racketeering, murder, and extorting kickbacks.

Plaintiff was convicted in 1992 of fifty-four (54) counts of murder, extortion and labor

racketeering.  He was sentenced to life in prison.

## PROCEDURAL HISTORY OF PLAINTIFF'S
## FOIA/PRIVACY ACT REQUEST

(6)    By letter dated April 10, 2007 to FBIHQ, plaintiff submitted a Freedom of

Information and Privacy Act (FOIA/PA) request for "any and all documents, records,

memoranda, notes, statements and other information or data in what ever form maintained by

your agency that relates to and/or makes reference to Amuso directly or indirectly.  More

specifically, any data or information in the possession or control of your agency related to and/or

generated by the criminal investigation and prosecution of Amuso by federal authorities in and

around the U.S. Federal Districts of New York."  Plaintiff specifically requested information

dated from January 1980 to the present.  **(See Exhibit A.)**

(7)    By letter dated April 16, 2007 from the plaintiff to the FBI Albany Field Office,

plaintiff submitted an identical FOIA/PA request for any and all records pertaining to himself.

See ¶ 6, supra.  **(See Exhibit B.**)

(8)    By letter dated  May 3, 2007 from FBIHQ to the plaintiff, FBIHQ acknowledged

receipt of plaintiff's FOIPA request and advised that his case was assigned FOIPA number

1076768-000.  In addition, plaintiff was advised that his FOIPA request to the Albany field office

3

was forwarded to FBIHQ for handling.[1]  **(See Exhibit C.)**

(9)    By letter dated May 7, 2007 from FBIHQ to the plaintiff, acknowledgment was made of plaintiff's Albany FOIPA request and was assigned FOIPA number 1076768-000.  **(See Exhibit D.)**

(10)    By letter dated May 21, 2007 from FBIHQ to the plaintiff, the plaintiff was advised that records which may be responsive to his Albany FOIPA request were destroyed (date unknown).[2]  Plaintiff was advised that if he desired a check of our field office files, he must write directly to the appropriate field office(s).[3]  In addition, plaintiff was informed that he could file an administrative appeal with the Office of Information and Privacy ("OIP"), United States Department of Justice, Washington , DC.  **(See Exhibit E.)**

(11)    By letter dated June 20, 2007 from OIP to the plaintiff, plaintiff was advised of the receipt of his appeal and its assigned number.  **(See Exhibit F.)**

(12)    By letter dated July 12, 2007 from the plaintiff to FBIHQ, plaintiff inquired about the "status of my two FOIA/PA requests sent to your office for referral to Scranton, PA.; and New York City, NY FBI field offices".  Plaintiff's letter contested the referral of his Scranton letter to FBIHQ.  Plaintiff provided copies of certified mail receipts dated April 11, 2007 and April 26, 2007 as documentation for the above FOIPA requests.  **(See Exhibit G.)**

(13)    By letter dated August 8, 2007, from OIP to the plaintiff, OIP advised plaintiff that they are affirming the actions of the FBI that resulted in his appeal for access to records

---

[1]  A second acknowledgment letter was sent to the plaintiff by letter dated 5/7/07.

[2]  The search of the indices to the CRS for FBIHQ main files located no record.

[3]  28 CFR §§ 16.3(a), 16.41(a) 2007.

4

pertaining to himself at the Albany Field Office and FBIHQ. **(See Exhibit H.)**

(14)    On October 25, 2007, plaintiff filed a Complaint in the U.S. District Court for the District of Columbia, seeking a release of all records responsive to his April 10, 2007 FOIA/Privacy Act request and that the FBI provide a "Vaughn" index regarding the records at issue.

## EXPLANATION OF FBI'S CENTRAL RECORDS SYSTEM

(15)    The CRS enables the FBI to maintain information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. The CRS is organized into a numerical sequence of files called FBI "classifications," which are broken down according to subject matter. The subject matter of a file may correspond to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). Certain records in the CRS are maintained at FBIHQ, whereas records that are pertinent to specific field offices of the FBI are maintained in those field offices. While the CRS is primarily designed to serve as an investigative tool, the FBI searches the CRS for documents that are potentially responsive to FOIA and Privacy Act requests. The mechanism that the FBI uses to search the CRS is the Automated Case Support System ("ACS").

(16)    The ACS was implemented for all field offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that were previously automated. ACS can be described as an internal computerized subsystem of the CRS. Because the CRS cannot electronically query the case files for data, such as an individual's name or social security number, the required information is duplicated and moved to the ACS so that it can be searched.

More than 105 million records from the CRS were converted from automated systems previously

utilized by the FBI. Automation did not change the CRS; instead, automation has facilitated

more economic and expeditious access to records maintained in the CRS.

(17)    The retrieval of data from the CRS is made possible through the ACS using the

General Indices, which are arranged in alphabetical order.[4] The entries in the General Indices fall

into two categories:

> (a) A "main" entry -- A "main" entry, or "main" file, carries the name
> corresponding with a subject of a file contained in the CRS.
>
> (b) A "reference" entry --"Reference" entries, sometimes called
> "cross-references," are generally only a mere mention or reference
> to an individual, organization, or other subject matter, contained in
> a document located in another "main" file on a different subject
> matter.

(18)    Searches made in the General Indices to locate records concerning a particular

subject, such as Vittorio Amuso are made by searching the subject requested in the index.

(19)    The ACS consists of three integrated, yet separately functional, automated

applications that support case management functions for all FBI investigative and administrative

cases:

> (a) Investigative Case Management ("ICM") – ICM provides the ability to open,

assign, and close investigative and administrative cases as well as set, assign, and track leads.

The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens

a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs").

When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is used by

---

[4] The General Indices are not only automated but also include index cards which allow a
manual search for records that pre-date the implementation of ACS on October 16, 1995.

FBIHQ, as well as all FBI field offices and Legats that are conducting or assisting in the investigation. Using a fictitious file number "111-HQ-12345" as an example, an explanation of the UCFN is as follows: "111" indicates the classification for the specific type of investigation, "HQ" is the abbreviated form used for the OO of the investigation, which in this case is FBIHQ; and "12345" denotes the individual case file number for the particular investigation.

(b) Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 99.5 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(20)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could

7

not be readily retrieved. The FBI files would thus be merely archival in nature and could not be

effectively used to serve the mandated mission of the FBI, which is to investigate violations of

federal criminal and national security statutes. Therefore, the General Indices to the CRS files

are the means by which the FBI can determine what retrievable information, if any, the FBI may

have in its CRS files on a particular subject matter or individual, i.e., Vittorio "Vic" Amuso.

## EXPLANATION OF THE "I" AND "S" DRIVE SYSTEM

(21)    Plaintiff's letter dated April 10, 2007 requested a search of the "I-Drive" system.

An "I drive" is simply a shared drive in a computer network. The "I drive" has now been

renamed in many FBI field offices as shared drives with such letters as "S," "T," etc. Shared

("S") drives are found in almost every computer network. These shared computer drives are used

in field offices to hold preliminary work product investigative documents drafted by FBI SAs in

order to allow SSAs to review and approve them before they are finalized, uploaded, and

serialized in the official investigative file. FBIHQ does not maintain an "I drive" that is similar

in nature to the shared drives maintained by field offices. Since these shared drives were not

likely to contain information responsive to plaintiff's request, they were not searched.

## SEARCH FOR RECORDS RESPONSIVE
## TO PLAINTIFF'S REQUEST TO FBIHQ

(22)    In response to plaintiff's FOIPA request, RIDS personnel conducted a search of

the automated indices for responsive documents at FBIHQ. A search of the CRS using the

names "Amuso, Vittorio Benito" covered a phonetic breakdown of the name. For example, this

search would locate records using the phonetic sounds of the last, middle, and first names. The

FBI also used plaintiff's date of birth and social security number to facilitate the identification

of requested records.

### ·FBIHQ RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(23)    A de novo search of the CRS indices was conducted in response to this litigation

for HQ records responsive to plaintiff's request. The following cross-references are identified as

being responsive:  66F-HQ-A1074181-63; 92A-HQ-1020655-C1-5; 183-11597-271; 12-0-8733;

91-61044-4; 92A-HQ-1043395-I-1, 12, 13x2, 28 and 29; 89-6289-4; and 183-8533-2107X6,

4932, 4955, 4970, 5008, 5062, 5608, 5611, and 5664.

### SEARCH FOR RECORDS RESPONSIVE
### TO PLAINTIFF'S REQUEST TO ALBANY

(24)    A search of the indices at the Albany Field Office revealed that records which

may be responsive to plaintiff's FOIPA request were destroyed (date unknown).

### EXPLANATION OF THE CODED FORMAT USED FOR THE
### JUSTIFICATION OF DELETED MATERIAL

(25)    All documents were processed to achieve maximum disclosure consistent with

the access provisions of the Privacy Act and FOIA.  Every effort was made to provide plaintiff

· with all material in the public domain and with all reasonably segregable portions of releasable

material.  To further describe the information withheld could identify the material which the FBI

seeks to protect.  Copies of the pages being released today in part and in full are attached as

**Exhibit I**.  Each page of **Exhibit I** is consecutively numbered "**AMUSO-1 through AMUSO-**

**150"** at the bottom right-hand corner of the page.  In addition, three pages withheld in their

entireties are replaced by a "Deleted Page Information Sheet" ("DPIS") which identifies

applicable FOIPA exemptions relied upon to withhold the document in full and/or referred to

other federal government agencies as well as the page numbers for the withheld pages.  The

exemptions asserted by the FBI are Exemption (j)(2) of the Privacy Act and FOIA Exemptions 2, 6, 7(C), 7(D), 7(E) and 7(F).

(26)     Copies of the pages contain, on their face, coded categories of exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA.  The coded categories are provided to aid the Court's and plaintiff's review of the FBI's explanations of FOIA exemptions used to withhold the protected material.  All material withheld is exempt from disclosure pursuant to a FOIA exemption or it is so intertwined with protected material that segregation is not possible without revealing the underlying protected material.

(27)     Each instance of information withheld on the attached documents is accompanied by a coded designation that corresponds to the categories listed below.  For example, if "(b)(7)(C)-1" appears on the document, the "(b)(7)(C)" designation refers to "Exemption (b)(7)(C)" of the FOIA concerning an "Unwarranted Invasion of Personal Privacy." The numerical designation of "1" following the "(b)(7)(C)" narrows the main category into the more specific subcategory, "Names and/or Identifying Information of FBI Special Agents and Support Personnel."  Listed below are the categories used to explain the FOIA exemptions asserted to withhold this material:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **Exemption and Codes** | **INFORMATION WITHHELD** |
| **Exemption (b)(2)** | **INTERNAL AGENCY RULES AND PRACTICES** |
| (b)(2)-1 | Source File Numbers (Cited in conjunction with (b)(7)(D)-2.) |
| (b)(2)-2 | Source Symbol Numbers (Cited in conjunction with (b)(7)(D)-3.) |

10

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **Exemption and Codes** | **INFORMATION WITHHELD** |
| **(b)(2)-3** | FBI Internal Investigative Techniques/Procedures and Information Pertaining to FBI Undercover Operations (Cited in conjunction with (b)(7)(E).) |
| **Exemption (b)(6)** | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| **(b)(6)-1** | Names and/or Identifying Information of FBI Special Agents and Support Personnel (Cited in conjunction with (b)(7)(C)-1.) |
| **(b)(6)-2** | Names and/or Identifying Information of Third Parties Who Provided Information to FBI (Cited in conjunction with (b)(7)(C)-2.) |
| **(b)(6)-3** | Names and/or Identifying Information of Third Parties Merely Mentioned (Cited in conjunction with (b)(7)(C)-3.) |
| **(b)(6)-4** | Names and/or Identifying Information concerning Local Law Enforcement Personnel (Cited in conjunction with (b)(7)(C)-4.) |
| **(b)(6)-5** | Names and/or Identifying Data of Third Parties of Investigative Interest (Cited in conjunction with (b)(7)(C)-5). |
| **Exemption (b)(7)(C)** | **UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| **(b)(7)(C)-1** | Names and/or Identifying Information of FBI Special Agents and Support Personnel (Cited in conjunction with (b)(6)-1.) |
| **(b)(7)(C)-2** | Names and/or Identifying information of Third Parties Who Provided Information to FBI (Cited in conjunction with (b)(6)-2.) |
| **(b)(7)(C)-3** | Names and Identifying Information of Third Parties Merely Mentioned (Cited in conjunction with (b)(6)-3.) |
| **(b)(7)(C)-4** | Names and/or Identifying Information Concerning Local Law Enforcement Personnel (Cited in conjunction with (b)(6)-4.) |
| **(b)(7)(C)-5** | Names and/or Identifying Data of Third Parties of Investigative Interest. (Cited in conjunction with (b)(6)-5.) |
| **Exemption (b)(7)(D)** | **CONFIDENTIAL SOURCE INFORMATION** |

| (b)(7)(D)-1 | Names, Identifying Data and/or Information Provided by Individual(s) Interviewed by the FBI Under an "Implied" Assurance of Confidentiality (Cited in conjunction with (b)(6)-2 and (b)(7)(C)-2.) |
|---|---|
| (b)(7)(D)-2 | Source File Numbers (Cited in conjunction with (b)(2)-1.) |
| (b)(7)(D)-3 | Source Symbol Numbers (Cited in conjunction with (b)(2)-2.) |
| (b)(7)(D)-4 | Identifying Data and Information Provided by Source Symbol Numbered Informants. |
| (b)(7)(D)-5 | Foreign Government Agency Information (Express Confidentiality.) |
| **Exemption (b)(7)(E)** | **INVESTIGATIVE TECHNIQUES AND PROCEDURES** |
| (b)(7)(E) | Investigative Techniques and Procedures and Details of an FBI Undercover Operation (Cited in conjunction with (b)(2)-3.) |
| **Exemption (b)(7)(F)** | **ENDANGERMENT OF LIFE OR PHYSICAL SAFETY** |
| (b)(7)(F) | Names and/or Identifying Information Provided by Witnesses or Third Parties Who Provided Information Regarding Criminal Activities. |

(28)    The paragraphs that follow explain defendant's rationale for withholding each

particular category of information under the specific exemption categories described above.

## PRIVACY ACT EXEMPTION (j)(2)

(29)    Section (j)(2) of the Privacy Act exempts from mandatory disclosure systems of

records "maintained by an agency or component thereof which performs as its primary function

any activities pertaining to the enforcement of criminal laws, including police efforts to prevent,

control, or reduce crime or to apprehend criminals..."

(30)    The investigatory records at issue are part of the FBI's CRS. The cross

references are contained in files which were compiled pursuant to investigations relating to

organized crime activities. Accordingly, these files are exempt from disclosure pursuant to

Exemption (j)(2) of the Privacy Act in conjunction with 28 C.F.R. § 16.96 (2003). Although

access to the records at issue were denied under the Privacy Act, they have been processed

under the access provisions of the FOIA to achieve maximum disclosure.

### EXEMPTION (b)(2)
### INFORMATION RELATED SOLELY TO THE INTERNAL
### RULES AND PRACTICES OF AN AGENCY

(31)    5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to the

internal personnel rules and practices of an agency."

(32)    This exemption protects routine internal administrative matters and functions of

the FBI which have no effect on the public at large. Disclosure of this information could

impede the effectiveness of the FBI's internal law enforcement procedures.

### (b)(2)-1        Source File Numbers

(33)    Exemption (b)(2)-1 has been asserted in conjunction with Exemption (b)(7)(D)-2

to protect the informant file numbers of permanent confidential symbol number sources of the

FBI. Similar in usage to the confidential source symbol number, these confidential source file

numbers are also assigned in sequential order to confidential informants who report information

to the FBI on a regular basis pursuant to an express assurance of confidentiality. The

confidential source file is unique to the particular confidential informant and is used only in

documentation relating to that particular informant. In this instance, confidential source file

numbers were used to document information provided by various sources.

(34)    Disclosure of confidential source file numbers at various times and in various

documents could ultimately identify these sources since it would reveal the connections of

confidential informants to the information provided by them. Repeated release of confidential

13

source file numbers along with the information provided by these confidential informants would narrow the possibilities of their true identities. This is especially true since each confidential source file number is assigned to only one confidential informant.

(35)     The disclosure of the identity of confidential sources would have a chilling effect on the activities and cooperation of other FBI confidential informants. It is only with the understanding of complete confidentiality that the aid of such informants can be enlisted, and only through this assurance of confidentiality that these informants can be persuaded to continue their assistance in providing information to the FBI in the future. Accordingly, the disclosure of this confidential source file number could reasonably be expected to identify a permanent confidential source of the FBI. Therefore, this information has been appropriately protected from disclosure pursuant to Exemption (b)(2)-1. Exemption (b)(2)-1 is invoked on the following pages of **Exhibit I**:  AMUSO-53, 56, 60, 64, 67, 71, 72, 76, 77, 117, and 126.

### (b)(2)-2          Source Symbol Numbers

(36)     Exemption (b)(2)-2 has been asserted in conjunction with Exemption (b)(7)(D)-3 to protect the permanent source symbol numbers of FBI sources. Permanent symbol numbers are assigned to confidential informants who report information to the FBI on a regular basis pursuant to an "express" grant of confidentiality. The symbol number is used as an administrative reporting tool to protect the actual, sensitive identity of an informant in documents generated by the FBI. A symbol number consists of a two-letter abbreviation which identifies the particular FBI field office where the symbol-numbered source is operating or has operated, followed by a sequentially assigned number. For example, using a fictitious symbol number, "NY 1234" for informant "JOHN DOE," the two letter abbreviation "NY" reveals that

14

this is a source of the New York Field Office and the source is the 1234 symbol-numbered

source of that office. The symbol number would be used in all written reports in which JOHN

DOE provided information to the FBI. Therefore, every time "NY 1234" was released, the

reader of the document would know that the source behind the symbol number was the same

individual reporting. Thus, every time "NY 1234" was used by the FBI in a record, the number

would always identify JOHN DOE.

     (37) · Release of these source symbol numbers would indicate both the scope and

location of FBI informant coverage within a particular geographic area. If a particular symbol

number such as "NY 1234" is released to the public at repeated times and in various documents,

the identity of the source could be determined. Each release of information in which the symbol

number is disclosed reveals connections to dates, times, places, events and names from which

the source's identity could be deduced. A person familiar with the facts being reported by

JOHN DOE could easily identify "NY 1234's" identity as being JOHN DOE given enough

instances in which "NY 1234" provided information to the FBI. Releasing the symbol number,

along with information provided by the source from the source's personal perspective

concerning the matters being investigated by the FBI, would allow an individual with

knowledge of such matters to extrapolate the source's true identity. This is especially true given

the fact that regardless of the law enforcement investigative file in which the symbol number

appears, "NY 1234" would always be the symbol number used to protect the true identity of

informant JOHN DOE. Thus, a confidential source symbol number is protected under FOIA

Exemption (b)(2) since it is an internal administrative tool used by the FBI to protect

informants' identities. The protection of these identifiers is essential to maintaining the integrity

15

of the FBI's confidential source program where release could endanger the lives of informants or discourage cooperation by confidential sources. Accordingly, because these source symbol numbers are related solely to the FBI's internal practices, disclosure would not serve any public interest, and would impede the FBI's effectiveness. This information has been appropriately protected from disclosure pursuant to Exemption (b)(2)-2. Exemption (b)(2)-2 is invoked on the following pages of **Exhibit I**: AMUSO-56, 117, 126, 135, and 136.

### (b)(2)-3    FBI Internal Investigative Techniques/Procedures and Information Pertaining to Undercover Activities

(38)    Exemption (b)(2)-3 is cited, in conjunction with (b)(7)(E), to withhold certain techniques and procedures the FBI uses when it is conducting criminal investigations and undercover operations. Exemption (b)(2)-3 is cited here to protect such information as instructions to cooperating witnesses, the amount of money used to purchase evidence, and specific investigatory techniques used during the investigation. Accordingly, because this information relates solely to the FBI's internal practices, because disclosure would not serve any public interest, and because disclosure would impede the FBI's effectiveness by providing plaintiff and other potential lawbreakers with information they could use to circumvent the techniques at issue, the FBI properly withheld this information pursuant to Exemption (b)(2)-3.

(39)    Exemption (b)(2)-3 has also been asserted to protect the logistical details of an FBI undercover operation. If this internal administrative information were disclosed, it could provide insight into how the FBI conducts undercover operations. This information could be used to predict how the FBI will conduct similar operations in the future. The information could be used as means by which to exhaust the FBI's funding of a particular investigation, which in

16

turn could impede the effectiveness of the FBI's internal law enforcement procedures. Accordingly, the FBI properly protected this information pursuant to Exemption (b)(2)-3. Exemption (b)(2)-3 is invoked on the following pages of **Exhibit I**:  AMUSO-1-2, 135, and 138-147.

## EXEMPTION (b)(6)
## CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

(40)    5 U.S.C. § 552 (b)(6) exempts from disclosure:

> "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

(41)    In asserting this exemption, each piece of information was scrutinized to determine the nature and strength of the privacy interest of any individual whose name and/or identifying information appears in the documents at issue.  In withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure.  In making this analysis, public interest information was determined to be information which would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.  In each instance where information was withheld, it was determined that individual privacy rights outweighed the public interest.

### (b)(6)-1    Names and/or Identifying Information of FBI Special Agents and Support Personnel

(42)    Exemption (b)(6)-1 has been asserted in conjunction with Exemption (b)(7)(C)-1 to protect the names and/or identifying information of FBI SAs and support personnel

17

responsible for conducting, assisting with and/or supervising the investigative activities reported in the documents concerning plaintiff and others. These responsibilities include interviewing cooperating witnesses or sources and reviewing materials complied as a result of the investigation of plaintiff and others. FBI SAs are not assigned to investigations or administrative duties by choice. Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. The privacy consideration is also to protect FBI SAs as individuals, from unnecessary, unofficial questioning as to the conduct of this and other investigations, whether or not currently employed by the FBI.

(43)    FBI SAs conduct official inquiries into various criminal and national security cases. They come into contact with all strata of society. They conduct searches and make arrests, both of which constitute reasonable, but nonetheless serious intrusions into peoples' lives. Many of these people carry grudges which last for years and they may seek any excuse to harass the SA deemed responsible for these intrusions. The publicity associated with the release of the SA's identity in connection with a particular law enforcement investigation could trigger hostility toward the SA. Accordingly, FBI SAs referenced in the responsive records maintain a substantial privacy interest in not having their identities disclosed. In addition, the FBI asserted Exemption (b)(6)-1 to protect the names and telephone numbers of FBI support employees. These individuals were assigned to handle tasks relating to the investigation concerning plaintiff and others. These FBI employees were, and possibly still are, in a position to access information regarding official law enforcement investigations, and therefore could become the target of harassing inquiries for unauthorized access to investigative materials if their identities

18

were disclosed.

(44)    The FBI next examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the FBI SAs and support employees. The FBI could not identify any discernible public interest. There have been no allegations that the FBI SAs or the professional support employees engaged in any type of significant misconduct which would establish a public interest in the disclosure. Ultimately, disclosure of the names of the FBI SAs and the professional support employees would shed no light on the performance of the FBI's mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. Thus, disclosure of the identities of these employees would constitute a clearly unwarranted invasion of their personal privacy; therefore, the FBI has properly asserted Exemption (b)(6)-1. Exemption (b)(6)-1 is invoked on the following pages of **Exhibit I**: AMUSO-1, 3, 6, 9, 15, 22, 27, 31, 33, 39, 45, 49, 52, 53, 56, 57, 59, 60, 64, 67, 71, 76, 77, 85, 93, 103, 106, 117, 118, 121, 126, 127, 129, 132, and 134.

### <u>(b)(6)-2</u>    <u>Names and/or Identifying Information of Third Parties Who Provided Information To FBI</u>

(45)    Exemption (b)(6)-2 has been asserted to protect the names and/or identifying data of individuals who assisted the FBI by providing information within the records responsive to plaintiff's request. Information provided by individuals during an interview is one of the most productive tools utilized by law enforcement agencies. The largest roadblock in successfully obtaining the desired information through an interview is the fear by the interviewee that his or

19

her identity could possibly be exposed and, consequently, they could be harassed, intimidated or threatened with legal or economic reprisal, or possible physical harm. In order to surmount these obstacles, persons interviewed must be assured that their identities will be held in the strictest confidence. The FBI has attempted to release all segregable portions of the information provided by these individuals without revealing their identities. The continued access to persons willing to provide pertinent facts bearing on a particular investigation outweighs any benefits derived from releasing the identities of these individuals. Furthermore, there is no legitimate public interest to be served by releasing the identities of persons who provided information to the FBI because it will not shed light on the operations and activities of the FBI. This information has been appropriately protected from disclosure pursuant to Exemption (b)(6)-2. Exemption (b)(6)-2 is invoked on the following pages of **Exhibit I**: AMUSO-1, 10, 49-55, 59-77, 79-116, 119, and 137.

### <u>(b)(6)-3</u>    <u>Names and/or Identifying Information of Third Parties Merely Mentioned</u>

(46)    Exemption (b)(6)-3 has been asserted in conjunction with Exemption (b)(7)(C)-3 to withhold the names and personal identifying information of third parties who were merely mentioned in the documents responsive to plaintiff's request. These individuals are not of investigative interest to the FBI, but are mentioned in these communications.

(47)    The third parties merely mentioned maintain strong privacy interests in not having their identities disclosed. Disclosure of these third parties' names and identifying information in connection with the investigation of plaintiff carries a strong negative connotation. In addition, disclosing the identities of these individuals could subject them to

possible harassment and could focus derogatory inferences and suspicion on them.

Accordingly, the FBI has determined that these third parties maintain a substantial privacy

interest in not having their identity disclosed. After identifying the substantial privacy interests

these individuals maintain, the FBI balanced their right to privacy against the public interest in

the disclosure. Because disclosure of the names of these third parties would not shed light on

the FBI's performance of its statutory duties, the FBI determined that there is no public interest

in the disclosure, and that disclosure of the names of these third parties would constitute a

clearly unwarranted invasion of their personal privacy. Accordingly, the FBI has properly

withheld this information pursuant to Exemption (b)(6)-3. Exemption (b)(6)-3 is invoked for

the following pages of **Exhibit I**: AMUSO-2, 4, 59, 62, 63, 65, 69, 75, 86-88, 94-100, 104,

105, 107, 124, 125, and 137.

### (b)(6)-4    Names and/or Identifying Information Concerning Local Law Enforcement Personnel

(48)    Exemption (b)(6)-4 has been asserted in conjunction with Exemption (b)(7)(C)-4

to withhold the name and rank of a law enforcement officer of the Morris County, NJ

Prosecutor's Office and a law enforcement officer of the New York City Police Department.

These officers were acting in their official capacity and assisted in the interview of a

confidential source. The rationale for protecting the identities of FBI SAs and support personnel

found at paragraphs 42 and 43  supra, also pertains to withholding the name and identifying

information of these two  police officers. To release the identity of these officers could subject

them as individuals to unnecessary, unwarranted harassment which would constitute a clearly

unwarranted invasion of privacy. Furthermore, the officers could become a prime target for

21

compromise if their identities were known.

(49)    Disclosure of these individuals' identities could seriously jeopardize their effectiveness in the performance of their official duties. There is no public interest to be served by releasing this information as this information does not shed light on the FBI's performance of it mission. Thus release would constitute a clearly unwarranted invasion of their personal privacy; therefore, the FBI has properly asserted Exemption (b)(6)-4. Exemption (b)(6)-4 is invoked for the following pages of **Exhibit I:** AMUSO-60, 71, and 85.

### (b)(6)-5    Names and/or Identifying Information of Third Parties of Investigative Interest

(50)    Exemption (b)(6)-5 has been asserted in conjunction with Exemption (b)(7)(C)-5 to protect the names and identifying information of third party individuals who are of investigative interest to the FBI and/or other law enforcement agencies. Identifying information withheld concerning these third parties includes individual names and other personal information. Being linked with any law enforcement investigation carries a strong negative connotation and a stigma. To release the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Accordingly, the FBI has determined that these individuals maintain a substantial privacy interest in not having their identities disclosed. In making a determination whether to release the names and personal information concerning these third parties, the public's interest in disclosure was balanced against the individual's right to privacy. It was determined that this information would not enlighten the public on how the FBI conducts its internal operations and investigations. Thus, release of this information would be a clearly unwarranted invasion of privacy and the

22

FBI has properly asserted Exemption (b)(6)-5. Exemption (b)(6)-5 is invoked for the following

pages of **Exhibit I**: AMUSO-1-4, 49-52, 54, 55, 57, 58, 60-63, 65, 66, 69-80, 81-84, 86-116,

119-125, 127-131, 134, 135, and 138-147.

<div align="center">

**FOIA EXEMPTION 7**
**EXEMPTION 7 THRESHOLD**

</div>

(51)    Exemption 7 of the FOIA protects from mandatory disclosure records or

information compiled for law enforcement purposes, but only to the extent that disclosure could

reasonably be expected to cause one of the harms enumerated in the subparts of the exemption.

See 5 U.S.C. § 552(b)(7). In this investigation, the harm that could reasonably be expected to

result from disclosure is invasion of personal privacy, revealing the identities of confidential

sources, revealing a sensitive law enforcement technique, and endangering the life or physical

safety of individuals. Before an agency can invoke any of the harms enumerated in Exemption

7, it must first demonstrate that the records or information at issue were compiled for law

enforcement purposes. Law enforcement agencies such as the FBI must demonstrate that the

records at issue are related to the enforcement of federal laws and that the enforcement activity

is within the law enforcement duty of that agency. The various records at issue in this case were

compiled for criminal law enforcement purposes during the course of the FBI's performance of

its law enforcement mission, including the investigation of criminal activities.

(52)    Because the records clearly meet the Exemption 7 threshold, the remaining

inquiry is whether their disclosure would invade personal privacy, reveal the identities of

confidential sources, reveal sensitive law enforcement techniques, and/or reveal information

which if released could reasonably cause harm and/or endanger the life or physical safety of any

<div align="center">

23

</div>

individual.

## FOIA EXEMPTION (b)(7)(C)
## UNWARRANTED INVASION OF PERSONAL PRIVACY

(53)    5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . .

(54)    When withholding information from disclosure pursuant to this exemption, the

FBI is required to balance the privacy interests of the individuals mentioned in these records

against any public interest in disclosure. In asserting this exemption, each piece of information

was scrutinized to determine the nature and strength of each individual's privacy interest. The

FBI identified the public interest in disclosure of the information to be whether the information

in question would inform plaintiff or the general public about the FBI's performance of its

mission to protect and defend the United States against terrorist and foreign intelligence threats,

to uphold and enforce the criminal laws of the United States and to provide leadership and

criminal justice services to federal, state, municipal and international agencies and partners. In

this case, every effort has been made to release all reasonably segregable information contained

in these pages without infringing upon the privacy rights of the individuals mentioned in the

documents. As explained below, there is no legitimate public interest in the information that

has been withheld pursuant to Exemption (b)(7)(C).

### (b)(7)(C)-1    Names and/or Identifying Information of FBI Special Agents and Support Employees

(55)    Exemption (b)(7)(C)-1 has been asserted in conjunction with Exemption (b)(6)-1

24

to protect the names and/or identifying information of FBI SAs and support personnel responsible for conducting, assisting with and/or supervising the investigative activities reported in the documents concerning plaintiff and others. These responsibilities include interviewing cooperating witnesses, sources and reviewing materials compiled as a result of the investigation of plaintiff and others. FBI SAs are not assigned to investigations or administrative duties by choice. Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. The privacy consideration is also to protect FBI SAs as individuals, from unnecessary, unofficial questioning as to the conduct of this and other investigations, whether or not currently employed by the FBI.

(56)    FBI SAs conduct official inquiries into various criminal and national security cases. They come into contact with all strata of society. They conduct searches and make arrests, both of which constitute reasonable, but nonetheless serious intrusions into peoples' lives. Many of these people carry grudges which last for years and they may seek any excuse to harass the SA deemed responsible for these intrusions. The publicity associated with the release of the SA's identity in connection with a particular law enforcement investigation could trigger hostility toward the SA. Accordingly, FBI SAs referenced in the responsive records maintain a substantial privacy interest in not having their identities disclosed. In addition, the FBI asserted Exemption (b)(7)(C)-1 to protect the names of FBI support employees. These individuals were assigned to handle tasks relating to the investigation concerning plaintiff and others. These FBI employees were, and possibly still are, in a position to access information regarding official law enforcement investigations, and therefore could become the target of harassing inquiries for

25

unauthorized access to investigations if their identities were disclosed.

(57)    The FBI next examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the FBI SAs and support employees. The FBI could not identify any discernible public interest. There have been no allegations that the FBI SAs or the professional support employees engaged in any type of significant misconduct which would establish a public interest in the disclosure. Ultimately, disclosure of the names of the FBI SAs and the professional support employees would shed no light on the performance of the FBI's mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. Thus, disclosure of the identities of these employees could constitute an unwarranted invasion of their personal privacy; therefore, the FBI has properly asserted Exemption (b)(7)(C)-1. Exemption (b)(7)(C)-1 is invoked on the following pages of **Exhibit I**: AMUSO-1, 3, 6, 9, 15, 22, 27, 31, 33, 39, 45, 49, 52, 53, 56, 57, 59, 60, 64, 67, 71, 76, 77, 82, 85, 93, 103, 106, 117, 118, 121, 126, 127, 129, 132, and 134.

### (b)(7)(C)-2    Names and/or Identifying Information of Third Parties Who Provided Information to FBI

(58)    Exemption (b)(7)(C)-2 has been asserted in conjunction with (b)(6)-2 to protect the names and/or identifying data of individuals who assisted the FBI by providing information within the records responsive to the plaintiff's request. Information provided by individuals during an interview is one of the most productive tools utilized by law enforcement agencies. The largest roadblock in successfully obtaining the desired information through an interview is

26

the fear by the interviewee that his or her identity may possibly be exposed and, consequently result in being harassed, intimidated or threatened with legal or economic reprisal, or possible physical harm. In order to surmount these obstacles, persons interviewed must be assured that their identities will be held in the strictest confidence. The FBI has attempted to release all segregable portions of the information provided by these individuals without revealing their identities. The continued access to persons willing to provide pertinent facts bearing on a particular investigation outweighs any benefits derived from releasing the identities of these individuals. Balancing this privacy interest against the public interest, the FBI found no legitimate public interest to be served by releasing the identities of private citizens who provided information to the FBI because it would not shed light on the operations and activities of the FBI. The FBI has properly withheld the identities of these third party individuals providing information pursuant to Exemption (b)(7)(C)-2. Exemption (b)(7)(C)-2 is invoked on the following pages of **Exhibit I**:  AMUSO-1, 10, 49-55, 59-116, 119, and 137.

### (b)(7)(C)-3    Names and/or Identifying Information of Third Parties Merely Mentioned

(59)    Exemption (b)(7)(C)-3 has been asserted in conjunction with Exemption (b)(6)-3 to withhold the names and personal identifying information of third parties who were merely mentioned in the documents responsive to plaintiff's request. These individuals are not of investigative interest to the FBI, but are mentioned in these communications.

(60)    The third parties merely mentioned maintain strong privacy interests in not having their identities disclosed. Disclosure of these third parties' names and identifying information in connection with the investigation of plaintiff carries a strong negative

27

connotation. In addition, disclosing the identities of these individuals could subject them to possible harassment and could focus derogatory inferences and suspicion on them. Accordingly, the FBI has determined that these third parties maintain a substantial privacy interest in not having their identities disclosed. After identifying the substantial privacy interests these individuals maintain, the FBI balanced their right to privacy against the public interest in the disclosure. Because disclosure of the names of these third parties would not shed light on the FBI's performance of its statutory duties, the FBI determined that there is no public interest in the disclosure, and that disclosure of the names of these third parties could constitute an unwarranted invasion of their personal privacy. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(C)-3. Exemption (b)(7)(C)-3 is invoked on the following pages of **Exhibit I**: AMUSO-2, 4, 59, 62, 63, 65, 69, 75, 86-88, 94-100, 104, 105, 107, 124, 125, and 137.

### (b)(7)(C)-4    Names and/or Identifying Information of Local Law Enforcement Personnel

(61)    Exemption (b)(7)(C)-4 has been asserted in conjunction with Exemption (b)(6)-4 to withhold the names and ranks of law enforcement officers of the New Jersey and New York City Police Departments. The officers were acting in their official capacity and assisted in the investigation of plaintiff and others. The rationale for protecting the identities of FBI SAs and support personnel found at paragraphs 42 and 43, supra, also pertains to withholding the names and identifying information of local police officers. To release the identity of a law enforcement employee could subject him to unnecessary, unwarranted harassment which could constitute an unwarranted invasion of privacy. Furthermore, these officers could become a prime target for

28

compromise if their identities were known.

(62)   The disclosure of an individual's identity could seriously jeopardize his effectiveness in the performance of his official duties.  There is no public interest to be served by releasing this information as this information does not shed light on the FBI's performance of it mission.  Thus, release could constitute an unwarranted invasion of his personal privacy; therefore, the FBI has properly asserted Exemption (b)(7)(C)-4.  Exemption (b)(7)(C)-4 is invoked on the following pages of **Exhibit I**:  AMUSO-60, 71, and 85.

### (b)(7)(C)-5   Names and/or Identifying Information About Third Parties of Investigative Interest

(63)   Exemption (b)(7)(C)-5 has been asserted in conjunction with Exemption (b)(6)-5 to protect the names and identifying information of third party individuals who were of investigative interest to the FBI and/or other law enforcement agencies.  Identifying information withheld concerning these third parties include addresses, and other personal information.  Being linked with any law enforcement investigation carries a strong negative connotation and a stigma.  To release the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention.  Accordingly, the FBI has determined that these individuals maintain a substantial privacy interest in not having their identities disclosed.  In making a determination whether to release the names and personal information concerning these third parties, the public's interest in disclosure was balanced against the individual's right to privacy.  It was determined that this information would not enlighten the public on how the FBI conducts its internal operations and investigations.  Thus, release of this information could be an unwarranted invasion of privacy and the FBI has

29

properly asserted Exemption (b)(7)(C)-5.  Exemption (b)(7)(C)-5 is invoked on the following

pages of **Exhibit I**:  AMUSO-1-4, 49-52, 54, 55, 57, 58, 60-63, 65, 66, 69-84, 86-116, 119-125,

127-131, 134, 135, and 138-147.

## EXEMPTION  (b)(7)(D)
## CONFIDENTIAL SOURCE MATERIAL

(64)    5 U.S.C. § 552 (b)(7)(D) provides protection for:

> records or information compiled for law enforcement purposes, but only to the
> extent that the production of law enforcement records or information . . . could
> reasonably be expected to disclose the identity of a confidential source, including
> a State, local or foreign agency or authority or any private institution which
> furnished information on a confidential basis, and, in the case of a record or
> information compiled by a criminal law enforcement authority in the course of a
> criminal investigation, or by an agency conducting lawful national security
> intelligence investigation, information furnished by a confidential source.

(65)    Numerous confidential sources report to the FBI on a regular basis and are

"informants" in the common meaning of the term.  Some of the sources provide information

under an express assurance of confidentiality.  Further, during the course of an investigation,

other individuals are interviewed under circumstances from which an assurance of

confidentiality can reasonably be inferred.  These individuals are considered to be confidential

informants or sources since they furnish information only with the understanding that their

identities and the information provided will not be divulged outside the FBI.  Information

provided by these individuals is singular in nature, and if released, could reveal the their

identity.

(66)    During the course of the FBI's investigation, FBI SAs sought the assistance of

numerous individuals in obtaining information to aid its investigation.  Information was

provided by FBI symbol number sources and by other third parties under an implied or express

grant of confidentiality

(67)    These individuals were placed directly in positions that could subject them to

acts of reprisal, harassment, or an unnecessary amount of public attention if the FBI disclosed

their cooperation. The FBI has learned through experience that individuals who provide

information about subjects under investigation must be free to do so without fear of reprisal.

Individuals who provide the investigative information must be free to furnish that information

with complete candor and without the understandable tendency to hedge or withhold

information out of fear that their names or their cooperation with the FBI will later be made

public. Those who provide information in these investigations must be secure in the knowledge

that their assistance and their identities will be held in confidence.

### (b)(7)(D)-1    Names and/or Identifying Data and Information Provided by Third Parties under an "Implied" Assurance of Confidentiality

(68)    Exemption (b)(7)(D)-1 has been asserted in conjunction with (b)(6)-2 and

(b)(7)(C)-2 to protect the names, identifying information and information provided by third

parties to the FBI under an implied grant of confidentiality during the course of the FBI's

investigation of the plaintiff and others. These individuals were interviewed under

circumstances from which an assurance of confidentiality may be implied since the individuals

were reporting on activities of organized crime families. Interviews conducted under such

assurances of confidentiality warrant the protection of the interviewee's name as well as the

information the interviewee provided, but only to the extent that the information could identify

the interviewee. In the processing of the records concerning plaintiff, the objective was to

release as much segregable information as possible without revealing the identities of the

31

individuals interviewed. Therefore, the primary concern in processing interviews became the protection of the interviewees' identities. If the interviewees' identities were released, it could subject him or her to embarrassment, humiliation or possible physical harm not only for themselves, but also for their families. Protection extends beyond the name of the interviewee, and includes all other possible identifying information about the interviewee.

(69)    The FBI protected the contents of the interview conducted with the third parties because individuals who have knowledge of the activities that gave rise to the investigation of the plaintiff and others could clearly determine his/her identity. The sources provided valuable information that is detailed and singular in nature. The disclosure of the identity of these individuals could have disastrous consequences. Given the violent nature of the crimes reportedly committed by plaintiff, disclosure of the identities of the informants could subject him/her to violent reprisals. In addition, disclosure of the identities of confidential sources who are expressly promised confidentiality has wider implications. If the FBI disclosed the identities of confidential sources that entered into express agreements, that revelation would have a chilling effect on the activities and cooperation of other FBI confidential sources. The FBI has found that it is only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future. Thus, the identity of, and the information provided by the sources who were expressly promised confidentiality are properly withheld pursuant to FOIA Exemption (b)(7)(D)-1. Exemption (b)(7)(D)-1 is invoked on the following pages of **Exhibit I**: AMUSO-1, 2, 49-57, 59-78, 80-116, 119, 131, 137, and 146.

32

### (b)(7)(D)-2    Source File Numbers

(70)    Exemption (b)(7)(D)-2 has been asserted in conjunction with Exemption (b)(2)-1 to protect the informant file numbers of permanent confidential symbol number sources of the FBI. Similar in usage to the confidential source symbol number, these confidential source file numbers are also assigned in sequential order to confidential informants who report information to the FBI on a regular basis pursuant to an express assurance of confidentiality. The confidential source file is unique to the particular confidential informant and is used only in documentation relating to that particular informant.

(71)    Disclosure of confidential source file numbers at various times and in various documents could ultimately identify these sources since it would reveal the connections of confidential informants to the information provided by them. Repeated release of confidential source file numbers along with the information provided by these confidential informants would narrow the possibilities of their true identities. This is especially true since each confidential source file number is assigned to only one confidential informant.

(72)    The disclosure of the identities of the confidential sources would have a chilling effect on the activities and cooperation of both current and future FBI confidential informants. It is only with the understanding of complete confidentiality that the aid of such informants can be enlisted, and only through this assurance of confidentiality that these informants can be persuaded to continue their assistance in providing information to the FBI in the future. Accordingly, the disclosure of the confidential source file numbers could reasonably be expected to identify permanent confidential sources of the FBI. Therefore, this information has been appropriately protected from disclosure pursuant to Exemption (b)(7)(D)-2. Exemption

33

(b)(7)(D)-2 is invoked on the following pages of **Exhibit I**:  AMUSO-53, 56, 60, 64, 67, 71, 72, 76, 77, 117, and 126.

### (b)(7)(D)-3    Source Symbol Numbers and Information Furnished by Symbol Numbered Sources

(73)    Exemption (b)(7)(D)-3 has been asserted in conjunction with Exemption (b)(2)-2 to withhold FBI source symbol numbers and information provided by the symbol numbered sources.  Paragraphs 36 and 37, supra, describe the administrative aspect of using a source symbol number to protect the identity of an FBI source.  Source symbol numbers are assigned to confidential sources who have been developed, instructed, closely monitored and in many cases paid for his/her services.  These sources report information to the FBI under an express grant of confidentiality.  Within the FBI, knowledge of these sources identities is limited to those FBI employees who have a legitimate need for the information.  Also, sources to whom the FBI has provided source symbol numbers are not referred to by name in any document which contains information they provided.

(74)    Considerable harm to the informants and to ongoing FBI operations could result from releasing the identity of the symbol numbered sources.  The sources provided valuable information concerning plaintiff and other persons who were of investigative interest to the FBI or other law enforcement agencies during the course of this investigation.  Information provided was detailed and singular in nature concerning certain criminal activity.  The source names are not referenced, but the source symbol numbers are cited where the sources are referred to in the responsive records.  The fact that these individuals were assigned source symbol numbers is a positive indicium that supports an express assurance of confidentiality.  If the FBI disclosed the

34

informants' source symbol numbers, the sources' identity could be ascertained by a person

knowledgeable of the events that gave rise to the FBI's investigation of plaintiff and other

subjects. If the FBI disclosed the informants' identity, the informants as well as his/her family

could be subjected to embarrassment, humiliation, and physical/mental harm. In addition, such

a disclosure has wider implications. If the FBI disclosed the identity of these confidential

sources who entered into an express confidentiality agreement, that revelation could have a

chilling effect on the activities and cooperation of other FBI confidential sources. It is only with

the understanding of complete confidentiality that the aid of such sources can be enlisted, and

only through assurances of this confidence, that these sources can be persuaded to continue

providing valuable assistance in the future. Thus, the FBI has properly withheld this

information pursuant to FOIA Exemption (b)(7)(D)-3. Exemption (b)(7)(D)-3 is invoked on the

following pages of **Exhibit I**: AMUSO-56, 117, and 126.

### (b)(7)(D)-4    Identifying Data and Information Provided by Source Symbol Numbered Informants

(75)    Exemption (b)(7)(D)-4 was asserted to withhold the identifying data and

information received from symbol numbered sources with the understanding that it would be

held in confidence. As a matter of policy and practice, all symbol numbered sources are given

an express grant of confidentiality. Illustrative of this express assurance of confidentiality is the

manner in which we treat such information within the FBI. The identities of such sources are

not referred to by name in the FBI document which records the information they furnished. The

identities of these sources are known to very few FBI employees and are available only on a

"need to know" basis. These special precautions are needed because of the sensitive nature of

35

the information being provided and harm that may befall these sources if their identities were revealed. The manner in which the FBI actually obtains information from these sources is also demonstrative of the expressed assurance of confidentiality under which it is received. The information is received only under conditions which guarantee the contact will not be jeopardized. It is only with the understanding of complete confidentiality that the aid of such people can be enlisted, and only through this confidence that such individuals can be persuaded to continue providing valuable assistance in the future. The FBI has properly withheld this information pursuant to FOIA Exemption (b)(7)(D)-4. Exemption (b)(7)(D)-4 is invoked on the following pages of **Exhibit I**: AMUSO-4, 57, 58, 117-128, and 135.

### (b)(7)(D)-5    Foreign Government Agency Information (Express Confidentiality)

(76)    Confidential source material protected in the 92A-HQ-1020655-C1-5 file by the assertion of exemption (b)(7)(D) includes information provided to the FBI from a foreign agency or authority with an explicit understanding of confidentiality. The FBI, in connection with a wide variety of criminal and national security investigations, solicits and receives information regularly from state, local, and foreign agencies sand authorities. Inherent in the cooperative effort is the mutual understanding that the identity of such a source and the information provided by it will be held in confidence by the FBI, and not released pursuant to FOIA and Privacy Act requests. If disclosure of information provided in confidence were to be made public pursuant to FOIA and Privacy requests, cooperation between the FBI and the foreign agencies and authorities would be greatly diminished, causing great detriment to effective law enforcement. The FBI has properly withheld this information pursuant to FOIA

Exemption (b)(7)(D)-5.  Exemption (b)(7)(D)-5 is invoked on AMUSO-4, **Exhibit I**.

## EXEMPTION (b)(7)(E)
## INVESTIGATIVE TECHNIQUES AND PROCEDURES

(77)     5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:
records or information compiled for law enforcement purposes, but only
to the extent that the production of such law enforcement records or
information would disclose techniques and procedures for law
enforcement investigations or prosecutions, or would disclose guidelines
for law enforcement investigations or prosecutions if such disclosure
could  reasonably be expected to risk circumvention of the law . . . .

### (b)(7)(E)        Internal Techniques and Procedures and Information Pertaining to
### FBI Undercover Operation

(78)     Exemption (b)(7)(E) has been asserted in conjunction with Exemption (b)(2)-3 to

protect procedures and techniques used by FBI Special Agents during the investigation of

plaintiff.  If the FBI were to disclose the procedures as to how it conducts undercover operations

and release details of the specific techniques used during the undercover operation it could

jeopardize any future criminal investigations and undercover operations conducted by the FBI.

Release of these techniques could reasonably be expected to alert the subjects in other criminal

investigations to how the FBI conducts undercover operations and risk circumvention of the

law.  Exemption (b)(7)(E) is invoked on the following pages of **Exhibit I**:  AMUSO-1-2, 135,

and 138-147.

## EXEMPTION (b)(7)(F)
## ENDANGER PHYSICAL SAFETY

(79)     5 U.S.C. § 552 (b)(7)(F) provides for the withholding of:
records or information compiled for law enforcement purposes, but only
to the extent that the production of such law enforcement records or
information...could reasonably be expected to endanger the life or
physical safety of any individual.

37

(80)    Exemption (b)(7)(F) is cited to protect symbol number informants and the names and identifying information concerning cooperating witnesses who provided information to the FBI concerning the criminal activities of plaintiff and/or other individuals of investigative interest in the records responsive to plaintiff's request. The exemption has been asserted to protect information, the release of which could reasonably be expected to endanger the life and/or physical safety of these cooperating individuals in light of the crimes reportedly committed by plaintiff and other members of organized crime families. It is reasonable to expect that release of their identities would place them at great risk. The FBI has properly withheld this information pursuant to FOIA Exemption (b)(7)(F). Exemption (b)(7)(F) is invoked on the following pages of **Exhibit I**: AMUSO-1, 49-55, 57-116, 120-125, 127-128, 135, 137, and 146.

### FBI Referral to Another Law Enforcement Agency

(81)    During the review of material for purposes of this declaration, documents were located which originated with the Bureau of Prisons. Specifically, by letter dated August 14, 2008, FBIHQ sent a referral package to the Bureau of Prisons for processing and direct response to plaintiff. (See **Exhibit I** pages: AMUSO-45, 46, 47, and 48.) Previously, by letter, FBIHQ sent and BOP received on May 2, 2008 (See **Exhibit J, Attachment A**), a referral package consisting of three pages: AMUSO 46, 47, and 48. The August 14th referral included the three pages sent earlier and an additional page not previously referred.

### CONCLUSION

(82)    FBIHQ has processed and released all segregable information from the documents responsive to plaintiff's request. Each document was reviewed page by page,

paragraph by paragraph and line by line to ensure maximum disclosure. The FBI has carefully examined those documents responsive to plaintiff's FOIA request for records on himself and released 147 pages with redactions pursuant to FOIA Exemptions 2, 6, 7(C), 7(D), 7(E) and 7(F), 5 U.S.C. § 552 (b)(2), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F), and Privacy Act Exemption (j)(2), 5 U.S.C. § 552a (j)(2). Furthermore, the FBI carefully examined the responsive material and determined that the information withheld from plaintiff, if disclosed, could reasonably be expected to impede the effectiveness of the FBI's internal law enforcement procedures and practices, cause unwarranted invasions of the privacy interests of numerous individuals, disclose confidential sources and the information they provided to the FBI, disclose techniques and procedures for a law enforcement investigations and endanger the safety of third parties. After an extensive review of the records at issue, I have determined that the FBI has released all reasonably segregable, nonexempt information to plaintiff in response to his FOIA request to the FBI.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that **Exhibits A-I** attached hereto are true and correct copies.

Executed this _27th_ day of August 2008.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VITTORIO AMUSO,<br># 38740-079<br>USP-BIG SANDY<br>P.O. BOX 2068<br>INEZ, KY 41224<br><br>     Plaintiff,<br><br>       v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br>FEDERAL BUREAU OF INVESTIGATION<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 07-CV-01935 |

# EXHIBIT A

April 16, 2007
    (Date)

Vittorio "Vic" Amuso #38740-079
U.S.P. Big Sandy
P.O. Box #2068
Inez, KY  41224

Federal Bureau of Investigations
ALBANY Feild Office/FOIA Officer
200 MCarty Ave.
Albany, NY   12209

Re:  Freedom of Information/Privacy Acts Request

Dear Records Custodian:

This is a Freedom of Information and Privacy Act (FOIA/PA)
request made pursuant to Title 5 U.S.C. Sec. 552, 552a and
28 C.F.R. Sec. 16.1 et. seq.   In this case Amuso is requesting
any and all documents, records, memoranda, notes, statements and
other information or data in what ever form maintained by your
agency that relates to and/or makes reference to Amuso directly
or indirectly.  More specifically, any data or information in
the possession or control of your agency related to and/or
generated by the criminal investigation and prosecution of
Amuso by federal authorities in and around the U.S. Federal
Districts of New York.  This would include, but not be limited
to, any agency documents, records, reports, statements, notes,
case file summaries and all forms of information maintained by
your agency that makes reference to Amuso directly and indirectly.
    Amuso would specifically request a search of your agency's
Central Records System (CRS), Automated Case Support System (ACSS),
Electronic Case Files (ECF), Universal Index (UI), Legal Attaches
(Legats), Investigative Case Managment system (ICMS), Confidential
Source System (CSS) and the "I-Drive" system.  Any "main" and/or
"references" to Amuso by his known name would be responsive to
this request.  Also, any reference to Amuso as the "Boss" of the
Lucchese "Crime Family", or "soldier", or "Captian", or "Member"
of the "La Cosa Nostra" would be requested.
    This FOIA/PA request specifically requests information from
January 1980 until the present time.  To further aid your agency
in effecting this FOIA/PA request, be advised that numerous federal
criminal investigations and prosecutions have been pursued against
Amuso and "fellow members" of the "La Cosa Nostra" resulting in
volumous records and information that will make reference to
Amuso and various participants in those investigations and criminal
prosecutions.  For example, in 2006 there was reference to Amuso
related to the criminal trial of two former New York City Police
officers alleged to be employed by the Lucchese "Crime Family".
Additionally, the prosecution of various alleged members of the
"La Cosa Nostra" transpired during 2005 and 2006 which made ref-
erences to Amuso.  These records would be responsive to this

[Page 1 or 3 pages]

Freedom of Information/Privacy Acts Request
Vittorio "Vic" Amuso #38740-079
Page 2 of 3 pages

FOIA/PA request. Certian alleged "members" and/or "associates"
identified as Anthony "Gas Pipe" Casso and Alphonse D'Arco would
be relevent to any information requested by Amuso.

Be advised that Amuso makes this FOIA/PA request for solely
personal and not commercial purposes. All information sought by
Amuso is for the public's interest insomuch as society is offended
when an innocent man remains imprisoned. A grave miscarriage of
justice is being committed by Amuso's continued incarceration and
Life sentence based on perjured testimony of certain individuals
and prosecutorial misconduct. The release of information in this
case will serve to correct this miscarriage of justice and reaffirm
the public's confidence in the American criminal justice system.

Your agency should specifically reference any and all stat-
utory provisions relied upon to assert any exemption when denying
release of information under Secs. 552 and 552a. Amuso agrees to
pay any and all reasonable costs and fees associated with this
request, however would request that your agency make the first
100 documents available without cost under 28 C.F.R. Sec. 16.1,
et. seq.

All of Amuso's personal information is being made available
to your agency as found at page #3 of this request. If your
agency requires any additional information to complete this FOIA
request please contact Amuso at the address indicated above. A
certificate of identity is attached herewith.

Thank you for your time and concern in this matter.

Respectfully submitted,

/s/ _Vittorio Amuso_
Vittorio "Vic" Amuso

Attachments

cc: Retained

Freedom of Information/Privacy Acts Request
Vittorio "Vic" Amuso #38740-079
Page 3 of 3 pages

PERSONAL INFORMATION OF VITTORIO "VIC" AMUSO

Date of Birth :

Place of Birth:  Brooklyn, New York

SS No.:  _____    __

FBI No:  _698774B_ .

US Marshal No.:  .38740-079 .

Criminal Docket #: CR-90-446 . Eastern District, NY

Other Information: Alleged "member" of "La Cosa Nostra" and
"Lucchese Crime Family"/ Federal prosecution case names "Windows
Cases I and II"

U.S. Department of Justice            **Certification of Identity** 

---

**Privacy Act Statement.** In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The purpose of this solicitation is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. Failure to furnish this information will result in no action being taken on the request. False information on this form may subject the requester to criminal penalties under 18 U.S.C. Section 1001 and/or 5 U.S.C. Section 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to Director, Facilities and Administrative Services Staff, Justice Management Division, U.S. Department of Justice, Washington, DC 20530 and the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC 20503.

Full Name of Requester [1] __Vittorio Amuso__

Citizenship Status [2] _____American_____  Social Security Number [3] _____

Current Address __Big Sandy  USP  P.O.  Box 2068, Inez, KY  41224__

Date of Birth __ _____  Place of Birth __Brooklyn, NY__

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

Signature [4] _Vittorio Amuso_ _____ Date _7/16/07_

---

**OPTIONAL: Authorization to Release Information to Another Person**

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b), I authorize the U.S. Department of Justice to release any and all information relating to me to:

_____

**Print or Type Name**

[1] Name of individual who is the subject of the record sought.
[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an Alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.
[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.
[4] Signature of individual who is the subject of the record sought.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VITTORIO AMUSO,<br># 38740-079<br>USP-BIG SANDY<br>P.O. BOX 2068<br>INEZ, KY 41224<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br>FEDERAL BUREAU OF INVESTIGATION<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 07-CV-01935<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# EXHIBIT B

<u>April 10, 2007</u>
   (Date)

Vittorio "Vic" Amuso #38740-079
U.S.P. Big Sandy
P.O. Box #2068
Inez, KY  41224

Federal Bureau of Investigations
FOIA/PA Division
950 Pennsylviana Ave., NW
Washington, DC  20530

Re:  Freedom of Information/Privacy Acts Request

Dear Records Custodian:

This is a Freedom of Information and Privacy Act (FOIA/PA)
request made pursuant to Title 5 U.S.C. Sec. 552, 552a and
28 C.F.R. Sec. 16.1 et. seq.   In this case Amuso is requesting
any and all documents, records, memoranda, notes, statements and
other information or data in what ever form maintained by your
agency that relates to and/or makes reference to Amuso directly
or indirectly.  More specifically, any data or information in
the possession or control of your agency related to and/or
generated by the criminal investigation and prosecution of
Amuso by federal authorities in and around the U.S. Federal
Districts of New York.  This would include, but not be limited
to, any agency documents, records, reports, statements, notes,
case file summaries and all forms of information maintained by
your agency that makes reference to Amuso directly and indirectly.
     Amuso would specifically request a search of your agency's
Central Records System (CRS), Automated Case Support System (ACSS),
Electronic Case Files (ECF), Universal Index (UI), Legal Attaches
(Legats), Investigative Case Managment system (ICMS), Confidental
Source System (CSS) and the "I-Drive" system.  Any "main" and/or
"references" to Amuso by his known name would be responsive to
this request.  Also, any reference to Amuso as the "Boss" of the
Lucchese "Crime Family", or "soldier", or "Captian", or "Member"
of the "La Cosa Nostra" would be requested.
     This FOIA/PA request specifically requests information from
January 1980 until the present time.  To further aid your agency
in effecting this FOIA/PA request, be advised that numerous federal
criminal investigations and prosecutions have been pursued against
Amuso and "fellow members" of the "La Cosa Nostra" resulting in
volumous records and information that will make reference to
Amuso and various participants in those investigations and criminal
prosecutions.  For example, in 2006 there was reference to Amuso
related to the criminal trial of two former New York City Police
officers alleged to be employed by the Lucchese "Crime Family".
Additionally, the prosecution of various alleged members of the
"La Cosa Nostra" transpired during 2005 and 2006 which made ref-
erences to Amuso.  These records would be responsive to this

{Page 1 or 3 pages}

Freedom of Information/Privacy Acts Request
Vittorio "Vic" Amuso #38740-079
Page 2 of 3 pages

FOIA/PA request. Certian alleged "members" and/or "associates" identified as Anthony "Gas Pipe" Casso and Alphonse D'Arco would be relavent to any information requested by Amuso.

Be advised that Amuso makes this FOIA/PA request for solely personal and not commercial purposes. All information sought by Amuso is for the public's interest insomuch as society is offended when an innocent man remains imprisoned. A grave miscarriage of justice is being committed by Amuso's continued incarceration and Life sentence based on perjured testimony of certain individuals and prosecutorial misconduct. The release of information in this case will serve to correct this miscarriage of justice and reaffirm the public's confidence in the American criminal justice system.

Your agency should specifically reference any and all statutory provisions relied upon to assert any exemption when denying release of information under Secs. 552 and 552a. Amuso agrees to pay any and all reasonable costs and fees associated with this request, however would request that your agency make the first 100 documents available without cost under 28 C.F.R. Sec. 16.1, et. seq.

All of Amuso's personal information is being made available to your agency as found at page #3 of this request. If your agency requires any additional information to complete this FOIA request please contact Amuso at the address indicated above. A certificate of identity is attached herewith.

Thank you for your time and concern in this matter.

Respectfully submitted,

/s/ Vittorio Amuso
Vittorio "Vic" Amuso

Attachments

cc: Retained

740-079

Freedom of Information/Privacy Acts Request
Vittorio "Vic" Amuso #38740-079
Page 3 of 3 pages

PERSONAL INFORMATION OF VITTORIO "VIC" AMUSO

Date of Birth :

Place of Birth:    Brooklyn, New York

SS No.:

FBI No:    698774B

US Marshal No.:    38740-079

Criminal Docket #: CR-90-446  Eastern District, NY

Other Information:  Alleged "member" of "La Cosa Nostra" and

"Lucchese Crime Family"/ Federal prosecution case names "Windows

Cases I and II"

apartment of Justice                 **Certification of Identity**            

**Privacy Act Statement.** In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The purpose of this solicitation is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. Failure to furnish this information will result in no action being taken on the request. False information on this form may subject the requester to criminal penalties under 18 U.S.C. Section 1001 and/or 5 U.S.C. Section 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to Director, Facilities and Administrative Services Staff, Justice Management Division, U.S. Department of Justice, Washington, DC  20530 and the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC  20503.

Full Name of Requester [1]   *VITTERIO AMUSO*

Citizenship Status [2]  *U.S.A.*            Social Security Number [3] _____

Current Address   *U.S.P. BIG SANDY INEZ. KY. 41224*

Date of Birth _____          Place of Birth  *Brooklyn. N.Y. 11236*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

Signature [4]  *Vittorio Amuso*                       Date  *4/10/07*

## OPTIONAL: Authorization to Release Information to Another Person

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b), I authorize the U.S. Department of Justice to release any and all information relating to me to:

_____

**Print or Type Name**

[1] Name of individual who is the subject of the record sought.
[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an Alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.
[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.
[4] Signature of individual who is the subject of the record sought.

FORM APPROVED OMB NO. 1103-0016
EXPIRES 2/29/04                            *U.S. GPO: 3001-472-528/52201                          FORM DOJ-361
                                                                                                 APR.02

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VITTORIO AMUSO,                                    )
# 38740-079                                        )
USP-BIG SANDY                                      )
P.O. BOX 2068                                      )
INEZ, KY 41224                                     )
                                                   )
        Plaintiff,                                 )
                                                   )   Civil Action No. 07-CV-01935
            v.                                     )
                                                   )
U.S. DEPARTMENT OF JUSTICE,                        )
FEDERAL BUREAU OF INVESTIGATION                    )
                                                   )
        Defendants.                                )
                                                   )

# EXHIBIT C



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

May 3, 2007

MR VITTORIO AMUSO
**38740-079
U.S.P. BIG SANDY
POST OFFICE BOX 2068
INEZ, KY 41224

Request No.: 1076768- 000
Subject: AMUSO, VITTORIO

Dear Requester:

☒    This acknowledges receipt of your Freedom of Information-Privacy Acts (FOIPA) request to the FBI. The FOIPA number listed above has been assigned to your request. Your request to the Albany Field Office was forwarded to FBI Headquarters for handling.

☐    For an accurate search of our records, please provide the complete name, alias, date and place of birth for the subject of your request. Any other specific data you could provide such as prior addresses, or employment information would also be helpful. If your subject is deceased, please include date and proof of death.

☐    To make sure information about you is not released to someone else, we require your notarized signature or, in place of a notarized signature, a declaration pursuant to Title 28, United States Code 1746. For your convenience, the reverse side of this letter contains a form which may be used for this purpose.

☐    If you want the FBI's Criminal Justice Information System (CJIS) to perform a search for your arrest record, please follow the enclosed instructions in Attorney General Order 556-73. You must submit fingerprint impressions so a comparison can be made with the records kept by CJIS. This is to make sure your information is not released to an unauthorized person.

☒    We are searching the indices to our central records system at FBI Headquarters for the information you requested, and will inform you of the results as soon as possible.

☐    Processing delays have been caused by the large number of requests received by the FOIPA. We will process your request(s) as soon as possible.

Your request has been assigned the number indicated above. Please use this number in all correspondence with us. Your patience is appreciated.

Sincerely yours,

David M. Hardy

Section Chief,
Record/Information
  Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VITTORIO AMUSO,                      )
# 38740-079                          )
USP-BIG SANDY                        )
P.O. BOX 2068                        )
INEZ, KY 41224                       )
                                     )
        Plaintiff,                   )
                                     )
                                     )    Civil Action No. 07-CV-01935
            v.                       ).
                                     )
U.S. DEPARTMENT OF JUSTICE,          )
FEDERAL BUREAU OF INVESTIGATION      )
                                     )
        Defendants.                  )
                                     )

# EXHIBIT D



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D. C. 20535-0001

May 7, 2007

Vittorio "Vic" Amuso
U.S.P. Big Sandy
Post Office Box 2068
Inez, KY 41224

Request No.: 1076768

Dear Requester:

This acknowledges receipt of your Freedom of Information-Privacy Acts (FOIPA) request
to FBI Headquarters. The FOIPA number listed above has been assigned to your request.

Sincerely yours,

David M. Hardy
Section Chief
Record/Information
 Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VITTORIO AMUSO,                          )
# 38740-079                              )
USP-BIG SANDY                            )
P.O. BOX 2068                            )
INEZ, KY 41224                           )
                                         )
        Plaintiff,                       )
                                         )     Civil Action No. 07-CV-01935
        v.                               )
                                         )
U.S. DEPARTMENT OF JUSTICE,              )
FEDERAL BUREAU OF INVESTIGATION          )
                                         )
        Defendants.                      )
                                         )

# EXHIBIT E



U.S. Department of Justice

Federal Bureau of Investigation

*Washington, D.C. 20535*

May 21, 2007

MR VITTORIO AMUSO
**38740-079
U.S.P. BIG SANDY
POST OFFICE BOX 2068
INEZ, KY 41224

Request No.: 1076768- 000
Subject: AMUSO, VITTORIO

Dear Requester:

Records which may be responsive to your Freedom of Information-Privacy Acts (FOIPA) request were destroyed (date unknown). Since this material could not be reviewed, it is not known if it actually pertains to your subject. The disposal of records is handled under Title 44, United States Code, Section 3301 and Title 36, Code of Federal Regulations, Chapter 12, Sub-chapter B, Part 1228, issued by the National Archives and Records Administration (NARA). The FBI Records Retention Plan and Disposition Schedules have been approved by the United States District Court for the District of Columbia and are monitored by knowledgeable representatives of the NARA.

Should you desire a check of our field office files, you must write directly to the appropriate field office(s).

You may file an administrative appeal by writing to the Office of Information and Privacy, United States Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001, within sixty days from the date of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal." Please cite the Freedom of Information-Privacy Acts (FOIPA) request number assigned to your request so that it may be easily identified.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
    Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VITTORIO AMUSO,                              )
# 38740-079                                  )
USP-BIG SANDY                                )
P.O. BOX 2068                                )
INEZ, KY 41224                               )
                                             )
        Plaintiff,                           )
                                             )        Civil Action No. 07-CV-01935
             v.                              )
                                             )
U.S. DEPARTMENT OF JUSTICE,                  )
FEDERAL BUREAU OF INVESTIGATION              )
                                             )
        Defendants.                          )
                                             )

# EXHIBIT F



**U.S. Department of Justice**

Office of Information and Privacy

_____

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*

**JUN 2 0 2007**

Mr. Vittorio Amuso
Register No. 38740-079
United States Penitentiary
Post Office Box 2068
Inez, KY 41224

      Re: Request No. 1076768

Dear Mr. Amuso:

      This is to advise you that your administrative appeal from the action of the Federal Bureau of Investigation was received by this Office on June 8, 2007.

      The Office of Information and Privacy, which has the responsibility of adjudicating such appeals, has a substantial backlog of pending appeals received prior to yours. In an attempt to afford each appellant equal and impartial treatment, we have adopted a general practice of assigning appeals in the approximate order of receipt. Your appeal has been assigned number 07-1718. Please mention this number in any future correspondence to this Office regarding this matter.

      We will notify you of the decision on your appeal as soon as we can. We regret the necessity of this delay and appreciate your continued patience.

                    Sincerely,

                    Priscilla Jones
                    Supervisory Administrative Specialist

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VITTORIO AMUSO,<br># 38740-079<br>USP-BIG SANDY<br>P.O. BOX 2068<br>INEZ, KY 41224<br><br>     Plaintiff,<br><br>          v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br>FEDERAL BUREAU OF INVESTIGATION<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 07-CV-01935<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# EXHIBIT G

July 12, 2007

Vittorio Amuso #38740-079
USP Big Sandy
P.O. Box 2068
Inez, KY 41224

FOIA/PA Mail Referral Unit
Justice Management Division
US Dept. of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

Re: FOIA/PA Request Follow-up

To Whom it May Concern:

This letter is written to check the status of my two FOIA/PA requests sent to your office
for referral to Scranton, PA; and New York City, NY FBI Feild Offices. See attached
FOIA/PA letter and Certified Mail Receipts dated 4/26/07 and 4/11/07 respectfully.

Your office did send me a notice (related to Scranton letter) that a referral was made to
the US Justice Dept. (FBI) in Washington, DC, however I did not request such referral.
Under 28 CFR § 16.3(a) your office is required to preform referrals under the FOIA/PA
statute as requested by requesters. Apparently this was not done in either of my
referral requests. I trust your office will correct the matter by properly refering my
FOIA/PA requests as provided by law.

I will assume that your office has denied my request here if I don't receive an answer
within the next 30 days and appeal to the Director's Office accordingly.

Thank you for your time and concern in this matter.

Respectfully,

Vittorio Amuso

Vittorio Amuso

attachments
cc: Retained



Re:  Freedom of Information/Privacy Acts Request

Dear Records Custodian:

This is a Freedom of Information and Privacy Act (FOIA/PA) request made pursuant to Title 5 U.S.C. Sec. 552, 552a and 28 C.F.R. Sec. 16.1 et. seq.  In this case Amuso is requesting any and all documents, records, memoranda, notes, statements and other information or data in what ever form maintained by your agency that relates to and/or makes reference to Amuso directly or indirectly.  More specifically, any data or information in the possession or control of your agency related to and/or generated by the criminal investigation and prosecution of Amuso by federal authorities in and around the U.S. Federal Districts of New York.  This would include, but not be limited to, any agency documents, records, reports, statements, notes, case file summaries and all forms of information maintained by your agency that makes reference to Amuso directly and indirectly.
    Amuso would specifically request a search of your agency's Central Records System (CRS), Automated Case Support System (ACSS), Electronic Case Files (ECF), Universal Index (UI), Legal Attaches (Legats), Investigative Case Managment system (ICMS), Confidental Source System (CSS) and the "I-Drive" system.  Any "main" and/or "references" to Amuso by his known name would be responsive to this request.  Also, any reference to Amuso as the "Boss" of the Lucchese "Crime Family", or "soldier", or "Captian", or "Member" of the "La Cosa Nostra" would be requested.
    This FOIA/PA request specifically requests information from January 1980 until the present time.  To further aid your agency in effecting this FOIA/PA request, be advised that numerous federal criminal investigations and prosecutions have been pursued against Amuso and "fellow members" of the "La Cosa Nostra" resulting in volumous records and information that will make reference to Amuso and various participants in those investigations and criminal prosecutions.  For example, in 2006 there was reference to Amuso related to the criminal trial of two former New York City Police officers alleged to be employed by the Lucchese "Crime Family".  Additionally, the prosecution of various alleged members of the "La Cosa Nostra" transpired during 2005 and 2006 which made references to Amuso.  These records would be responsive to this

[Page 1 or 3 pages]



CERTIFIED MAIL

7002 2030 0005 8230 2693

Vittorio Amuso 38740-079
USP Big Sandy
PO Box 2068
Inez, KY 41224

Legal Mail

FOIA/PA Mail Referral Unit
Justice Management Division
U.S. Dept of Justice
950 Pennsylvania Ave. N.W.
Washington, DC 20530-0001

U.S. Department of Justice
Justice Management Division

**Freedom of Information Act/Privacy Act
Referral/Action Slip**

Clerk:  M. Barnes

Date:

Organization:  JMD/FASS

Building & Room:  LOC, 113

AUG 2 2 2007

| To | From | | To | From |
|---|---|---|---|---|
| ☐ | ☐ | Office of Information & Privacy | ☐ | ☐ Immigration Review, Executive Office for |
| | | ———————— | ☐ | ☐ Inspector General, Office of |
| | | ———————— | ☐ | ☐ Intelligence Policy and Review, Office of |
| | | ———————— | ☐ | ☐ INTERPOL, U.S. National Central Bureau |
| ☐ | ☐ | Antitrust Division | ☐ | ☐ Justice Management Division Staff: _____ |
| ☐ | ☐ | Bureau of Alcohol, Tobacco, Firearms and Explosives | ☐ | ☐ Justice Programs, Office of |
| ☐ | ☐ | Civil Division | ☐ | ☐ Legal Counsel, Office of |
| ☐ | ☐ | Civil Rights Division | ☐ | ☐ National Drug Intelligence Center |
| ☐ | ☐ | Community Relations Service | ☐ | ☐ Pardon Attorney, Office of |
| ☐ | ☐ | Community Oriented Policing Services | ☐ | ☐ Professional Responsibility Advisory Office |
| ☐ | ☐ | Criminal Division | ☐ | ☐ Professional Responsibility, Office of |
| ☐ | ☐ | Dispute Resolution, Office of | ☐ | ☐ Solicitor General, Office of |
| ☐ | ☐ | Drug Enforcement Administration | ☐ | ☐ Tax Division |
| ☐ | ☐ | Environment & Natural Resources Division | ☐ | ☐ U.S. Attorneys, Executive Office for |
| ☐ | ☐ | Federal Bureau of Prisons | ☑ | ☐ U.S. Marshals Service |
| ☑ | ☐ | Federal Bureau of Investigation | ☐ | ☐ U.S. Parole Commission |
| ☑ | ☐ | Federal Detention Trustee, Office of | ☐ | ☐ U.S. Trustees, Executive Office for |
| ☐ | ☐ | Foreign Claims Settlement Commission | ☐ | ☐ ———————— |

Requester:  Vittorio Amuso

Ref: _____

Date of Request:  July 28, 2007

Received By:  FOIA/PA Mail Referral Unit _____  Type of Request:  FOI/PA

Remarks:  Requester advised of this referral.

"Follow-Up"

FORM JMD-481
Rev. Mar. 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VITTORIO AMUSO,                          )
# 38740-079                              )
USP-BIG SANDY                            )
P.O. BOX 2068                            )
INEZ, KY 41224                           )
                                         )
        Plaintiff,                       )
                                         )   Civil Action No. 07-CV-01935
            v.                           )
                                         )
U.S. DEPARTMENT OF JUSTICE,              )
FEDERAL BUREAU OF INVESTIGATION          )
                                         )
        Defendants.                      )
                                         )

# EXHIBIT H



**U.S. Department of Justice**

Office of Information and Privacy

---

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*

AUG 0 8 2007

Mr. Vittorio Amuso
Register No. 38740-079
United States Penitentiary .              Re:    Appeal No. 07-1718
Post Office Box 2068                            Request Nos. 1076768
Inez, KY 41224                                  ADW:CAS

Dear Mr. Amuso:

      You appealed from the action of the Albany Field Office and the Headquarters Office of the Federal Bureau of Investigation on your request for access to records pertaining to yourself.

      After carefully considering your appeal, I am affirming the action of the FBI. The FBI informed you that records that might have been responsive to your request were destroyed pursuant to routine records destruction schedules and Department of Justice regulations. <u>See</u> 44 U.S.C. § 3302 (2000) and 36 C.F.R. § 1228 (2006). I have determined that the FBI's response was correct.

      The FBI has not searched any of its other field offices. If you would like other field offices searched, you must make new requests directly to those field offices. <u>See</u> 28 C.F.R. §§ 16.3(a), 16.41(a) (2007) (requests for records held by FBI field offices must be submitted to the field offices directly).

      In addition, the FBI has indicated that the Drug Enforcement Administration (DEA) may have records responsive to your request. If you have not already done so, I suggest that you submit a separate Freedom of Information Act request for this information directly to DEA at the following address:

                  Ms. Katherine L. Myrick, Chief
                  Freedom of Information Operations Unit
                  Drug Enforcement Administration
                  Department of Justice
                  700 Army Navy Drive
                  Arlington, VA 22202

-2-

If you are dissatisfied with my action on your appeal, you may seek judicial review in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Janice Galli McLeod
Associate Director

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VITTORIO AMUSO,                              )
# 38740-079                                  )
USP-BIG SANDY                                )
P.O. BOX 2068                                )
INEZ, KY 41224                               )
                                             )
        Plaintiff,                           )
                                             )      Civil Action No. 07-CV-01935
                v.                           )
                                             )
U.S. DEPARTMENT OF JUSTICE,                  )
FEDERAL BUREAU OF INVESTIGATION              )
                                             )
        Defendants.                          )
                                             )

# EXHIBIT I

HPR-04-1996  10:44       FBI BROOKLIN QUEEN'S PA

(04/01/1995)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                          **Date:** 04/04/1996

**To:** FBIHQ                    **Attn:** [        ]OC SECTION
                                              , ROOM 3117
**From:** NEW YORK
        C-17, BQRA
        **Contact:** [                    ]

**Approved By:** [                    ]                    b6 -1,5
                                                           b7C -1,5
**Drafted By:** [                    ] J:gjh

**Case ID #:** 281A-NY-247053   (Pending)

**Title:** VITTORIO AMUSO, [          ]
            [          ] ET AL;
            OC/DI-LCN LUCHESE FAMILY;
            OO:NY/BQRA

**Synopsis:** [                                                    ]    b2 -3
                                                                       b7E

**Details:** Captioned case is focusing on the organized crime grip
on labor unions and the trucking industry in the garment center
and specifically the Luchese Family domination of the
INTERNATIONAL LADIES GARMENT WORKERS UNION (ILGWU). One of the
methods used to exert their power is the control of union
officials at the ILGWU.

66F - HQ - A 1074181 - 63

b6 -2,5
b7C -2,5
b7D -1
b7F

1

AMUSO-1



(Rev. 01/1995)

# FEDERAL BUREAU OF INVESTIGATION

To: FBIHQ From: NEW YORK
Re: 281A-NY-247053, 04/04/1996

b2 -3
b6 -3,5
b7C -3,5
b7D -1
b7E

2

AMUSO-2

*357*

0017  MRI 01378

PP P12

DE FBINY #0013 3429606        b6 -1,5
                             b7C -1,5
ZNR UUUUU        *ICE*

P 062208Z DEC 96

FM FBI NEW YORK (281A-NY-260322) (C-1)

TO DIRECTOR FBI/PRIORITY/

LEGAT CARACAS/PRIORITY/

LEGAT OTTAWA/PRIORITY/

FBI NEWARK/PRIORITY/

INFO LEGAT ROME/PRIORITY/

BT

UNCLAS

SECTION ONE OF TWO SECTIONS

CITE: //3540//

PASS: HQ FOR OC #2, DOS SSA [          ] NEWARK FOR GMRQ, SA        b6 -1
                                                                    b7C -1

[          ]

SUBJECT: [                                              ]        b6 -5
                                                                 b7C -5
[                      ] DRUGS - IOC; OO: NY.

                                              Outside the Scope

AMUSO-3

*92A-HQ-1020655-C1-5*

*92A-HQ-1020655-C1*

PAGE FIVE DE FBINY 0013 UNCLAS

Outside the Scope

b6 -3,5
b7C -3,5
b7D -4,5

WAS CONVICTED IN DEA HEROIN DISTRIBUTION CASE ALSO INVOLVING                    AND VITTORIO AMUSO IN 1981, THE

AMUSO-4

PAGE SIX DE FBINY 0013 UNCLAS

LATTER INDIVIDUALS SUBSEQUENTLY FORMING THE RULING FIGURES OF

THE LUCHESE LCN FAMILY IN THE LATE 1980'S-EARLY 1990'S.

Outside the Scope

BT

#0013

NNNN

AMUSO-5

**Memorandum**

To    :  SECTION CHIEF, ORGANIZED CRIME SECTION  Date  6/19/92
         ATTN:  UNIT CHIEF

b6 -1
b7C -1

From  :  SSA STANLEY T. NYE, JR.

Subject:  LIUNA
          RICO
          (OO:  Chicago)

*183-11597*

        Attached are copies of the following newspaper
clippings:

Article entitled "Mob Paper Trail in Court" by PAUL MOSES
published on Page 7 of Newsday on Long Island, New York, on
Sunday, May 31, 1992, with attached article entitled "Mob Took
Payoffs under Fed's Nose" by KEVIN FLYNN and MICHAEL WEBER,
concerning the testimony of former Luchese La Cosa Nostra (LCN)
Family Acting Boss ALPHONSE D'ARCO in the trial of Luchese LCN
Family Boss VITTORIO AMUSO, also known as (aka) "Little Vic,"
which mentions organized crime involvement with Quadrozzi
Concrete Corporation, International Brotherhood of Teamsters
(IBT) Local 202, at the Hunts Point Market, IBT Local 295, IBT
Local 851, and Laborers' International Union of North America
(LIUNA) Local 66

Outside the Scope

STN/stn

AMUSO-6

183-11597-271

b6 -1
b7C -1

# Mob Paper Trail in Court

**By Paul Moses**
STAFF WRITER

In this time of financial accountability, even the mob has opened its books to the public.

The man who kept the "books" — actually, scraps of paper he hid in his bedroom — is balding, affable-looking Alfonso D'Arco, 59, who testified that he was acting boss of the Luchese crime family, and took part in 10 murders or attempted slayings.

His testimony last week at U.S. District Court in Brooklyn portrayed, dollar by dollar, how organized crime insinuates itself into the economic life of the New York metropolitan area by shaking down some businesses for hundreds of thousands of dollars and controlling unions. In one six-month period cited at the trial, more than $1 million in payoffs were described.

Prosecutors were trying to prove with a paper trail that the defendant — alleged Luchese boss Vittorio Amuso — collected tribute from a wide range of businesses through their control of unions.

It's unusual for such records to exist, but D'Arco explained that he was afraid his bosses, who were fugitives, wouldn't trust him to handle such large amounts of cash. So he began jotting down the income and expenses in late 1990 and early 1991.

The Christmas holidays were particularly lucrative.

According to D'Arco:

On Tuesday, Dec. 18, 1990, "Tommy" brought in $30,000 in cash from a labor payoff in the air freight industry.

Another man came by two days later. He was a big favorite, the head of "a construction panel that handled all the labor racketeering and unions for the Luchese family." He brought over small change — $2,000 — as a Christmas gift.

On Dec. 25, Amuso got a $12,000 Christmas gift from D'Arco's crew. Another crew sent in $5,300 in "Christmas tribute" for the boss.

A week later, another $30,000 rolled in from Tommy for "a deal." Then someone brought in $50,000 from a contractor. The next day, the record lists $15,000 more, but D'Arco can't remember what that was for.

On Jan. 5, D'Arco says, Sally Avellino stopped in with $11,500, the Luchese boss' monthly share from the mob's control of garbage carting in Manhattan's garment district. Two days later, another contractor sent in $25,000.

Contractors were a big favorite. John Quadrozzi of Queens was shaken down for $20,000 a month, D'Arco testified. A Long Island construction firm gave a single $5,000 payment for a "labor deal," he said. One entry on March 4, 1991, refers to $175,000 that D'Arco says was from two other contractors. "They paid approximately $300,000 a year," he testified.

A Long Island contractor was supposed to make two $25,000 payments a year, including once at



Alfonso D'Arco: the man who kept the 'books'

Christmas time, D'Arco said.

Unions, which prosecutors say were a source of Luchese power in the air freight and construction industries, also were big donors.

D'Arco said a laborers local contributed $1,100 a

Please see MOB on Page 38

---

## Mob Took Payoffs Under Fed's Nose

**By Kevin Flynn and Michael Weber**
STAFF WRITERS

A cement company that federal prosecutors vouched for three years ago made monthly payoffs to the Luchese mob under the nose of a government monitor, according to court testimony.

U.S. Attorney Otto Obermaier personally assured city leaders in 1989 that Quadrozzi Concrete's ties to organized crime were in the past and that they had little to fear from the Queens firm's takeover of a sizable portion of the cement market.

Just in case, Obermaier said, a monitor appointed by the federal government would be overseeing the company's books. But on Thursday, the former acting boss of the Luchese crime family testified that Quadrozzi paid the mob $20,000 a month.

Quoting from his tattered records of payoffs, former boss Alphonse D'Arco recalled routinely picking up $10,000 payments from Quadrozzi during 1990 and 1991. These, he said, represented "part of the $20,000 a month that [Quadrozzi] ... customarily had to pay."

The monitor, Bart Schwartz, a former federal prosecutor, defended his work, saying he picked up on "suspicious accounting and financial practices" at Quadrozzi in the summer of 1991 and alerted the U.S. attorney's office.

Obermaier said he could not comment fully on D'Arco's allegations because they were under investigation. But he said he was satisfied that the monitor had done all he could to ensure Quadrozzi operated lawfully. "Preventing people intent on doing wrong from doing wrong is an extraordinarily difficult task," he said.

The president of the company, John Quadrozzi, did not return phone calls. In the past he has denied having any business relationship with organized crime.

Although Quadrozzi has never been convicted of a crime, law enforcement authorities have long identified him as a Luchese associate who participated in mob schemes to control the ready-mix cement industry. Based on wiretap and other evidence, they have charged that he paid off reputed Luchese member Frank Manzo for years to protect his business from competition.

Attorney General Robert Abrams said in 1989 that one of Quadrozzi's partners was an unnamed mobster and that Quadrozzi had admitted associating with crime figures since 1948.

Obermaier's office came forward in 1989 to vouch for Quadrozzi, which was trying to buy the assets of two defunct cement companies convicted in a mob racketeering case.

AMUSO-7

*183 - 11597-271*

NEW YORK · SUNDAY ·



## AREA RUG SAVINGS
Area Rugs Available At Our Lake Grove and Brooklyn Stores Only!

Contemporary & Modern Patterns From Belgium 5'x8' **$69**
Compare $149.

Custom Beveled 2-Color Bordered Patterns 6'x9' **$159**
Compare $299.

Southwestern Pattern Or Traditional Design 7'x12' **$189**
Compare $389.

Hand-Carved All Wool Chinese Special Closeout 9'x12' **$499**

Most rugs available in other sizes. All sizes are approximate.

### NO PAYMENT NO INTEREST 'TIL OCT. '92*

### ODD ROLL SUPER SPECIALS
Choose from our all wool designer series, DuPont Stainmaster, Anso CrushResister, BASF, and much more!

**$3 49** SQ. YD. To **$24 99** SQ. YD.

PAD AND INSTALLATION AVAILABLE

SOME QUANTITIES LIMITED
FIRST COME FIRST SERVED!

*Comparative regular prices for the same or similar goods sold in specialty and department stores. **With $500 minimum purchase and 1/3 down; see stores for details. Prior Sales Exclude. Intermediate markdowns may have been taken.

# Cadillac Carpet Distributors
No Gimmicks . . . No Games . . .
We Sell For Less Because We Buy Direct!

COMMERCIAL CARPET DEPT. FOR ALL YOUR COMMERCIAL AND INDUSTRIAL NEEDS CALL HERB HEIM 1-800-334-2234.

LAKE GROVE          WESTBURY
BROOKLYN

NEW YORK NEWSDAY, SUNDAY, MAY 31, 1992*

To frenzy applause, Abrams cited differences between Ferraro and himself. She shared a timid "Democratic establishment" approach to defense spending cuts, he said, and a timid health-care plan to leave the present system mostly in place. Abrams got his loudest applause when he noted that Ferraro favors the death penalty while he, like the Liberals, oppose it.

# Harried by the Mob, He Wrote It All Down

MOB from Page 7

week and that another union came up with $15,000 at Christmas.

D'Arco said a mobster identified as Anthony Colagna came up with thousands of dollars "from the airport" — he had the hands-on control of a union of toll-booth collectors in the Hunts Point Market, and of Teamsters Locals 851 and 295, the main air freight unions. This included several payments collected from air freight companies in New Jersey, one as large as $29,000, D'Arco said.

D'Arco says he recorded a $6,000 payment obtained through Laborers Local 66, which he said was controlled by the Luchese mob.

Where did all the money go?

D'Arco said some went to the renovation of reputed underboss Anthony Casso's home in the Mill Basin section of Brooklyn. There were payments to an architect, who later was murdered. One list includes $12,000 for stucco; a $12,000 down payment on German-made doors that cost $40,000; and money for roofing and the plumber.

D'Arco said legal bills of Luchese mobsters were paid by the family. Flowers were sent to the deceased mother of an associate. Wedding gifts were purchased. Mortgages were paid on homes.

In his opening arguments, Assistant U.S. Attorney Charles Rose said that Amuso "held himself out to be a motel employee in Howard Beach," a window salesman and marina operator. His tax returns reflected a slow increase in his annual income, starting with $16,000 in 1979 and going up to $65,000 in 1987.

Rose said that, "curiously," the man "trained in marina operations, window sales and motel work" became a trucking executive in the garment center in 1988, and got $360,000 in profit in 1990.

AMUSO-8

## Memorandum

| | | | Date | |
|---|---|---|---|---|
| To | : | SECTION CHIEF, ORGANIZED CRIME SECTION | 5/19/92 | |
| | | ATTN:   UNIT CHIEF | | b6 -1 |
| From | : | SSA STANLEY D. NYE, JR. | | b7C -1 |

Subject:  LIBERATUS
          RICO
          (OO:   FBIHQ)

183-8533

**Attached are copies of the following newspaper clippings:**

Outside the Scope

533-4955

b6 -1
b7C -1

AMUSO-9

Outside the Scope



b6 -2
b7C -2

who are both currently cooperating witnesses

Article entitled "2d Windows Trial Opens in B'klyn" by FRANCES MC MORRIS published on Page 5 of the New York Daily News in New York, New York, on Tuesday, May 19, 1992, regarding the trial of

2

AMUSO and CASSO

Article entitled "Rally 'Round the Don / 700 Demand New Gotti Trial / 'Organized' Rally Cry: Re-Try Gotti" by JERE HESTER published on Page 3 of the New York Daily News in New York, New York, on Monday, May 18, 1992, regarding Gambino LCN Family Boss JOHN GOTTI

3                                                    Outside the Scope

AMUSO-11

AMUSO-12

183-8533-4955

Exec AD Adm. _____
Exec AD Inv. _____
Exec AD LES _____
Asst. Dir.:
  Adm. Servs. _____
  Crim. Inv. _____
  Ident. _____
  Insp. _____
  Intell. _____
  Lab. _____
  Legal Coun. _____
  Off. Cong. &
    Public Affs. _____
  Rec. Mgnt. _____
  Tech. Servs. _____
  Training _____
Telephone Rm. _____
Director's Sec'y _____

(See Attached)

The Washington Post _____
The Washington Times _____
Daily News (New York) _____
The New York Times _____ P. 62
The Wall Street Journal _____
The Chicago Tribune _____
The Los Angeles Times _____
The Christian Science Monitor _____
USA Today _____

AMUSO-13

Date _Tuesday, 5/19/92_

Page _B2_ _____ FBI/DOJ

# Man Linked to Mob Is Said To Rule With an 'Iron Fist'

**By ARNOLD H. LUBASCH**

The racketeering-murder trial of the man accused of being the head of the Lucchese crime family opened yesterday with a prosecutor charging that the defendant, Vittorio Amuso, ordered nine murders and ruled the family "with an iron fist."

The evidence will show that "Mr. Amuso did run the Lucchese crime family in a reign of terror" that included all those murders, the prosecutor, Charles E. Rose, told the jury in his opening statement in Federal District Court in Brooklyn.

"Only Mr. Amuso had the responsibility for ordering those murders that you will hear about in the courtroom," Mr. Rose said.

A defense lawyer, Gerald L. Shargel, said that the charges were "completely unsubstantiated" and that the prosecutors were relying on testimony from "two psychopathic killers."

**'Made Me Do It'**

"They offered freedom to killers," Mr. Shargel told the jury. He asserted that the prosecution's two main witnesses got deals to evade responsibility for the murders by saying, "Vic made me do it."

At the defense table, Mr. Amuso listened to the opening statements with a faint frown. The 57-year-old defendant, conservatively dressed in a dark blue suit, white shirt and blue-striped tie, could face life in prison if convicted.

Both the prosecution and the defense said in their opening statements that two admitted Lucchese leaders who become informers, Alfonse D'Arco and Peter Chiodo, would testify as the main witnesses in the Amuso trial.

Federal authorities say the Lucchese crime family has been involved in drug trafficking, gambling, loan sharking, labor racketeering and corruption in the construction industry, including the replacement of window for the city's Housing Authority.

**'A Smaller Organization'**

The Lucchese organization has about 125 members, making it much smaller than the Gambino and Genovese organizations, the largest Mafia families in the country, according to the authorities. They say it is larger than the Colombos and Bonannos, two other crime families in the area.

Mr. Amuso, a modest-sized man known as Vic or Little Vic who prosecutors say has headed the Lucchese family since 1986, displays none of the high-profile flamboyance of John Gotti, the Gambino boss convicted of similar charges last month in the same courthouse.

The indictment portrays Mr. Amuso as the Lucchese leader responsible for nine murders between 1988 and 1991. But he is described by friends as "a regular guy" who loves sports, stays in good condition and plays a first-rate game of paddle ball in public parks.

Mr. Amuso, who lives in Howard Beach, Queens, has listed his employ-

ment over the years as a security guard for a motel, a salesman for a window-installation company and an executive of a trucking company in the garment center. The indictment charges him with racketeering, murder, extortion, labor payoffs and tax fraud.

The case grew out of a long investigation of mob influence in the window-installation industry in New York City. Mr. Amuso, who was a fugitive for more than a year, has been held in jail without bail since his arrest last July 28.

**A Sequestered Jury**

Judge Eugene H. Nickerson granted the prosecution's request for an anonymous and sequestered jury, keeping the names of the jurors secret and housing them in a hotel under guard. The prosecutors are Mr. Rose, Gregory J. O'Connell and Jo-

## The Lucchese family was run with 'a reign of terror,' a prosecutor says.

seph Nocella. The defense lawyers are Mr. Shargel, Michael Rosen and Alan Futerfas.

The murder victims have been described as Lucchese mobsters, business associates and suspected informers. Information about the murders has come from Mr. Chiodo and Mr. D'Arco, who began cooperating with the authorities last year.

Mr. D'Arco, described by the prosecution as the acting boss of the Lucchese family while Mr. Amuso was a fugitive, will be testifying in public for the first time. Mr. Chiodo, a Lucchese captain called Big Pete, first testified in the so-called windows trial last year after he was severely wounded in an assassination attempt.

**Original Indictment**

The original indictment was filed two years ago, charging Mr. Amuso and several other reputed mob figures with corrupt control of the city's window-installation industry. A superseding indictment early this year added the murder charges against Mr. Amuso.

Mr. Amuso and his reputed underboss, Anthony Casso, who is also a defendant in the case, disappeared shortly before the original indictment was filed. Mr. Amuso was captured in Scranton, Pa., while the windows trial was continuing. But Mr. Casso remains a fugitive.

The windows trial ended with three defendants convicted of some extortion charges, and five others acquitted of all the charges, including labor racketeering. One of the acquitted men was Mr. Gotti's brother, Peter Gotti, a reputed Gambino captain.

AMUSO-14

## Memorandum

*398*

| | | |
|---|---|---|
| To | : | SECTION CHIEF, ORGANIZED CRIME SECTION Date 2/2/93 |
| | | ATTN:  UNIT CHIEF |

b6 -1
b7C -1

From : SSA STANLEY E. NYE, JR.

Subject: LIBERATUS
RICO
(OO:  WMFO)

*183 - 8533*

      Attached are copies of the following newspaper
clippings:

Outside the Scope

ENCL. BEHIND FILE

SDN/sth
ENCLOSURE!

*X,1,2,3,4,5,6,*
*7,8,9,10,11,*
*12,13*

AMUSO-15

6 -

b6 -1
b7C -1

Article entitled "Prosecutors Shift Attack Against Mafia /
Second-Tier Mobsters Focus of New Campaign" by SELWYN RAAB
published on Page 25 of the New York Times in New York, New York,
on Sunday, January 24, 1993, with attached article entitled
"Seven Organized Crime Families / Who's Who," which mention the
convictions of Gambino LCN Family Boss JOHN GOTTI; former Gambino
LCN Family Underboss and current cooperating witness SALVATORE
GRAVANO, aka "Sammy the Bull;" Colombo LCN Family Boss CARMINE
PERSICO, aka "Junior;" Colombo LCN Family Acting Boss VICTOR J.
ORENA, aka "Little Vic;" former Luchese LCN Family Acting Boss
ALPHONSE D'ARCO, aka "Little Al;" De Cavalcante LCN Family Boss
and former Laborers' International Union of North America (LIUNA)
official GIOVANNI RIGGI, aka John M. Riggi; and Luchese LCN
Family Boss VITTORIO AMUSO, aka Vic Amuso; mentions the arrest of
Luchese LCN Family Underboss ANTHONY SALVATORE CASSO, aka
"Gaspipe;" mentions civil and criminal RICO actions brought by
the Government in cases involving organized crime activities in
the private garbage collection industry on Long Island, NMDU, the
International Brotherhood of Painters and Allied Trades (IBPAT),
the New York City District Council of Carpenters, and the
trucking industry in the New York City Garment Center; and also
mentions Gambino LCN Family capo JOHN GOTTI, JR.; Gambino LCN
Family capo PETER GOTTI; Genovese LCN Family Boss VINCENT
GIGANTE, aka "Chin;" Bonanno LCN Family Boss JOSEPH MASSINO; and
Philadelphia LCN Family Boss JOHN STANFA

Article entitled "F.B.I. Arrests a Mafia Boss in New Jersey /
Cellular Calls Traced to Wooded Hideaway" by SELWYN RAAB
published on Page B1 of the New York Times in New York, New York,
on Wednesday, January 20, 1993, regarding the arrests of fugitive
ANTHONY CASSO, who was indicted in the EDNY with AMUSO on charges
including murder and crimes related to the operations of IBPAT,
and ROSEMARIE BILLOTTI, who was arrested for harboring ANTHONY
CASSO

Article entitled "Reputed Crime Boss Is Said to Have Stored Cash
in Hideaway" by SELWYN RAAB published on Page B2 of the New York
Times in New York, New York, on Thursday, January 21, 1993,
regarding the arrests of ANTHONY CASSO and BILLOTTI, which
mentions AMUSO; ANTHONY CASSO, JR., ANTHONY CASSO's son; JOLYNN
CASSO, ANTHONY CASSO's daughter; and GERALD L. SHARGEL, ANTHONY
CASSO's attorney

8                                                    Outside the Scope

AMUSO-16

on Tuesday, January 12, 1993

Outside the Scope

Article entitled "Robbers Take $8.2M in B'klyn Mega-Heist" by
JOHN MARZULLI published on Page 7 of the New York Daily News in
New York, New York, on Tuesday, December 29, 1992, with attached
article entitled "Armored-Car Haul of Fame" by JAY MAEDER, which
mentions armored car robberies in which members and associates of
the Luchese LCN Family were involved

Article entitled "Big Noise from Little Al at Little Vic's Trial"
by FRANCES MC MORRIS and JERE HESTER published on Page 7 of the
New York Daily News in New York, New York, on Wednesday, November
25, 1992, regarding the testimony of ALPHONSE D'ARCO at the trial
of ORENA, which mentions AMUSO and GUSTAVE NEWMAN, AMUSO's
attorney

Outside the Scope

Article entitled "Peace Efforts by Mobsters Recounted / Witness
Says Talks Didn't Stop Killings" by ARNOLD H. LUBASCH published
on Page B4 of the New York Times in New York, New York, on
Tuesday, November 24, 1992, regarding the testimony of ALPHONSE
D'ARCO in the trial of ORENA, which mentions an internecine
conflict in the Colombo LCN Family between a faction led by ORENA
and a faction led by CARMINE PERSICO, the murder of OCERA, AMUSO,
NEWMAN, SESSA, former Luchese LCN Family soldier and current
cooperating witness JOSEPH D'ARCO, and JOHN GOTTI, JR.

Article entitled "Seven Betting Dens Shut in Super Sweep"
published on Page 8 of the New York Post in New York, New York,
on Wednesday, January 20, 1993, regarding raids by the New York

10

AMUSO-17

# CRUB OUT! TOP OBSTER NABBED I THE SHOWER

P. 7, New York
Post, NY, NY
Wednesday, 1/20/9

ly MURRY WEISS
ond JIM NOLAN

y "Gaspipe" Casso —
's most-wanted mob
vas caught naked in the
of his girlfriend's New
home yesterday by a
am of FBI agents.
: his reputation as a
flashy gangster who
a $500,000 diamond ring,
urrendered meekly yes-
exiting the shower with
ls up and a bath towel
is waist.
oture ended three years
un during which he not
ded the feds, but man-
illegedly order the mur-
even of his Mafia associ-

Casso, the 52-year-old
ss of the Lucchese crime
is accused of murdering
e in a federal indictment
ld send him to prison for
of his life.
ickname should not be
;,' " said FBI boss James
should be 'Mad Dog.' "
scribed Casso as a "psy-

: those murdered, al-
at Casso's behest, since
ne a futigive in 1990 are:
ony Fava, the architect
signed Casso's lavish,
on home in Mill Basin.
ad Fava killed rather
y him $40,000 for the de-
·k.
lael Salerno, who Casso
_would try to take over
ly in his absence.



AMUSO-18



**WASHED UP:** *Captured gangland murderer Anthony "Gaspipe" Casso in a 1989 surveillance photo.*

■ Bruno Fatiola, for allegedly violating family rules on money.

■ Larry Taylor and Al Visconti, who were close to Fatiola and sanctioned his murder — vowed to avenge it.

"Gaspipe was not a bad guy before he got into this killing mode," a longtime friend recalled.

"But, like the rest of them, he started getting paranoid once he got up there and thinking people were trying to usurp his spot."

Casso, was cornered at 11:15 a.m. by a 12-member FBI SWAT team that rammed its way through the front door of the suburban home at 79 Waterloo Road in Mount Olive, N.J.

The house is owned by Casso's girlfriend, Rosemarie Billotti, 32, who was home at the time and who also was taken into custody.

After three frustrating years of tracking Casso around the metropolitan area, federal authorities were finally provided with a reliable lead on his whereabouts from wiretaps conducted by the New York State Organized Crime Task Force, in conjunction with the district attorneys of Brooklyn and Nassau County.

Sources said the wiretaps stem from an investigation into labor racketeering at Kennedy Airport.

Fox said Casso had been trying to disguise his appearance. The stocky Casso, who once sported a 10.5-carat diamond ring worth $500,000, had grown a mustache and was wearing glasses to appear bookish.

Billotti was charged with harboring a fugitive.

Authorities said little is known about her, except that she is not a relation of Thomas Billotti, the Gambino family underboss slain with Paul "Big Paul" Castellano in 1985.

At a joint press conference that included Ron Goldstock, the state task force head, and Brooklyn DA Charles Hynes, authorities heralded Casso's capture as the latest blow against the bosses of organized crime.

"Another day, another don," Fox quipped.

Goldstock, citing the recent prosecutions of John Gotti and Vic Amuso, predicted that the mob will be "unrecognizable by the end of the century."

The feds have also jailed Colombo crime boss Carmine Persico, as well has his temporary successor, Victor Orena.

Casso, if convicted, could face life in prison — a fate similar to Amuso, his boss in the Lucchese family.



**GOTTI**
*Locked up.*



**AMUSO**
*In the can.*



**ORENA**
*Behind bars.*

AMUSO-19

# Metro Report

### The New York Times

25

SUNDAY, JANUARY 24, 1993



The extent of damage from the December storm is most striking along what had been Dune Road in Westhampton Beach, L.I. More than 40 structures were destroyed and others, held up on wooden pilings, have ocean waves breaking beneath them.

## Exposing Oceanfront Property and Human Folly

**By JON NORDHEIMER**
Special to The New York Times

WESTHAMPTON BEACH, L.I. — The December storm that carved two new inlets in the narrow barrier beach here and ripped acres of sand away from summer homes has also exposed a reality long buried in promotional fiction along the region's shore:

A rising ocean, part of a long geologic process, is relentlessly claiming parts of the coast faster than man can reclaim it.

And property owners long accustomed to building beach homes wherever they want — in some cases demolishing protective sand dunes to expand their ocean view — may be closer to a day of reckoning when the public will no longer pay the high cost of protecting them from future storms.

Scientists and coastal engineers have worried aloud for years about how much longer the ocean, which has risen nearly a foot in this century along the Atlantic coast, could be kept from destroying beachfront development. But four major storms in 14 months have reinvigorated a debate over where human structures can safely coexist with a surly ocean.

The outcome of the debate has enormous consequences on Long Island and in New Jersey, where for years home rule has allowed municipalities to ignore many of nature's laws and permit the construction of thousands of expensive homes on fragile sections of barrier beaches in places like Long Beach Island in New Jersey and Fire Island and the Hamptons on the southern shore of Long Island. Now there is growing pressure to let nature take its course and swallow beaches that are considered too costly to defend against storms and hurricanes.

The beautiful but fragile white sandy beaches of eastern Long Island and southern New Jersey — some of the most expensive real estate in the world — have long been minefields of explosive politics. When scientists and environmentalists call for a restrain from some vulnerable beaches, private and commercial interests object, citing the economic benefits of tourism and tax revenues produced by summer visitors. The advocates of beach reclamation say the barrier islands are too critical to the protection of the inland bays and populated mainland shores to consider abandoning — easy to reach.

In the four storms, including the Dec. 11 northeaster, homes were destroyed on Fire Island and protective dunes were washed away from Montauk Point to Cape May, N.J. Several seashore communities lost

Continued on Page 30

## Prosecutors Shift Attack Against Mafia

### Second-Tier Mobsters Focus of New Campaign

**By SELWYN RAAB**

With their main Mafia targets convicted or awaiting trial, Federal and state authorities in the metropolitan region are preparing a new campaign against the second tier of organized-crime leaders in New York and New Jersey.

In the last five years, most of the Mafia's bosses, underbosses, and acting bosses — John Gotti, Salvatore Gravano, Carmine Persico, Victor Orena, Alphonse D'Arco and Vittorio Amuso — have been imprisoned or have defected to become Government witnesses. On Tuesday, after 32 months as a fugitive sought on racketeering and murder charges, Anthony Salvatore Casso, the acting boss of the Lucchese family, was arrested in New Jersey.

"The trend is that there is no escape for mob bosses," said Ronald Goldstock, the director of New York State's Organized Crime Task Force. "The fate of anyone who assumes a leadership position in a Cosa Nostra family is a life prison sentence or assassination by a rival."

**Breaking Financial Ties**

Law-enforcement officials maintain that the mob has long reaped millions of dollars annually from extortion, fraud and labor racketeering in the waste-hauling, construction, trucking, garment manufacturing, gasoline-distribution and supermarket industries. So after removing most of the bosses and top henchmen of the area's five major crime families, investigators and prosecutors in New York and New Jersey say they will intensify efforts to uproot the Mafia's illicit financial ties to those industries.

State and Federal prosecutors have brought civil lawsuits to remove the Mafia from control of the trucking industry in Manhattan's Garment District, the private garbage-collection industry on Long Island and the carpenters', painters' and newspaper deliverers' unions in the region.

The growing successes against the long-entrenched Mafia groups may also free up Federal and state investigators and prosecutors to devote greater attention to other ethnic crime gangs that are assuming power in the region, officials said.

William V. Doran, the head of the Federal Bureau of Investigation's Criminal Division in New York, said the bureau's drive

Continued on Page 32

---

## For the Crime Weary, Security Through the Mist

### In a Rising Climate of Fear, Mace and Similar Substances Find Increasing Popularity

**By EVELYN NIEVES**
Special to The New York Times

CLIFTON, N.J., Jan. 23 — Unnerved by a spate of violent carjackings two months ago, Sandra Martinez bought some protection: a can of Mace on a key ring. A week later, she picked up another can to keep in her glove compartment. And another, to clip on her waist when she jogs.

On Thursday, she returned here to the River-Maine Emporium...



---

183- HQ- 8533 - EBF 5608

AMUSO-20

# 2d-Tier Mobsters Are Focus Of Prosecutors' New Efforts

Continued From Page 25

## WHO'S WHO
## Seven Organized Crime Families









AMUSO-21

**Memorand**

*398*

| | | |
|---|---|---|
| To | : | SECTION CHIEF, ORGANIZED CRIME SECTION   Date  2/8/93 |
| | | ATTN:   UNIT CHIEF |
| From | : | SSA STANLEY T. NYE, JR. |

b6 -1
b7C -1

Subject:  LIBERATUS
RICO
(OO:   WMFO)

(83 - 8532)

**Attached are copies of the following newspaper clippings:**

Outside the Scope

STN/stn

X (1,2,3,4,5)     6

b6 -1
b7C -1

HALSEY
AMUSO-22

Outside the Scope

Article entitled "Strike 3, and Mobster's Uncle Is Out" by
MICHELE PARENTE and PEG TYRE published on Page 3 of Newsday on
Long Island, New York, on Wednesday, February 3, 1993, regarding
the murder of FRANK SIGNORINO, the uncle of former LCN Family
capo and current cooperating witness PETER CHIODO, aka "Big
Pete," which mentions Luchese LCN Family Underboss ANTHONY
SALVATORE CASSO, aka "Gaspipe;" Luchese LCN Family Boss VITTORIO
AMUSO, aka Vic Amuso, Greek-American organized crime boss
SPYREDON VELENTZAS; and prior attempted murders of CHIODO and
PATRICIA CAPOZZALO, CHIODO's sister

Article entitled "Informer's Uncle Killed / Found in Daughter's
Car Trunk" by JERRY CAPECI published on Page 11 of the New York
Daily News in New York, New York, on Wednesday, February 3, 1993,
regarding the murder of SIGNORINO

Outside the Scope

AMUSO-23

AMUSO-24

# Strike 3, and Mobster's Uncle Is Out

By Michele Parente
and Peg Tyre
STAFF WRITERS

The third strike was deadly.

After separate unsuccessful attempts to rub out Luchese-captain-turned-government-informant Peter Chiodo and his sister, the mob apparently sought "retribution" against the turncoat a third time by murdering Chiodo's 68-year-old uncle, law-enforcement officials said.

Police found the body yesterday of Frank Signorino, wrapped in a plastic bag in the trunk of a 1991 black Acura parked at the corner of Vermont Street and Flatlands Avenue in East New York, Brooklyn. Signorino, who officials said is a Luchese family

associate, died from "some kind of trauma to the head, possibly a gunshot wound," said Lt. Kevin Perham of the 75th Precinct detective squad.

Signorino, who sources said was a regular at a McDonald Avenue social club that served as Chiodo's headquarters, was reported missing by his family on Staten Island on Jan. 30.

Law enforcement officials, who spoke on the condition of anonymity, said Signorino's murder is believed to have been ordered by jailed Luchese chief Anthony (Gaspipe) Casso, who was nabbed at a rural New Jersey hideout on Jan. 19, after 32 months on the lam. "Cas did the sister, now he did the uncle," said one source, referring to the shooting of Chiodo's sister Patricia Capozzalo as she sat in her car outside her Ben-

sonhurst home on March 10, 1992.

The mother of three survived the two bullets she took in the attempted mob hit, as did her 435-pound brother, who was shot 12 times at a Staten Island service station in May, 1991. Casso and Luchese crime boss Vittorio Amuso were both charged with conspiring to kill Chiodo.

At the time of his shooting, Chiodo was awaiting sentencing after having pleaded guilty in the so-called "Windows" racketeering trial. He turned government witness after the failed rubout attempt and has since testified against Greek-American mob kingpin Spyredon Velentzas and Amuso, who was convicted of racketeering and murder in June, 1992.

Page _____ 3

Date _____

USA Today _____
The Christian Science Monitor _____
The Los Angeles Times _____
The Chicago Tribune _____
The Wall Street Journal _____
The New York Times _____
Daily News (New York) _____
The Washington Times _____
The Washington Post _____

AMUSO-25

Wednesday, February 3, 1993          DAILY NEWS                                    11

# Informer's uncle killed

## Found in daughter's car trunk

By JERRY CAPECI
Daily News Staff Writer

An uncle of top Lucchese informer Peter (Big Pete) Chiodo was found dead in Brooklyn yesterday, apparently shot to death and wrapped in a plastic garbage bag in the trunk of his daughter's car, police said.

Frank Signorino, who was reported missing last Thursday, aided Chiodo in several construction company scams, but was viewed by law enforcement officials as more of a hanger-on guy than a wiseguy.

"He was not a made guy, or a Lucchese associate, but he drove Pete around now and then," said one law enforcement official.

Signorino's killing comes less than a year after Chiodo's sister, Patricia Capozzalo, survived an assassination attempt in front of her Bensonhurst, Brooklyn, house after she dropped one of her children off at school.

Law enforcement officials suspect the rubout attempt on Capozzalo was ordered by Lucchese leaders Vittorio (Vic) Amuso and Anthony (Gaspipe) Casso but said they had no real suspects or motives yet in Signorino's slaying.

'Suspicious-looking' tip

Signorino, 66, was found after residents complained that a suspicious-looking car had been parked at the corner of Flatlands Ave. and Vermont St. in East New York for several days, said Detective Sgt.

John Herbert.

His body was frozen, Herbert said, making it impossible to determine whether he was shot or bludgeoned to death until the body thawed and an autopsy performed.

At Amuso's trial last year, Chiodo, a former capo, said Signorino handled many illegal business dealings for him, destroyed records, and helped him cement phony invoices for a construction company.

Asked about a host of fake corporations created to launder money received from shakedowns of labor unions and contractors, Chiodo — who himself survived a rubout attempt in May 1991 — said some were held in Signorino's name.

"I think my uncle Frank signed on a few of them," Chiodo said. "My uncle who took care of most of those checkbooks, those companies where we washed and moved money around so I gave him instructions as how the money went to Vic," Chiodo testified.



A long way from Birmingham, 1964

## Mobster recalls he killed 10

By ALEX MICHELINI
Daily News Staff Writer

The key mob informant against accused drug kingpin John Gambino yesterday described a life of violence in the Sicilian Mafia that included 25 killings.

Wearing a business suit and looking more like a banker than a mobster, Francesco Mannoia, 41, also testified about his involvement in two bombings, a string of burglaries and robberies, and the falsifying of passports and other documents.

Mannoia said his victims were shot to death or strangled, but at times he had trouble remembering the count. So Assistant U.S. Attorney Patrick Fitzgerald handed him a typed list of victims and asked how many he had personally shot.

AMUSO-26

**Memorandum**

To : SECTION CHIEF, ORGANIZED CRIME SECTION Date 5/26/92
ATTN:  UNIT CHIEF

From :  SSA STANLEY T. NYE, JR.

b6 -1
b7C -1

Subject: LIBERATUS
RICO
(OO:  FBIHQ)

*183-8533*

Attached are copies of the following newspaper  Outside the Scope
clippings:

*183-8533-4970*

STN/stn

ENC. BEHIND FILE! "ENCLOSURE ATTACHED".

X 1, 2, 3

AMUSO-27

6 -

b6 -1
b7C -1

Outside the Scope

Article entitled "540-Lb. Canary Tells of Mob's Botched Attempt to Ice Him / 'I . . . Realized He Had a Gun in His Hand.' - Peter Chiodo" by KAREN PHILLIPS published on Page 16 of the New York Post in New York, New York, on Thursday, May 21, 1992, regarding the testimony of former Luchese La Cosa Nostra (LCN) Family capo PETER T. CHIODO, JR., also known as (aka) "Fat Pete," at the trial of Luchese LCN Family Boss VITTORIO AMUSO, aka "Little Vic," and Luchese LCN Family Underboss ANTHONY CASSO, aka "Gas Pipe."

Outside the Scope

2

AMUSO-28

AMUSO-29

Exec AD Inv.
Exec AD LES
Asst. Dir.:
  Adm. Servs.
  Crim. Inv.
  Ident.
  Insp.
  Intell.
  Lab.
  Legal Coun.
  Off. Cong. &
    Public Affs.
  Rec. Mgnt.
  Tech. Servs.
  Training
Telephone Rm.
Director's Sec'y

# 540-lb. canary tells of mob's botched attempt to ice him

### By KAREN PHILLIPS

A 540-pound, wheelchair-bound mob turncoat gave jurors a shot-by-shot description of the bungled attempt on his life yesterday — and blamed the assassination order on his former Luchese crime boss.

Testifying at the murder-racketeering trial of reputed Luchese head Vittorio "Vic" Amuso, ex-capo Peter Chiodo told jurors he was warned by the FBI that Amuso wanted to kill him after Chiodo had pleaded guilty in two criminal cases.

"I had become a liability," Chiodo said.

The former capo told the Brooklyn federal court that he initially gave limited information to the FBI to help find Amuso and reputed Luchese underboss Anthony "Gas Pipe" Casso.

Then, on May 8, 1991, as Chiodo was at a Staten Island gas station, he saw a car pull up and the passenger get out.

"I immediately realized he had a gun in his hand . . . A round was fired. I saw a piece of the concrete jump up," Chiodo said.

The shooter ran through the garage bays as Chiodo retreated, he testified.

"He fired a shot at me. I pulled out a pistol and started shooting

> "I . . . realized he had a gun in his hand."
>
> PETER CHIODO

back at him . . . I was hit a few times . . . I was shot in my leg and went down on the ground.

"The driver of the car started firing also. Then the first guy ran to the car and said, 'We're here much too long. Let's get out of here,' " Chiodo continued.

Chiodo had been shot 12 times — in his leg, arm, neck, stomach, chest, shoulder, armpit and buttocks.

He said it was only later — when the mob threatened the lives of his wife and father — that he agreed to cooperate fully with the feds.

So far, Chiodo has testified in the first Windows trial, and just completed testimony in the Brooklyn federal trial of reputed Greek mobster Spyredon Velentzas.

Yesterday, Chiodo linked Amuso to several of the nine homicides with which Amuso is charged, testifying that either Amuso or Casso ordered him to set up the victims.

Amuso, 57, was arrested by FBI agents last July in Pennsylvania and is jailed without bail. He faces life in prison if convicted.

AMUSO-30

The Washington Post
The Washington Times
Daily News (New York)
The New York Times
The Wall Street Journal
The Chicago Tribune
The Los Angeles Times
The Christian Science Monitor
USA Today
New York Post, A16
Date Thursday, 5/21/92
Page 16        FBI/DOJ

## Memorandum

163

| | |
|---|---|
| **To** : | SECTION CHIEF, ORGANIZED CRIME SECTION Date 5/10/93 |
| | ATTN:  UNIT CHIEF _____ |
| | b6 -1 |
| | b7C -1 |
| **From** : | SSA STANLEY T. NYE, JR. |

**Subject:** LIBERATUS
RICO                    183-8533
(OO:  WMFO)

          Attached are copies of the following newspaper
clippings:

Outside the Scope

ST?/stn

X (1 2 3 4 5)

183-8533-7969
6-

b6 -1
b7C -1

AMUSO-31

Article entitled "Mafia Tale:  Illicit Profits from Old Steel /
West Side Highway Was Windfall for Mob" by SELWYN RAAB published
on Page 25 of the New York Times in New York, New York, on
Sunday, May 9, 1993, regarding LCN influenced corruption
concerning the demolition of the West Side Highway in New York
City, which mentions the civil RICO action concerning LCN
domination of the NYCDCC; UBCARP Local 1456; the John P. Picone
Company; GRAVANO, former Luchese LCN Family Acting Boss and
current cooperating witness ALPHONSE D'ARCO, aka "Little AL;"
Luchese LCN Family Boss VITTORIO BENITO AMUSO, aka Vic Amuso;
Luchese LCN Family Underboss ANTHONY SALVATORE CASSO, aka
"Gaspipe;" Colombo LCN Family capo THOMAS J. PETRIZZO; A.J. Ross
Logistics, Inc.; DEVINE; defense attorney GEORGE L. SANTANGELO;
International Association of Bridge and Structural Ironworkers
(Ironworkers Union) Local 40; Ironworkers Union Local 40 Business
Manager RAY MULLET; JOHN P. PICONE; and defense attorney ROBERT
MORVILLO

3

**Memorandum**

39



To    :    SECTION CHIEF, ORGANIZED CRIME SECTION Date  6/2/92
           ATTN:  UNIT CHIEF
                                                              b6 -1
From  :    SSA STANLEY T. NYE, JR.                            b7C -1

Subject:   LIBERATUS
           RICO                   /83 - 8533
           (OO:  FBIHQ)

        **Attached are copies of the following newspaper**
clippings:                                          Outside the Scope

SDN/stn                                          b6 -1
                                                 b7C -1
                                AMUSO-33

X (1, 2, 3, 4,
   5, 6, 7)       6 -

ENCLOSURE

Outside the Scope

Article entitled "Mob Big Bird Sings / Says He Killed on Boss'
Orders / Mobster Chorus / Another Turncoat Sings in Brooklyn" by
FRANCES MC MORRIS published on Page 4 of the New York Daily News
in New York, New York, on Wednesday, May 27, 1992, regarding the
testimony of former Luchese LCN Family Acting Boss ALPHONSE
D'ARCO and former Luchese LCN Family capo PETER T. CHIODO, JR.,
aka "Big Pete," at the trial of Luchese LCN Family Boss VITTORIO
AMUSO, aka "Little Vic," and Luchese LCN Family Underboss ANTHONY
CASSO, aka "Gas Pipe"

4

Outside the Scope

AMUSO-34

Article entitled "Canary Tells of Amuso's 'Flight' Pay" by
FRANCES MC MORRIS published on Page 12 of the New York Daily News
in New York, New York, on Friday, May 29, 1992, regarding the
testimony of D'ARCO

5

Outside the Scope

# MOB BIG BIRD SINGS

## Says he killed on boss' orders

P. 1, New York Daily News, NY, NY
Wednesday, 5/27/92

AMUSD-36

# Mobster chorus

## Another turncoat sings in B'klyn

**By FRANCES McMORRIS**
Daily News Staff Writer

Another high-ranking turncoat mobster took the witness stand in Brooklyn yesterday and sang another bloody song of mayhem and murder against his boss.

In the courthouse where two months ago former Gambino family underboss Salvatore (Sammy Bull) Gravano helped bring down John Gotti, Alfonse D'Arco turned the tables on reputed Luchese family boss Vittorio (Vic) Amuso.

### Breaks vow of silence

In doing so, D'Arco — a former acting Luchese boss — became the highest-ranking mobster to break the Mafia vow of silence and testify in court against his boss.

D'Arco described Amuso as a drug trafficker who often sold inferior-quality heroin, a labor union racketeer and a vicious boss who ordered the slaying of anyone he suspected of being a government informant.

In graphic detail, D'Arco described how he and others carried out murders for Amuso — including that of Michael Pappadio, a Luchese soldier suspected of holding back on profits from the garment center.

D'Arco, short, bald and neatly dressed in a conservative suit, said he was lured to a Brooklyn warehouse.

### 'Lots of blood'

"There was a big mess, and lots of blood on the floor and walls, on everything," D'Arco told the jury.

He acknowledged participating in 10 murders and murder conspiracies. The 59-year-old life-long criminal said his career has involved drug dealing, labor racketeering, loansharking and other scams.

D'Arco, who was inducted into the Luchese crime family in 1982, was the second mobster close to Amuso to testify against the reputed boss.

### Turned informer

The first was Peter (Big Pete) Chiodo, who turned informer after surviving an assassination attempt allegedly ordered by Amuso — who then reportedly held D'Arco responsible.

Law enforcement officials say D'Arco turned government informer in September and joined the federal witness protection program because he believed he had been marked for death.

D'Arco, who became acting boss after Amuso fled an indictment in May 1990, testified that he met with Amuso and Anthony (Gaspipe) Casso, the underboss, while they were on the lam.

Amuso, 58, arrested in July, is charged with orchestrating nine mob murders. Casso, 51, is still a fugitive. Amuso faces life imprisonment if convicted of federal murder and racketeering charges.

AMUSO-37



Alfonse D'Arco (right), former acting boss of the Luchese crime family, testifies against Vittorio Amuso, reputed family boss.

AMUSO-38

## Memorandum

*396*



| | |
|---|---|
| To : | SECTION CHIEF, ORGANIZED CRIME SECTION  Date 6/19/92 |
| | ATTN:  UNIT CHIEF [                    ]  b6 -1 |
| | b7C -1 |
| From : | SSA STANLEY T. NYE, JR. |

Subject:  LIBERATUS
RICO·    *183-8533*
(OO:  FBIHQ)

        Attached are copies of the following newspaper
clippings:

Article entitled "Mob Paper Trail in Court" by PAUL MOSES
published on Page 7 of Newsday on Long Island, New York, on
Sunday, May 31, 1992, with attached article entitled "Mob Took
Payoffs under Fed's Nose" by KEVIN FLYNN and MICHAEL WEBER,
concerning the testimony of former Luchese La Cosa Nostra (LCN)
Family Acting Boss ALPHONSE D'ARCO in the trial of Luchese LCN
Family Boss VITTORIO AMUSO, also known as (aka) "Little Vic,"
which mentions organized crime involvement with Quadrozzi
Concrete Corporation, International Brotherhood of Teamsters
(IBT) Local 202 at the Hunts Point Market, IBT Local 295, IBT
Local 851, and Laborers' International Union of North America
(LIUNA) Local 66

                                        Outside the Scope

ENCLOSURE
ENCL BEHIND FILE

b6 -1
b7C -1

AMUSO-39

Outside the Scope



Article entitled "Amuso Takes a Big Fall / Mafioso Faces Life for
Murder & Fraud" by FRANCES MC MORRIS published on Page 3 of the
New York Daily News in New York, New York, on Tuesday, June 16,
1992, which reports the conviction of AMUSO and mentions the
testimony of ALPHONSE D'ARCO, former Luchese LCN Family capo
PETER T. CHIODO, JR., aka "Big Pete," and former Genovese LCN
Family associate PETER SAVINO, aka "Black Heart"

Article entitled "Crime Boss Is Convicted in Rackets Trial" by
ARNOLD H. LUBASCH published on Page B3 of the New York Times in
New York, New York, on Tuesday, June 16, 1992, regarding the
conviction of AMUSO

Article entitled "Mob Chief Convicted" published on Page 20 of
Newsday on Long Island, New York, on Tuesday, June 16, 1992,
regarding the conviction of AMUSO

6

AMUSO-40

Article entitled "Feds Aren't Amuso-d / Luchese Mob Figure Ripped as Killer, Cheat" by FRANCES MC MORRIS published on Page 18 of the New York Daily News in New York, New York, on Friday, June 12, 1992

Outside the Scope

# Mob Paper Trail in Court

By Paul Moses
STAFF WRITER

In this time of financial accountability, even the mob has opened its books to the public.

The man who kept the "books" — actually, scraps of paper he hid in his bedroom — is balding, affable-looking Alfonso D'Arco, 59, who testified that he was acting boss of the Luchese crime family, and took part in 10 murders or attempted slayings.

His testimony last week at U.S. District Court in Brooklyn portrayed, dollar by dollar, how organized crime insinuates itself into the economic life of the New York metropolitan area by shaking down some businesses for hundreds of thousands of dollars and controlling unions. In one six-month period cited at the trial, more than $1 million in payoffs were described.

Prosecutors were trying to prove with a paper trail that the defendant — alleged Luchese boss Vittorio Amuso — collected tribute from a wide range of businesses through their control of unions.

It's unusual for such records to exist, but D'Arco explained that he was afraid his bosses, who were fugitives, wouldn't trust him to handle such large amounts of cash. So he began jotting down the income and expenses in late 1990 and early 1991.

The Christmas holidays were particularly lucrative.

According to D'Arco:

On Tuesday, Dec. 18, 1990, "Tommy" brought in $30,000 in cash from a labor payoff in the air freight industry.

Another man came by two days later. He was a big favorite, the head of "a construction panel that handled all the labor racketeering and unions for the Luchese family." He brought over small change — $2,000 — as a Christmas gift.

On Dec. 25, Amuso got a $12,000 Christmas gift from D'Arco's crew. Another crew sent in $5,300 in "Christmas tribute" for the boss.

A week later, another $30,000 rolled in from Tommy for "a deal." Then someone brought in $60,000 from a contractor. The next day, the record lists $15,000 more, but D'Arco can't remember what that was for.

On Jan. 5, D'Arco says, Sally Avellino stopped in with $11,500, the Luchese boss' monthly share from the mob's control of garbage carting in Manhattan's garment district. Two days later, another contractor sent in $25,000.

Contractors were a big favorite. John Quadrozzi of Queens was shaken down for $20,000 a month, D'Arco testified. A Long Island construction firm gave a single $5,000 payment for a "labor deal," he said. One entry on March 4, 1991, refers to $175,000 that D'Arco says was from two other contractors. "They paid approximately $300,000 a year," he testified.

A Long Island contractor was supposed to make two $25,000 payments a year, including once at Christmas time, D'Arco said.

Unions, which prosecutors say were a source of Luchese power in the air freight and construction industries, also were big donors.

D'Arco said a laborers local contributed $1,100 a

Please see MOB on Page 35



Alfonso D'Arco, the man who kept the 'books.'

## Mob Took Payoffs Under Fed's Nose

By Kevin Flynn
and Michael Weber
STAFF WRITERS

A cement company that federal prosecutors vouched for three years ago made monthly payoffs to the Luchese mob under the nose of a government monitor, according to court testimony.

U.S. Attorney Otto Obermaier personally assured city leaders in 1989 that Quadrozzi Concrete's ties to organized crime were in the past and that they had little to fear from the Queens firm's takeover of a sizable portion of the cement market.

Just in case, Obermaier said, a monitor appointed by the federal government would be overseeing the company's books. But on Thursday, the former acting boss of the Luchese crime family testified that Quadrozzi paid the mob $20,000 a month.

Quoting from his tattered records of payoffs, former boss Alphonse D'Arco recalled routinely picking up $10,000 payments from Quadrozzi during 1990 and 1991. These, he said, represented "part of the $20,000 a month that [Quadrozzi] . . . customarily had to pay."

The monitor, Bart Schwartz, a former federal prosecutor, defended his work, saying he picked up on "suspicious accounting and financial practices" at Quadrozzi in the summer of 1991 and alerted the U.S. attorney's office.

Obermaier said he could not comment fully on D'Arco's allegations because they were under investigation. But he said he was satisfied that the monitor had done all he could to ensure Quadrozzi operated lawfully. "Preventing people intent on doing wrong from doing wrong is an extraordinarily difficult task," he said.

The president of the company, John Quadrozzi, did not return phone calls. In the past he has denied having any business relationship with organized crime.

Although Quadrozzi has never been convicted of a crime, law enforcement authorities have long identified him as a Luchese associate who participated in mob schemes to control the ready-mix cement industry. Based on wiretap and other evidence, they have charged that he paid off reputed Luchese member Frank Manzo for years to protect his business from competition.

Attorney General Robert Abrams said in 1989 that one of Quadrozzi's partners was an unnamed mobster and that Quadrozzi had admitted associating with crime figures since 1948.

Obermaier's office came forward in 1989 to vouch for Quadrozzi, which was trying to buy the assets of two defunct cement companies convicted in a mob racketeering case.

P.7

NEW YORK NEWSDAY, SUNDAY, ... 1992

AMUSO-42



"To friendly applause, Abrams cited differences between Ferraro and himself. She shared a' timid "Democratic establishment" approach to defense spending cuts, he said, and a timid health-care plan to leave the present system mostly in place. Abrams got his loudest applause when he noted that Ferraro favors the death penalty while he, like the Liberals, opposes it.

## Harried by the Mob, He Wrote It All Down

MOB from Page 7

week and that another union came up with $15,000 at Christmas.

D'Arco said a mobster identified as Anthony Colagna came up with thousands of dollars "from the airport" — he had the hands-on control of a union of toll-booth collectors in the Hunts Point Market, and of Teamsters Locals 851 and 295, the main air freight unions. This included several payments collected from air freight companies in New Jersey, one as large as $29,000, D'Arco said.

D'Arco says he recorded a $6,000 payment obtained through Laborers Local 66, which he said was controlled by the Luchese mob.

Where did all the money go?

D'Arco said some went to the renovation of reputed underboss Anthony Casso's home in the Mill Basin section of Brooklyn. There were payments to an architect, who later was murdered. One list includes $12,000 for stucco; a $12,000 down payment on German-made doors that cost $40,000; and money for roofing and the plumber.

D'Arco said legal bills of Luchese mobsters were paid by the family. Flowers were sent to the deceased mother of an associate. Wedding gifts were purchased. Mortgages were paid on homes.

In his opening arguments, Assistant U.S. Attorney Charles Rose said that Amuso "held himself out to be a motel employee in Howard Beach," a window salesman and marina operator. His tax returns reflected a slow increase in his annual income, starting with $16,000 in 1979 and going up to $65,000 in 1987.

Rose said that, "curiously," the man "trained in marina operations, window sales and motel work" became a trucking executive in the garment center in 1988, and got $360,000 in profit in 1990.

AMUSO-43

# Amuso takes a big fall

## Mafioso faces life for murder & fraud

**by FRANCES McMORRIS**

Daily News Staff Writer

Vittorio (Vic) Amuso, boss of one of the nation's largest Mafia families, was found guilty yesterday of murder and racketeering charges that could send him to prison for life.

*Tuesday, 6/16/92*
*3, New York Daily News, NY, NY*

It marked the second time in recent months that the boss of a major organized crime family in New York has been dethroned in court.

In just seven hours, Amuso, head of the Luchese crime family, was found guilty of all 54 counts; 33 of those were labor payoffs, one was a tax fraud charge. He was convicted of ordering the murder of nine men and plotting or trying to murder another five since he took over in 1986.

An eight-man, four-woman jury brought the four-week trial in Brooklyn Federal Court to a swift climax. The jury foreman barely glanced at the 11-page verdict sheet as he answered guilty to each of the 54 charges.

### Defendant impassive

Amuso, with his head cocked to the right, moved hardly a muscle.

The verdict was hailed as "another significant organized crime victory for the government" and a "further step in the erosion of organized crime control in the window-installation industry" by U.S. Attorney Andrew Maloney.

The original indictment in May 1990, which sent Amuso on the lam for 14 months before he was arrested last summer, "wreaked havoc" in four of New York's five crime families, said Assistant U.S. Attorney Gregory O'Connell.

The charges "diluted the strength of the Luchese crime family enormously," he said. And last year's so-called Windows case, which ended in acquittal for five defendants, got convictions on extortion for three others.

### Could be three

Amuso, 58, now joins convicted Gambino boss John Gotti. The Dapper Don will be sentenced for murder and racketeering June 23. A third mob boss, the alleged acting boss of the Colombo family, Victor Orena, was recently indicted by Brooklyn federal prosecutors on murder charges.

Defense lawyer Gerald Shargel said he was disappointed with the verdict and the fact that the jury was anonymous and sequestered.

"This jury would have convicted anything put in front of them," he said. Placing the jury under guard made Amuso look guilty from the outset and "reinforces the government's claim that this is a dangerous defendant," Shargel said.

Amuso's secrets were exposed at trial by two former top Luchese lieutenants, acting boss Alphonse D'Arco and captain Peter (Big Pete) Chiodo, and Genovese crime family associate-turned-informant Peter Savino.

D'Arco, 59, faces life in prison and got a deal for his son, Joseph, a Luchese soldier and heroin addict. D'Arco testified that he turned because he believed Amuso had ordered an attempt on his life in September a few months after he was stripped of his title as acting boss.

Chiodo, 41, the 540-pound Luchese capo, testified from a wheelchair to a life of crime and a change of heart following a botched attempt on his life last year.

Savino, 49, secretly recorded conversations between mobsters and corrupt union officials from January 1988 to June 1989, gathering proof of mob control in the city's lucrative window-installation industry. He cut a deal after two corpses were found in his Brooklyn window business.

Amuso faces life without parole, although no sentencing date has been set.

Co-defendant and alleged underboss Anthony (Gaspipe) Casso, 51, is still a fugitive.

AMUSO-44

# Memorandum



To      SECTION CHIEF, ORGANIZED CRIME SECTION Date  9/13/89
        ATTN:  SSA [          ] LCN WEST
                                                    b6 -1
                                                    b7C -1
From    SSA STANLEY T. NYE, JR.

SSP
CLASS
SRC'D
SER
REG

Subject :  LIBERATUS
           RICO
           (OO: FBIHQ)

183A-8533

        Attached are one (1) copy each of the following documents from
the Federal Bureau of Prisons:

Referral/Direct BOP


183-8533-2107X6


OCT 4 1989


2 - ENCLOSURE


STN/stn        ENCLOSURE ATTACHED


X (1)      b6 -1
           b7C -1

All o-
Attachment

AMUSO-45

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
## FOIPA
## DELETED PAGE INFORMATION SHEET

_3_   Page(s) withheld entirely at this location in the file. One or more of the following statements, where indicated, explain this deletion.

☐   Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐ (b)(1) | ☐ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☐ (j)(2) |
| ☐ (b)(3) | ☐ (b)(7)(C) | ☐ (k)(1) |
| _____ | ☐ (b)(7)(D) | ☐ (k)(2) |
| _____ | ☐ (b)(7)(E) | ☐ (k)(3) |
| _____ | ☐ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☐ (b)(6) | | ☐ (k)(7) |

☐   Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☒   Documents originated with another Government agency(ies). These documents were referred to that agency(ies) for review and direct response to you.

_____   Pages contain information furnished by another Government agency(ies). You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____   Page(s) withheld inasmuch as a final release determination has not been made. You will be advised as to the disposition at a later date.

_____   Pages were not considered for release as they are duplicative of _____

_____   Page(s) withheld for the following reason(s): _____

_____

☒   The following number is to be used for reference regarding these pages:
_183-8533-2107X6_

XXXXXXXXXXXXXXXX
X    Deleted Page(s)    X
X  No Duplication Fee   X
X    for this page      X
XXXXXXXXXXXXXXXX

XXXXXX
XXXXXX
XXXXXX

AMUSO- 46 thru 48    FBI/DOJ

**Memorandum**

To :     SECTION CHIEF, ORGANIZED CRIME SECTION Date  4/28/92
         ATTN:  UNIT CHIEF
                                                      b6 -1
                                                      b7C -1
From :   SSA STANLEY R. NYE, JR.

Subject: LIBERATUS
         RICO         183 - 8533
         OO:  FBIHQ

         Attached are copies of the following FD-202's
reflecting interviews of

    1.   Interviews on                 regarding

    2.   Interview on         regarding

    3.   Interview on         regarding
              Luchese LCN Family Boss VITTORIO AMUSO, aka    b6 -2,5
         "Little Vic" and                                    b7C -2,5
                                                             b7D -1
                                                             b7F

    4.   Interview on    regarding

    5.   Interviews on              regarding

    6.   Interview on         regarding

    7.   Interview on         regarding

    8.   Interview on         regarding

ENCLOSURE

AMUSO-49

                                                             b6 -1
                                                             b7C -1



9.   Interview on [          ], regarding [                    ]

10.  Interview on [            ] regarding the [                ]

11.  Interview on [          ] regarding [                    ]

12.  Interview on [        ], regarding [                    ]

13.  Interview on [        ] regarding the [                  ]

14.  Interview on [            ] regarding [                  ]

15.  Interview on [          ] regarding [                    ]

16.  Interview on [          ] regarding [                    ]

17.  Interview on [          ] regarding [                  ]

18.  Interview on [          ] regarding [                   ]

19.  Interviews on [          ] and [        ] regarding [        ]

20.  Interview on [          ] regarding [                    ]

21.  Interview on [          ] regarding the [               ]

22.  Interview on [          ] regarding [                    ]

23.  Interview on [          ] regarding [                    ]

b6 -2,5
b7C -2,5
b7D -1
b7F

2

AMUSO-50



24. Interview on [          ] regarding loansharking and extortionate credit transactions;

25. Interview on [          ] regarding [                    ]

26. Interview on [          ] regarding [                    ]

27. Interviews on [          ] and [          ] regarding political corruption

28. Interview on [          ] regarding [                ]

29. Interview on [          ] regarding [                ]

30. Interview on [          ] regarding [                ]

31. Interview on [          ] regarding the [          ]

32. Interview on [          ] regarding [                ]

33. Interview on [          ] regarding [                ]

34. Interview on [          ] regarding [                ]

35. Interview on [          ] regarding [                ]

36. Interview on [          ] regarding [                ] and [          ]

37. Interview on [          ] regarding [                ]

In addition, the following FD-302's reflecting interviews of [                    ] are also attached hereto:

1. Interviews on [          ] and [          ] regarding [                ]

2. Interview on [          ] regarding [                ]

b6 -2,5
b7C -2,5
b7D -1
b7F

3

AMUSO-51



3.    Interview on ▢▢▢▢ regarding ▢▢▢▢

4.    Interview on ▢▢▢▢ regarding ▢▢▢▢

5.    Interview on ▢▢▢▢ regarding ▢▢▢▢

6.    Interviews on ▢▢▢▢ and ▢▢▢▢
      regarding criminal activities of ▢▢▢▢
      and ▢▢▢▢

7.    Interview on ▢▢▢▢ regarding ▢▢▢▢

8.    Interview on ▢▢▢▢ regarding ▢▢▢▢

b6 -1,2,5
b7C -1,2,5
b7D -1
b7F

      The attachments were provided by SSA ▢▢▢▢
New York Office, on 4/23/92.

4

# FEDERAL BUREAU OF INVESTIGATION

## - 1 -

Date of transcription _10/15/91_



b6 -1,2
b7C -1,2
b7D -1
b7F

On _____ furnished the following information regarding _____

Outside the Scope

Investigation on _____   b7D -1        b2 -1        File # 183B-NY-192451
                                          b7D -2

by SA _____   b6 -1    Date dictated    10/9/91
   SA            b7C -1
                 (SAG:hrg)

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

_..I024 (Rev. 11-15-83)_

183B-NY-192451

Continuation of FD-302 of [                    ]    b6 -2
                                                     b7C -2
                                                     b7D -1
                                                     b7F    , On [                ] Page  3
                                                                                   b7D -1

b6 -2,5
b7C -2,5
b7D -1
b7F



VIC

**AMUSO, Boss of the LUCHESE family,**

AMUSO-54                    Outside the Scope

183B-NY-192451

Continuation of FD-302 of _____ . On _____ . Page ___ 4 ___

b6 -2
b7C -2
b7D -1
b7F

b7D -1

Outside the Scope



b6 -2,5
b7C -2,5
b7D -1
b7F

told VIC AMUSO that

No names were mentioned but VIC

that AMUSO advised them not to

Outside the Scope

AMUSO-55

U-209 (Rev. 12-5-84)

## Memorandum



To    : SAC , 11 [            ] (P)   b2 -1        Date    12/4/91
                                      b7D -2

From  : SA [                    ] (C-8)   b6 -1
                                          b7C -1

Subject: [                    ]
                                  b2 -2
                                  b7D -3

Dates of Contact [            ]   b7D -1

File #s on which contacted (Use Titles if File #s not available)

Purpose and results of contact

☐ NEGATIVE
☒ POSITIVE
☐ STATISTIC

Description of
Statistical Accomplishment              Title of Case                File No.

INFORMATION HEREIN OBTAINED CONFIDENTIALLY.  WITNESS WHO PROVIDED
THIS INFORMATION IS WILLING TO TESTIFY.  NO DISSEMINATION OF THIS
INFORMATION IS TO BE MADE OUTSIDE OF THE FBI WITHOUT PRIOR BUREAU
APPROVAL.  CHARACTERIZATION OF THIS WITNESS FOR INCLUSION IN ANY
LEGAL DOCUMENT MAY BE OBTAINED FROM THE WRITER.  ATTACHED FD-302
CONTAINS HIGHLY SENSITIVE INFORMATION.

1 - [            ] (ADM)     b2 -1
1 - [            ] (INV)     b6 -1
1 - 92-9284                  b7C -1
1 - CSSA [            ]      b7D -2
1 - CIMS

PERSONAL DATA

VJP:mab
()

HQ

AMUSO-56

FD-302 (Rev. 3-10-82)



## FEDERAL BUREAU OF INVESTIGATION

- 1 -

Date of transcription _____    b7D -1

A confidential source was interviewed on the below
listed date and advised as follows:                    Outside the Scope

VIC AMUSO changed _____    b6 -5
                                                       b7C -5
                                                       b7D -4
                                                       b7F

Outside the Scope

VIC AMUSO were described by SOURCE as    b6 -5
AMUSO wanted to                          b7C -5
                                         b7F

b7D -4

Investigation on _____ at __Undisclosed__ File # _____

by __SAs__ _____ and _____ Date dictated __11/14/91__    b6 -1
        WJC/mab                                                          b7C -1

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.    AMUSO-57



FD-302 (Rev. 11-15-83)

Continuation of FD-302 of _____ , On _____ , Page __2__

b6 -5
b7C -5
b7D -4
b7F

Outside the Scope

AMUSO-58

FD-302 (Rev. 3-10-82)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription      3/20/92

was
interviewed on                        by Special Agent (SA)                    b6 -1,2
              FEDERAL BUREAU OF INVESTIGATION (FBI), concerning his    b7C -1,2
                                                                        b7D -1
                                                           , was interviewed  b7F
telephonically
                        Aware of the identity of the interviewer and
purpose of the interview

b6 -2,3
b7C -2,3                          were LUCHESE LCN boss VIC AMUSO,
b7D -1
b7F

telling AMUSO              that

                                                                   Outside the Scope

b7D -1

Investigation on                    at **Telephonic**                    File # **BQ 92A-9284 SUB 59**

by  SA                              kmk     b6 -1      Date dictated  **3/20/92**
                                            b7C -1

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

                                                                   AMUSO-59

FD-302 (Rev. 3-10-82)

# FEDERAL BUREAU OF INVESTIGATION

## - 1 -

Date of transcription          10/11/91

b6 -1,2,4
b7C -1,2,4
b7D -1
b7F

[REDACTED] was interviewed at an unspecified location by Special Agent (SA) [REDACTED] and [REDACTED] Morris County, New Jersey Prosecutor's Office. Also sitting in during the interview were First Assistant Prosecutor JOHN J. O'REILLY and SA [REDACTED] Also present periodically throughout were SA's [REDACTED] and [REDACTED] provided the following information which is supplemental to previous information given by [REDACTED] regarding the

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

[REDACTED] meeting VIC AMUSO [REDACTED]

b2 -1
b7D -2

[REDACTED]

(See S. or e 1A-27)

AMUSO-60

FD-302a (Rev. 11-15-83)

BQ 183A-3667 SUB FUG 3

b6 -2
b7C -2
b7D -1
b7F

Continuation of FD-302 of _____ , On _____ b7D -1 , Page    2



b6 -2,5
b7C -2,5
b7D -1
b7F

anxious to see AMUSO the next day

AMUSO had given to

AMUSO gave the

Outside the Scope

**AMUSO-61**



FD-302 (Rev. 3-10-82)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription          1/28/92

b6 -2
b7C -2
b7D -1
b7F

was

telephonically interviewed concerning the _____ advised the
following:                                        Outside the Scope

b6 -2,3
b7C -2,3                                          the LUCHESE crime
b7D -1     family were considered the sole property of the boss of the
b7F        family, currently VITTORIO AMUSO, aka Vic.

                                                           Outside the Scope

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

b7D -1

Investigation on _____ at UNDISCLOSED     File #   183A-NY-204312

            b6 -1
            b7C -1
by SA _____ kmk                Date dictated   1/28/92

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

AMUSO-62

FD-302a (Rev. 11-15-83)

183A-NY-204312

Continuation of FD-302 of [____] , On [____] , Page   2

b6 -2
b7C -2
b7D -1
b7F

b7D -1



b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

mentioned to AMUSO [____] in casual conversation [____] When AMUSO [____] heard this,

Outside the Scope

AMUSO [____] were standing in front of
New York, [____] AMUSO were

b6 -2,5
b7C -2,5
b7D -1
b7F

AMUSO-63

FD-302 (Rev. 3-10-82)

**FEDERAL BUREAU OF INVESTIGATION**

- 1 -

Date of transcription    10/11/91

b6 -2
b7C -2
b7D -1
b7F

was advised of the identities of the interviewing Special Agents (SAS) and as to the purpose of their visit.



Outside the Scope

b2 -1
b7D -2

b7D -1

Investigation on _____ at _____          File # BQ 183A-3507 Sub W

SSA _____ SAS _____ and

by _____ /CFR/dam          Date dictated    10/8/91
b6 -1
b7C -1

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.          AMUSO-64

FD-302a (Rev. 11-15-83)

Continuation of FD-302 of _____ . On _____ . Page ___3___

Outside the Scope ⟶

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

PD–302a (Rev. 11–15–83)

Continuation of FD-302 of _____ , On _____ , Page ___4___

b6 -2,5
b7C -2,5
b7D -1
b7F

and VIC AMUSO, "Boss" of the LUCHESE LCN Family.

Outside the Scope

AMUSO-66

FD-302 (Rev. 3-10-82)

# FEDERAL BUREAU OF INVESTIGATION

## - 1 -

Date of transcription _____ 10/15/91 _____



b6 -1,2
b7C -1,2
b7D -1
b7F

On ☐ ☐ furnished the following information to Special

Agents (SAs) ☐ and ☐

Outside the Scope

b2 -1
b7D -2

b7D -1

Investigation on ☐                File # 183B-NY-192451

b6 -1
b7C -1

by  SA ☐ (SAG:hrq)    Date dictated _____ 10/9/91 _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

AMUSO-67

FD–302a (Rev. 11–15–83)

183B-NY-192451

Continuation of FD–302 of ⬚⬚⬚⬚⬚⬚ _____ , On _____ , Page ___ 2

b6 –2
b7C –2
b7D –1
b7F

b7D –1

Outside the Scope

b6 –2
b7C –2
b7D –1
b7F

AMUSO-68

FD-302a (Rev. 11-15-83)

183B-NY-192451

Continuation of FD-302 of ⬚ 

b6 -2
b7C -2
b7D -1
b7F

. On ___10/3/91___ . Page ___3___



b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

LUCHESE share of this money to VIC AMUSO, Boss of the LUCHESE family.

AMUSO-69

Outside the Scope

FD-302a (Rev. 11-15-83)

**183B-NY-192451**

b6 -2
b7C -2
b7D -1
Continuation of FD-302 of _____    b7F _____ . On __10/3/91__ . Page __4__

Outside the Scope



b6 -2,5
b7C -2,5
b7D -1
b7F

told VIC AMUSO tha[          ]anted

that AMUSO advised them not to speak to anyone

Outside the Scope

AMUSO-70

FD-302 (Rev. 3-10-82)

# FEDERAL BUREAU OF INVESTIGATION

## - 1 -

Date of transcription    9/30/91



interviewed at a confidential location by Special Agent (SA) was and NEW YORK CITY POLICE DEPARTMENT, concerning his knowledge

b6 -1,2,4
b7C -1,2,4
b7D -1
b7F

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

any further conversation with                    AMUSO regarding                    ave

b2 -1
b7D -2

Investigation on                    at    UNDISCLOSED LOCATION    File #    BQ 92A-9284

b7D -1

by    SA                    AND    b6 -1
FF:kmk    b7C -1    Date dictated    9/30/91

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

AMUSO-71

FD-302 (Rev: 3-10-82)

# FEDERAL BUREAU OF INVESTIGATION

**- 1 -**

Date of transcription _____ 9/10/91 _____

b6 -2
b7C -2
b7D -1
b7F



was interviewed at a confidential location regarding his knowledge of

b6 -2,5
b7C -2,5
b7D -1
b7F

VICTOR AMUSO was the boss of the family.

Outside the Scope

b2 -1
b7D -2

Investigation on _____ at _____  b7D -1                    File # __BQ 183A-NY-752__

by SA _____ AND _____  b6 -1   Date dictated _____ 9/6/91 _____
                                          b7C -1
/kmk

This document _____ nor conclusions of the  FBI. It is the property  of the FBI and is loaned
to your agency; it and   its contents are not   to be distributed outside   your agency.

AMUSO-72

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312



Continuation of FD-302 of

b6 -2
b7C -2
b7D -1
b7F

, On

b7D -1

Page     3

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

AMUSO-73

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312



Continuation of FD-302 of ⬚ 
b6 -2
b7C -2
b7D -1
b7F
, On ⬚ , Page ___ 4 ___

b7D -1

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

AMUSO-74

FD-302a (Rev. 11-15-83)



BQ 183A-NY-204312

b6 -2
b7C -2
b7D -1
b7F

b7D -1

Continuation of FD-302 of

, On

, Page    5

had a conversation with

VIC AMUSO

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

AMUSO-75

FD-302 (Rev. 3-10-82)

# FEDERAL BUREAU OF INVESTIGATION

## - 1 -

Date of transcription _____9/30/91_____

On _____ was interviewed by
Special Agent _____ FEDERAL BUREAU OF INVESTIGATION.
After being advised of the identity of the interviewing agent and
the nature of the interview _____ provided the following
information

b6 -1,2,5
b7C -1,2,5
b7D -1
b7F

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

_____ when AMUSO _____ took control of the
LUCHESE LCN family.

Outside the Scope

b2 -1
b7D -2

b7D -1

Investigation on _____ at _____     File # __183B-NY-200857__

b6 -1
b7C -1

by   SA _____     Date dictated _____9/30/91_____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned
to your agency; it and its contents are not to be distributed outside your agency.

AMUSO-76

FD-302 (Rev. 3-10-82)

## FEDERAL BUREAU OF INVESTIGATION

- 1 -

Date of transcription _____ 9/3/91 _____

b6 -1,2,5
b7C -1,2,5
b7D -1
b7F

was interviewed on _____ by
Special Agents (SA) _____ and _____
regarding _____

_____ provided the following information:

Outside the Scope

b2 -1
b7D -2

b7D -1

Investigation on _____ at    West Haverstraw, NY    File #    BQ 183A-NY-204312

by _____ AND    b6 -1
b7C -1    /G:kmk    Date dictated    8/23/91

This document contains    neither recommendations    nor conclusions of the    FBI. It is the property    of the FBI and is loaned
to your agency; it and    its contents are not    to be distributed outside    your agency.

AMUSO-77

FD-302a (Rev. 11-15-83)

**BQ 183A-NY-204312**

b6 -2
b7C -2
b7D -1
b7F

b7D -1

Continuation of FD-302 of ⬚ , On ⬚ , Page 2

Outside the Scope



Shortly thereafter ⬚ was summoned by VITTORIO "Vic" AMUSO to the ⬚ VIC AMUSO

and VIC AMUSO instructed

b6 -2,5
b7C -2,5
b7D -1
b7F

AMUSO-78

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

b6 -2
b7C -2
b7D -1                                    b7D -1
Continuation of FD-302 of _____  b7F _____ , On _____ Page ___3___



b6 -2,5
b7C -2,5      lack of cooperation with          VIC AMUSO.
b7D -1
b7F

Outside the Scope

AMUSO-79

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

Continuation of FD-302 of ☐    b6 -2
b7C -2
b7D -1
b7F    , On ☐    b7D -1    Page    4



Outside the Scope

response to VIC AMUSO ☐

☐ AMUSO ☐ did not believe that ☐
was not able to afford having the LUCHESE family and instructed

b6 -2,5
b7C -2,5
b7D -1
b7F

tried to convince AMUSO ☐

FD-302a (Rev. 11-15-83)

**BQ 183A**



b6 -2
b7C -2
b7D -1
b7F

Continuation of FD-302 of                                      , On                Page    **5**

b7D -1

b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

AMUSO-81

FD–302 (Rev. 3–10–82)

## FEDERAL BUREAU OF INVESTIGATION

- 1 -

Date of transcription    8/5/91



was interviewed regarding

a result AMUSO directed

As

During the early part of AMUSO told

AMUSO

provided

AMUSO

instructed

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

AMUSO-82



| Investigation on | | at | BROOKLYN, NY | File # | BQ 183A-NY-204312 |

b7D -1

by SA cmk

b6 -1
b7C -1

Date dictated

b7D -1

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312



Continuation of FD-302 of _____ b6 -2 / b7C -2 / b7D -1 / b7F . On _____ b7D -1 Page   2

Outside the Scope

Approximately November of [____] AMUSO [____] told
that they developed [____]
It was [____] AMUSO'S understanding that
in AMUSO'S presence, instructed
AMUSO told

b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

AMUSO-83

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

b6 -2
b7C -2
b7D -1
b7F

b7D -1

Continuation of FD-302 of _____ . On _____ Page    3

Outside the Scope



b6 -2,5      Approximately[          ] after [                    ]
b7C -2,5     [that AMUSO was upset because]
b7D -1
b7F

FD–302 (Rev. 3–10–82)

## FEDERAL BUREAU OF INVESTIGATION

- 1 -

Date of transcription    7/26/91

b6 -1,2,4
b7C -1,2,4
b7D -1
b7F

interviewed at [REDACTED] y Special Agent (SA) [REDACTED] was [REDACTED] and Detective [REDACTED] concerning his knowledge of [REDACTED]



AMUSO-85

Outside the Scope

Investigation on [REDACTED]    b7D -1    at    BROOKLYN, NY    File #    BQ 183A-NY-204312

by    DET [REDACTED]    b6 -1    b7C -1    L:kmk    Date dictated    7/26/91

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD–302a (Rev. 11–15–83)

BQ 183A-NY-204312

Continuation of FD–302 of _____ [_____] b6 –2  On [_____] b7D –1, Page ___3___
b7C –2
b7D –1  Outside the Scope
b7F



b6 –2,3,5
b7C –2,3,5
b7D –1
b7F

later
received complaints from[_____] [____] VICTOR AMUSO, "boss" of the
LUCHESE family, about [_____]

AMUSO-86

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312



Continuation of FD-302 of _____  b6 -2  b7D -1
                                          b7C -2
                                          b7D -1  . On _____ 4
                                          b7F

h has been
taken away by VICTOR AMUSO
said that AMUSO decided that

questioned AMUSO as to why he

b6 -2,3,5
b7C -2,3,5                               AMUSO became angry at
b7D -1
b7F

and chided            with AMUSO especially in

Outside the Scope

AMUSO-87

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

b6 -2
b7C -2
b7D -1
b7F

Continuation of FD-302 of _____ , On _____ Page ___5___

b7D -1



Outside the Scope

met with AMUSO,

AMUSO
began                                    AMUSO told

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

asked if AMUSO wanted him                      AMUSO said no,
that                                   questioned AMUSO if he was
                               AMUSO replied,
made a reference to AMUSO'S
                      AMUSO would pay for information about
ongoing criminal investigations.  AMUSO replied that the

Outside the Scope

AMUSO-88

FD-302 (Rev. 3-10-82)



# FEDERAL BUREAU OF INVESTIGATION

- 1 -

Date of transcription ___7/24/91___

b6 -2
b7C -2                                                                    was
b7D -1
b7F    interviewed at the          Brooklyn, New York, regarding his involvement in the
                                    advised the following:

b6 -2,5
b7C -2,5
b7D -1
b7F
                                                        Later, VICTOR AMUSO
       inherited                                                    At this time,
       AMUSO was the "boss" of the LUCHESE crime family.  AMUSO explained
       to

b6 -2,5
b7C -2,5
b7D -1       VICTOR AMUSO          ere waiting.
b7F          with VICTOR AMUSO          AMUSO told          that from now

Investigation on                    b7D -1  at  BROOKLYN, NY          File #  183A-NY-204312

by   SA                    AND   b6 -1          Date dictated  7/24/91
                           JFF:kmk b7C -1

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned
to your agency; it and its contents are not to be distributed outside your agency

AMUSO-89

FD-302a (Rev. 11-15-83)

183A-NY-204312

b6 -2
b7C -2
b7D -1
b7F

b7D -1

Continuation of FD-302 of _____ _____ . On _____ . Page ___ 2



b6 -2,5
b7C -2,5
b7D -1
b7F

wanted to talk to VICTOR AMUSO about a problem.

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

York, where          AMUSO where "hanging out."
wanted to talk directly to AMUSO about the
AMUSO discussed the problem

AMUSO-90

FD-302a (Rev. 11-15-83)

183A-NY-204312

Continuation of FD-302 of _____ , On ___7/22/91___ , Page ___3___

b6 -2,5
b7C -2,5
b7D -1
b7F

At first AMUSO said he didn't want

AMUSO finally agreed td

Outside the Scope

meaning did AMUSO          authorize the

b6 -2,5
b7C -2,5
b7D -1
b7F

e details in case AMUSO          should
have any questions.



AMUSO-91

FD-302a (Rev. 11-15-83)

183A-NY-204312



b6 -2
b7C -2
b7D -1
b7F

Continuation of FD-302 of _____, On ____ Page 4

b7D -1

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

hoped AMUSO wouldn't be too upset
saw AMUSO, which
told AMUSO that
AMUSO only inquired as to
told AMUSO that it was

Outside the Scope

AMUSO-92

FD-302 (Rev. 3-10-82)

# FEDERAL BUREAU OF INVESTIGATION

## - 1 -

Date of transcription    8/7/91

☐ was contacted by Special Agent
☐ of the Federal Bureau of Investigation
and was debriefed concerning his knowledge ☐

b6 -1,2
b7C -1,2
b7D -1
b7F

☐ Also present during the
course of the debriefings were Special Agent ☐
☐ and Assistant United States Attorney Charles E.
Rose, EDNY.

b6 -2,5
b7C -2,5
b7D -1
b7F

☐ advised that he became acquainted with
**VICTOR AMUSO** ☐

☐ He described both AMUSO ☐ as being
close friends of ☐

Outside the Scope

☐ asked AMUSO ☐ whether they had
☐
AMUSO ☐ explained that ☐

b6 -2,5
b7C -2,5
b7D -1
b7F

6

Investigation on ☐    b7D -1    File # BQ 183A-3667

by S/A's ☐    b6 -1
b7C -1    Date dictated    8/7/91

AMUSO-93

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



D-302a (Rev. 11-15-83)

BQ 183A-3667

b6 -2
b7C -2
b7D -1
b7F

b7D -1

continuation of FD-302 of _____ , On _____ age   2

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

In late _____ met with AMUSO _____

where they [AMUSO] _____ told _____

In substance, AMUSO _____ told

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

that _____

AMUSO _____ b also told _____ that _____

AMUSO

also told _____ that _____

AMUSO _____ b also told

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

told

that AMUSO _____ wanted

AMUSO-94

D-302a (Rev. 11-15-83)



BQ 183A-3667

b6 -2
b7C -2
b7D -1
b7F

b7D -1

Continuation of FD-302 of _____ . On _____ , Page    3

for the LUCHESE LCN Family to be shared as AMUSO
decided.

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

to give "regards"
from him     to AMUSO.

Outside the Scope

AMUSO-95

FD-302a (Rev. 11-15-83)



BQ 183A-3667

b6 -2
b7C -2
b7D -1
b7F

b7D -1

Continuation of FD-302 of _____ , On _____ , Page ___ 4 ___

met with AMUSO                at the

b6 -2,5
b7C -2,5
b7D -1
b7F

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

discussed with AMUSO                      and AMUSO
told

Outside the Scope

AMUSO-96

a (Rev. 11-15-83)

**BQ 183A-3667**

b6 -2
b7C -2
b7D -1
b7F

b7D -1

ation of FD-302 of _____ , On _____ . Page ___ 6



Outside the Scope

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

**inform AMUSO of it.**          **and would**

D–302♦ (Rev. 11–15–83)

BQ 183A-3667

b6 -2
b7C -2
b7D -1
b7F

b7D -1

Continuation of FD–302 of _____ , On _____ , Page ___ 7

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

b6 -2,5
b7C -2,5
b7D -1
b7F

advised that he would discuss the _____ and
_____ with AMUSO.                     Outside the Scope

02a (Rev. 11-15-83)

BQ 183A-3667

b7D -1

Continuation of FD-302 of _____    b6 -2    . On _____ . Page  8
                                                    b7C -2
                                                    b7D -1
                                                    b7F



b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

a meeting with AMUSO

AMUSO                    discussed

AMUSO              stated that they liked
but both raised the same concerns            it became  apparent
during these conversations that

Outside the Scope

AMUSO-99

302a (Rev. 11-15-83)

BQ 183A-3667

b7D -1

b6 -2
b7C -2
b7D -1
b7F

...uation of FD-302 of _____ . On _____

9



b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

he met with AMUSO
discussed who would have
They all agreed

Outside the Scope

he met with AMUSO
AMUSO         asked         go ahead

AMUSO was sitting         and nodded his
assent several times.

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

AMUSO then told
AMUSO stated
that

AMUSO-100

302a (Rev. 11-13-83)



BQ 183A-3667

Continuation of FD-302 of _____ , On _____ , Page 10

AMUSO also stated that all

b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

while AMUSO [          ] were fugitives.

Outside the Scope

**AMUSO-101**

02a (Rev. 11-15-83)

BQ 183A-3667

nuation of FD-302 of _____

b6 -2
b7C -2
b7D -1
b7F _. On

b7D -1

11



b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

at or about the same time he met VIC AMUSO.

b6 -2,5
b7C -2,5
b7D -1
b7F

FD-302 (Rev. 3-10-82)

# FEDERAL BUREAU OF INVESTIGATION

## - 1 -

Date of transcription    7/29/91

b6 -1,2
b7C -1,2
b7D -1
b7F

interviewed on July 24, 1991, at                    , was
                                        Brooklyn, New York, by
Special Agent (SA)              provided the following
information concerning

Outside the Scope



                              met with          VITTORIO
AMUSO at a
New York.

b6 -2,5
b7C -2,5
b7D -1
b7F

b7D -1

| Investigation on | | at | BROOKLYN, NY | File # | BQ 183A-NY-204312 |

b6 -1
b7C -1

by   SA                          cmk          Date dictated      7/24/91

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.                              AMUSO-103

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

Continuation of FD-302 of _____ [ ] b6 -2 / b7C -2 / b7D -1 / b7F _____ , On [ ] b7D -1 , Page ____ 2

Outside the Scope

At the above meeting with [ ] AMUSO, [ ]
further informed that as a result [ ]

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

[ ] that VIC (VITTORIO AMUSO), who was keeping a low
profile and was "sort of on the lam," [ ]

[ ] because of AMUSO
being on the lam.

AMUSO-104

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312



Continuation of FD-302 of _____  b6 -2  b7C -2  b7D -1  b7F _____. On _____. Page _____ 3

b7D -1

b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

AMUSO-105

FD-302 (Rev. 3-10-82)

## FEDERAL BUREAU OF INVESTIGATION

**- 1 -**

Date of transcription    8/7/91



b6 -1,2
b7C -1,2
b7D -1
b7F

_____ was interviewed by Special Agent (SA) _____ FBI, at Brooklyn, New York, on July 17, 23, 24 and 29, 1991, concerning _____ provided the following information:

Outside the Scope

VITTORIO AMUSO, who was also serving time at RIKER'S ISLAND, AMUSO, who had not yet been "made" in the LUCHESE LCN family, was

b6 -2,5
b7C -2,5
b7D -1
b7F

b7D -1

Investigation on _____ at **BROOKLYN, NY**    File # BQ 183A-NY-204312

AMUSO-106

by    S _____ /kmk

b6 -1
b7C -1    Date dictated    8/1/91

This document contains    neither recommendations    nor conclusions of the    FBI. It is the property    of the FBI and is loaned
to your agency; it and    its contents are not    to be distributed outside    your agency

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

b6 -2
b7C -2
b7D -1
b7F

b7D -1

Continuation of FD-302 of _____ , On _____ , Page _____



b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

b6 -2,3,5
b7C -2,3,5
b7D -1
b7F

b6 -2,5
b7C -2,5
b7D -1
b7F

AMUSO-107

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312



b6 -2
b7C -2
b7D -1
b7F

b7D -1

Continuation of FD-302 of

b6 -2,5
b7C -2,5
b7D -1
b7F

that AMUSO wanted to talk to him.

later conversed with AMUSO and was advised by AMUSO that although

AMUSO stated to

b6 -2,5
b7C -2,5
b7D -1
b7F

VITTORIO AMUSO was seated                      and appeared
to be in charge.

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

b7D -1



Continuation of FD-302 of

b6 -2
b7C -2
b7D -1
b7F

b6 -2,5
b7C -2,5
b7D -1
b7F

AMUSO asked

AMUSO advised

AMUSO then asked

AMUSO then instructed

b6 -2,5
b7C -2,5
b7D -1
b7F

AMUSO-109

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

Continuation of FD-302 of                                    b6 -2                          b7D -1
                                                              b7C -2
                                                              b7D -1          , On                    , Page
                                                              b7F

b6 -2,5
b7C -2,5
b7D -1
b7F



in the evening  VITTORIO AMUSO                                who by now
                              were acting boss                 respectively,
arrived.

Outside the Scope

**AMUSO-110**

FD-302a (Rev. 11-15-83)



BQ 183A-NY-204312

Continuation of FD-302 of

b6 -2
b7C -2
b7D -1
b7F

b7D -1

, On                    , page



upon arriving found that
VITTORIO AMUSO.                    were waiting for him.
                                        AMUSO suggested
b6 -2,5
b7C -2,5                    AMUSO then informed
b7D -1                                   AMUSO asked
b7F

                    AMUSO        called        aside and
AMUSO introduced

AMUSO advised
        AMUSO explained that each person

AMUSO informed
b6 -2,5
b7C -2,5
b7D -1
b7F

AMUSO-111

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

b7D -1

Continuation of FD-302 of

b6 -2
b7C -2
b7D -1
b7F

On _____ Page ___

Outside the Scope



they were going to meet VITTORIO AMUSO

b6 -2,5
b7C -2,5
b7D -1
b7F

saw VITTORIO

VITTORIO AMUSO told
and asked him whether he knew why he had been called.
AMUSO seemed surprised
AMUSO then said

AMUSO-112

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312

Continuation of FD-302 of  b6 -2
b7C -2
b7D -1
b7F
 b7D -1

, On _____ , Page _____

that he (AMUSO) was

b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

b6 -2
b7C -2
b7D -1
b7F

AMUSO-113



FD-302a (Rev. 11-15-83)



BQ 183A-NY-204312

b7D -1

Continuation of FD-302 of ⬚⬚⬚⬚ b6 -2
b7C -2
b7D -1
b7F ⬚⬚⬚⬚ , On ⬚⬚⬚⬚ , Page ⬚⬚



AMUSO lost his temper

. AMUSO was upset because he (AMUSO)

b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

b6 -2,5
b7C -2,5
b7D -1
b7F

s.  At this time AMUSO,

were "on the lam."

AMUSO-114

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312



Continuation of FD-302 of

b6 -2
b7C -2
b7D -1
b7F

b7D -1

b6 -2,5
b7C -2,5
b7D -1
b7F



in AMUSO'S absence, needed to speak

AMUSO-115

Outside the Scope

FD-302a (Rev. 11-15-83)

BQ 183A-NY-204312



b7D -1

b6 -2
b7C -2
b7D -1
b7F

Continuation of FD-302 of



b6 -2,5
b7C -2,5
b7D -1
b7F

Outside the Scope

AMUSO-116

FD-209 (Rev. 12-5-84)



# Memorandum



| | | |
|---|---|---|
| To : SAC , II [               ] | b2 -1<br>b7D -2 | Date 10/8/91 |
| From : SA [                    ] (C-22) | b6 -1<br>b7C -1 | |
| Subject: [                    ] | b2 -2<br>b7D -3 | |

| Dates of Contact [          ] | b7D -4 |
|---|---|

File #'s on which conducted (Use titles if File #'s not available)

_____
_____
_____
_____
_____

**Purpose and results of contact**

☐ NEGATIVE
☒ POSITIVE
☐ STATISTIC

**Description of Statistical Accomplishment**                **Title of Case**                **File No.**

1 [               ]      b2 -1
1 - 183B-                b7D -2
1 - CIMS

**PERSONAL DATA**

JWH :mab
(3)

AMUSO-117

FD-302 (Rev. 3-10-82)



## FEDERAL BUREAU OF INVESTIGATION

- 1 -

Date of transcription    10/4/91

        A confidential source was advised of the identity of the interviewing Agents and the purpose of the interview.

Outside the Scope

b7D -4

Investigation on _____ at · **Undisclosed**    File # **183B-** _____

by   SAs _____     _____  b6 -1   b7C -1

and _____ JWH/mab     Date dictated **10/3/91**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

AMUSO-118

H.Q.

FD-302a (Rev. 11-15-83)

183B-

b7D -4

Continuation of FD-302 of _____ , On _____ [        ] , Page ___ 2

Outside the Scope

b6 -2,5
b7C -2,5
b7D -4
b7F

AMUSO-119

FD-302a (Rev. 11-15-83)

183B-

b7D -4

Continuation of FD-302 of _____ . On _____ . Page ___3___

b6 -5
b7C -5
b7D -4
b7F

VIC

AMUSO when AMUSO was on the lam.

Outside the Scope

AMUSO-120

FD-302 (Rev. 3-10-82)



# FEDERAL BUREAU OF INVESTIGATION

## - 1 -

Date of transcription _____10/7/91_____

A confidential source was interviewed in <u>the presence</u> of <u>Assistant United State</u>s Attorney (AUSA) SIANO, and [                ] Source advised as follows:

b6 -5
b7C -5
b7D -4
b7F

VIC AMUSO

that they both went on the lam (approximately the

.

Outside the Scope

b6 -5
b7C -5
b7D -4
b7F

Outside the Scope

Investigation on [                ]  b7D -4  Undisclosed          File # _____

by  SAs [                ]  b6 -1  ctated  _____10/4/91_____
[                ]  b7C -1
/RJM/mab

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

HQ

AMUSO-121

FD-302a (Rev. 11-15-83)

Continuation of FD-302 of _____, On _____    age    2

b7D -4



b6 -5
b7C -5
b7D -4
· b7F

met personally by AMUSO

b6 -5
b7C -5
b7D -4
b7F

AMUSO-122

FD-302a (Rev. 11-15-83)

b7D -4

Continuation of FD-302 of _____ . On ___ [____] Page ___ 3

b6 -5
b7C -5
b7D -4
b7F

Among those present were AMUSO

FD-302a (Rev. 11-15-83)

b7D -4

Continuation of FD-302 of _____ , On _____ [   ] ge ___4__

Outside the Scope

b6 -3,5
b7C -3,5
b7D -4
b7F

FD-302a (Rev. 11-15-83)

b7D -4

Continuation of FD-302 of _____, On _____ [        ] age ___ 5 __

b6 -5
b7C -5
b7D -4
b7F

Outside the Scope

b6 -3,5
b7C -3,5
b7D -4
b7F

AMUSO-125

FD-209 (Rev. 12-5-84)

## Memorandum



To    : SAC , II [            ] (P) ──b2 -1──
                              b7D -2

Date 10/29/91

From  : SA [              ] C-17)    b6 -1
                                     b7C -1

Subject: NY [              ]     b2 -2
                                 b7D -3

| Dates of Contact | [                        ] | b7D -4 |
|---|---|---|

File #'s on which contacted (Use Titles if File #'s not available)

Purpose and results of contact

☐ NEGATIVE
☒ POSITIVE
☐ STATISTIC

Description of
Statistical Accomplishment                    Title of Case                    File No.

INFORMATION HEREIN OBTAINED CONFIDENTIALLY.  WITNESS WHO PROVIDED
THIS INFORMATION IS WILLING TO TESTIFY.  NO DISSEMINATION OF THIS
INFORMATION IS TO BE MADE OUTSIDE OF THE FBI WITHOUT PRIOR BUREAU
APPROVAL.  CHARACTERIZATION OF THIS WITNESS FOR INCLUSION IN ANY
LEGAL DOCUMENT MAY BE OBTAINED FROM THE WRITER.  ATTACHED FD-302
CONTAINS HIGHLY SENSITIVE INFORMATION.

1 - [        ] (ADM)    b2 -1
1 -           (INV)    b7D -2
1 - 92-9284
1 - CSSA [        ]    b6 -1
1 - CIMS              b7C -1

PERSONAL DATA

JLK:mab
()

HQ

AMUSO-126

FD-302 (Rev. 3-10-82)

# FEDERAL BUREAU OF INVESTIGATION

## - 1 -

Date of transcription    10/29/91

On the below listed dates, a confidential source provided the following information:

There are several members of organized crime that have sources within the law enforcement community from which they can readily obtain information regarding ongoing investigations.

b6 -5
b7C -5
b7D -4
b7F

b7D -4                                                    Outside the Scope

Investigation on _____    Undisclosed    File # _____

b6 -1
b7C -1

by  SAs [                                    ]e dictated    10/23/91
[                                    ] /JLK/mab

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

AMUSO-127



FD-302a (Rev. 11-15-83)

Continuation of FD-302 of _____ , On _____ , Page __2__

Outside the Scope

4) VICTOR AMUSO [_____] before they went "on the lam" met [_____]

b6 -5
b7C -5
b7D -4
b7F

Outside the Scope

AMUSO-128

FORMS.TEXT HAS 1 DOCUMENT

INBOX.28 (#9143)

TEXT: VZCZCNY0141

OO HQ

DE NY #0141 0092216

ZNY UUUUU

R 092200Z JAN 87

FM FBI NEW YORK (BQ 89B-NEW) (C) (C-15)

TO DIRECTOR FBI IMMEDIATE

    ATTN: PERSONAL CRIMES SECTION, SSA [          ]    b6 -1
                                                     b7C -1

BT

UNCLAS

[          ]    ALSO KNOWN AS (AKA);

[          ]    AKA    [          ]    THREAT TO KILL    b6 -5
                                                         b7C -5
UNITED STATES DISTRICT COURT JUDGE (USDCJ),

EASTERN DISTRICT OF NEW YORK (EDNY), SEPTEMBER, 1986; OO:NY (BQ).

    RE NEW YORK-BROOKLYN-QUEENS TT TO FBIHQ, DATED JANUARY 7, 1987,

AND BQ TELCALL TO FBIHQ, PERSONAL CRIMES SECTION, JANUARY 9, 1987.

Outside the Scope

                                                       b6 -1
                                                       b7C -1

APR 2 2 1988

AMUSO-129

Outside the Scope

PAGE TWO DE NY 0141 UNCLAS

b6 -5
b7C -5

PAGE THREE DE NY 0141 UNCLAS

MURDER IN CONNECTION WITH BQ CASE ENTITLED, "VITTORIO BENITO AMUSO NY

AKA, ET AL," RICO, BQ FILE 183A-3489 ON THE LIFE OF LUCHESE CRIME

FAMILY MEMBER [                    ], WHO  NY

ALLEGEDLY PARTICIPATED IN THE FAILED ATTEMPT ON THE LIFE OF CASSO,

WITH [        ] HAS NOT BEEN SEEN SINCE LATE OCTOBER, 1986.  ACCORDING

TO A NUMBER OF BUREAU SOURCES, [        ] IS PRESUMED DEAD IN CONNECTION

WITH THE AFOREMENTIONED MURDER ATTEMPT. [                    ]

[          ] IS CURRENTLY AWAITING SENTENCING ON A FEDERAL NARCOTICS

CONVICTION DURING DECEMBER, 1986, AND IS NCARCERATED AT TE

METROPOLITAN CORRECTION CENTER (MCC), NEW YORK CITY.

b6 -5
b7C -5
b7D -1

Outside the Scope

STATES GOVERNMENT

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION

# Memorandum

TO          Mr. Moore                                          DATE:    6/15/79

FROM                                             b6 -1
                                                 b7C -1

SUBJECT   PLACING OF DEA CLASS I
          VIOLATORS IN FBI INDICES

PURPOSE:

        To request that the list of DEA Class I
violators received from DEA be entered into FBI indices in
the appropriate manner.

DETAILS:

        As part of the inter-agency cooperation agreed
to by Director Webster and DEA Administrator Bensinger,
DEA has, at the request of the FBI, made available a list
of 2,348 Class I narcotics violators. This list has been
furnished to all field divisions with instructions to
search their respective files for any information and to
enter this list in their general indices.

        It is also requested that this list of Class I
violators be entered in the appropriate manner in FBI
indices under file number 12-0.

        The above has been coordinated with SA                  b6 -1
and Mrs.                          of the Recording Unit.        b7C -1

RECOMMENDATION:

        That the list of 2,348 Class I DEA violators be
entered in the appropriate manner in FBI indices under
file number 12-0 for the violation of narcotics.
"ENCLOSURE IN BULKY ROOM"

APPROVED:

REC-    12-0- 8733

JUN 20 1979

AMUSO-132

AMUSO, VICTOR                                    05/05/79

DOB - 11/ 4/34   NADDIS NO. -   702300   STATE - NY

PLACE OF CRIMINAL ACTIVITY -

* UNKNOWN *

DEA CLASS I NARCOTIC VIOLATOR

CONTACT DEA FOR INFORMATION

/2-0- 8733                          AMUSO-133

FD-263 (Rev. 7-15-75)

# FEDERAL BUREAU OF INVESTIGATION

| REPORTING OFFICE | OFFICE OF ORIGIN | DATE | INVESTIGATIVE PERIOD |
|---|---|---|---|
| NEW YORK | NEW YORK | 3/7/77 | 10/27/76 - 3/2/77 |

| TITLE OF CASE | REPORT MADE BY | TYPED BY |
|---|---|---|
|  |  | rmb |

CHARACTER OF CASE  b6 -1,5
b7C -1,5

BR - CONSPIRACY; ESCAPED FEDERAL PRISONER

3/18/77

(TITLE CONTINUED ON COVER PAGE B)

## REFERENCES

NYrep of SA _____ 11/18/76.
NKairtel to NY, 11/26/76.
SJairtel to NK, 1/11/77.
MMairtel to NY, 2/10/77.
NYairtel to Bu, 2/28/77.
NYairtel to MM, 2/28/77.

-P-

## ADMINISTRATIVE

In view of extensive investigation conducted to date in this matter in the San Juan Division, two information copies of this report are being San Juan.

| ACCOMPLISHMENTS CLAIMED [X] NONE | | | | | ACQUIT-TALS | CASE HAS BEEN: |
|---|---|---|---|---|---|---|
| CONVIC. | PRETRIAL DIVERSION | FUG. | FINES | SAVINGS | RECOVERIES | |

PENDING OVER ONE YEAR [X] YES [ ] NO
PENDING PROSECUTION OVER SIX MONTHS [X] YES [ ] NO

APPROVED ___   SPECIAL AGENT IN CHARGE   DO NOT WRITE IN SPACES BELOW

COPIES MADE:
8 - Bureau (91-       )
(1 - 91-47484)
(1 - 91-51792)
(1 - 91-52358)
(1 - 91-52496)
(1 - 91-55854)
(1 - 91-56405)
(1 - 91-56557)
17- New York (NR 91-14889)   COPIES CONTINUED COVER PAGE B

91-61094-4   REC 67
DE-38
20 MAR 11 1977
ST 109

| Dissemination Record of Attached Report | | | | Notations |
|---|---|---|---|---|
| Agency | | | | |
| Request Recd. | | | | |
| Date Fwd. | | | | |
| How Fwd. | | | | |
| By | | | | |

70 MAR 22 1977

-A-
COVER PAGE
AMUSO-134

NR 91-14889

Outside the Scope

On ▢ advised that on
Tuesday or Wednesday of the previous week, at approximately
5:00 PM, he observed subject, ▢ standing with VICTOR
AMUSO and a third unidentified white male outside the
entrance of ▢
Brooklyn, NY.    Source advised that ▢ AMUSO, and
the third individual then entered a dark Cadillac and
drove to an address a short distance from the bar.    Source
was not sure of this address.

          VICTOR AMUSO is identified as a white male,
DOB 11/4/34, FBI #6987746.    Information had previously
been obtained that AMUSO was a close associate of the
subject, ▢

b2 -2
b6 -5
b7C -5
b7D -4
b7F

▢ Source therefore
advised that he could not be of further assistance in
frequenting the area where he observed ▢ or in
contacting VICTOR AMUSO.

b6 -5
b7C -5
b7D -4

          As a result of information received from this
source, a surveillance of ▢
Brooklyn, NY, was conducted 2:00 PM to
10:00 PM on 2/18, 2/22, 2/23, 2/24, and 2/25/77.    The
surveillance was conducted with Agents of the New Rochelle
Office, the NYO Bank Robbery Squad, and NYCPD Detectives
assigned to the Major Case Squad.    VICTOR AMUSO was observed

b2 -3
b7E

-O-
COVER PAGE

AMUSO-135

NR 91-14889

on the first night of the surveillance 2/18/77, and was not
seen after that time.

AMUSO is known to sources of the NYO, including

b2 -2
b7D -3

-P-
COVER PAGE

AMUSO-136

Mr. Potts                                                    5/7/93

Outside the Scope

In July of 1991, _____ after the capture of
Luchese LCN Boss Vittorio Amuso.

b6 -2,3
b7C -2,3
b7D -1
b7F

Outside the Scope

**THE ABOVE INFORMATION IS APPROPRIATE FOR DISSEMINATION TO THE
PUBLIC.**

183 B - HQ - 1043395 - I - 1          J. C. Frier



U.S. Department of Justice

Federal Bureau of Investigation

b2 -3
b6 -5
b7C -5
b7E

/83B-HQ-1043395-T-12

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

AMUSO-138

LCN SUB I



b2 -3
b6 -5
b7C -5
b7E

Outside the Scope

Outside the Scope

b2 -3
b6 -5
b7C -5
b7E

3

b2 -3
b6 -5
b7C -5
b7E

92A-HQ-1043395 - Sub I



b2 -3
b6 -5
b7C -5
b7E

22



**U.S. Department of Justice**

**Federal Bureau of Investigation**

b2 -3
b6 -5
b7C -5
b7E

92A-HQ-1043395-Sub I          AMUSO-143

b2 -3
b6 -5
b7C -5
b7E

2

AMUSO-144

b2 -3
b6 -5
b7C -5
b7E

b2 -3
b6 -5
b7C -5
b7D -1
b7E
b7F

b2 -3
b6 -5
b7C -5
b7E

OPCA-20 (12-3-96)

XXXXXX
XXXXXX
XXXXXX

## FEDERAL BUREAU OF INVESTIGATION
### FOIPA
### DELETED PAGE INFORMATION SHEET

_____ Page(s) withheld entirely at this location in the file. One or more of the following statements, where indicated, explain this deletion.

☐ Deletions were made pursuant to the exemptions indicated below with no segregable material available for release to you.

| Section 552 | | Section 552a |
|---|---|---|
| ☐ (b)(1) | ☐ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☐ (j)(2) |
| ☐ (b)(3) | ☐ (b)(7)(C) | ☐ (k)(1) |
| _____ | ☐ (b)(7)(D) | ☐ (k)(2) |
| _____ | ☐ (b)(7)(E) | ☐ (k)(3) |
| _____ | ☐ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☐ (b)(6) | | ☐ (k)(7) |

☐ Information pertained only to a third party with no reference to the subject of your request or the subject of your request is listed in the title only.

☐ Documents originated with another Government agency(ies). These documents were referred to that agency(ies) for review and direct response to you.

_____ Pages contain information furnished by another Government agency(ies). You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

_____ Page(s) withheld inasmuch as a final release determination has not been made. You will be advised as to the disposition at a later date.

3 Pages were not considered for release as they are duplicative of _92A-HQ -1043395-I serial 28_ _Bates # 145-147_

_____ Page(s) withheld for the following reason(s): _____

_____

☒ The following number is to be used for reference regarding these pages:
_92A-HQ-1043395-I serial 29     Bates # 148-150_ _____

XXXXXXXXXXXXXXXX
X    Deleted Page(s)     X
X    No Duplication Fee   X
X    for this page        X
XXXXXXXXXXXXXXXX

XXXXXX
XXXXXX
XXXXXX

FBI/DOJ

EXHIBIT
J

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VITTORIO AMUSO,                        )
                                       )
                    Plaintiff,         )
                                       )
                                       )
            v.                         )     Civil Action No.: 07-CV-01935
                                       )
U.S. DEPARTMENT OF                     )
JUSTICE, et al.,                       )
                                       )
                    Defendant.         )
                                       )

## DECLARATION OF WILSON J. MOORER

I, Wilson J. Moorer, do hereby declare and state the following:

1.  I am currently a Paralegal Specialist at the Federal Bureau of Prisons, Office of
General Counsel, Freedom of Information Act Section, Washington, D.C. I have been employed
in this position since April 2003; however, I have been employed with the Bureau of Prisons since
July of 1988. My duties include assisting the Chief, Freedom of Information Act/Privacy Act
Section and Freedom of Information Administrator in the review and possible release of
information requested from the Bureau of Prisons via the Freedom of Information Act.

2.  The Freedom of Information Act, commonly referred to as FOIA, is a statute
governing the release of government records. In general, FOIA provides that any person has a
right, enforceable in court, to obtain access to federal agency records, except to the extent that
such records (or portions of them) are protected from public disclosure by one of nine exemptions
or by one of three (3) special law enforcement record exclusions.

1

3.  On or about August 26, 2008, the Bureau of Prisons FOIA Office, Washington, D.C. was made aware of the above titled civil action and a request was made to supply this declaration in support of the motion being submitted by the United States Attorney Office (USAO).  This declaration will detail information regarding the referral of three (3) pages information from the U.S. Department of Justice, Federal Bureau of Investigations (FBI), Washington, DC.

4.  The Bureau of Prisons FOIA Office received the 3 page referral of information from the Federal Bureau of Investigations (FBI) on May 2, 2008.  The referral was logged in and assigned FOIA Request Number 2008-06852.  See Referral from Federal Bureau of Investigations to Federal Bureau of Prisons, a true and correct copy of which is attached here to as Exhibit A.

5.  The BOP Central Office responded to the referral from the FBI on June 20, 2008.  A determination was made to withhold the 3 pages of information in their entirety.  The withholding of the 3 pages of information was made pursuant to 5 U.S.C. §552(b)(7)(C)  and (b)(7)(F).  See Letter from Federal Bureau of Prisons to Vittorio Amuso, dated June 20, 2008, a true and correct copy of which is attached here to as Exhibit B.[1]

---

[1]We have been advised by the USAO that the FBI has referred a package to BOP as of August 14, 2008.  A review of the Bureau of Prisons FOIA data base reveals that as of this date the package has not been received in this office.  However, once the package is received it will be reviewed, logged in, assigned a FOIA number, and responded to in the appropriate manner.

6. A copy of the redacted document, on its face, contain exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA. A more detailed description of the information withheld could identify the protected material. As described below, no reasonably segregable non-exempt portions were withheld from plaintiff. Accordingly, all information withheld was exempt from disclosure pursuant to a FOIA exemption or was not reasonably segregable because it was so intertwined with protected material that segregation was not possible or its release would have revealed the underlying protected material. All documents which relate to plaintiff's requests were processed to achieve maximum disclosure consistent with the provisions of the FOIA.

7. Exemption (b)(7)(C) provides for the withholding of records or information compiled for law enforcement purposes which could reasonably be expected to constitute an unwarranted invasion of personal privacy and Exemption (b)(7)(F), which provides for the withholding of records or information compiled for law enforcement purposes which could endanger the lives or physical safety of an individual, were used to withhold 3 pages of law enforcement documents which contained the names, register numbers, locations, FBI numbers, Social Security numbers, dates of birth, and organized crime affiliation of inmates incarcerated in the Federal Bureau of Prisons. If this information was disclosed Plaintiff would have the names of individuals the BOP has confirmed as being a significant organized crime member. As described above, no reasonably segregable non-exempt portions were withheld from Plaintiff.

3

Accordingly, all redacted information was exempt from disclosure pursuant to a FOIA exemption or was not reasonably segregable.

I declare under the penalty of perjury, pursuant to Title 28 U.S.C. § 1746, the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this ___27___ day of August  2008, at Washington, D.C.

Wilson J. Moorer
Paralegal Specialist
Federal Bureau of Prisons
Washington, D.C.

4

**EXHIBIT**

**A**



U.S. Department of Justice

Federal Bureau of Investigation

*Washington, D.C. 20535*

To:   Wanda M. Hunt, Chief, FOIA Section
      FOIA/Privacy Act Requests
      Federal Bureau of Prisons                      BY COURIER
      Department of Justice
      Room 841, HOLC Building
      Washington, D.C. 20534

# Received

From:   David M. Hardy
        Record/Information Dissemination Section
        Records Management Division

MAY   2 2008

**FOIA/PA Section**
**Federal Bureau of Prison**

Subject: FOI/PA Request of
         FBI FOI/PA # 1076768- 001        Re: AMUSO, VITTORIO

In connection with review of FBI files responsive to the above request, the following was surfaced:

☑  t     unclassified document(s) which originated with your agency is/are being referred to you for
         direct response to the requester. The requester has been advised of this referral. Please
         furnish this Bureau a copy of your disclosure letter to the requester. (See index A).

☐        FBI document(s) containing information (outlined in red) concerning your agency.
         ☐ We will advise the requester to expect a direct response from your agency regarding this matter.

         ☐ Please review this information and return the documents to us, making any deletions you deem
           appropriate. (See index B).

☐        classified document(s) which originated with your agency is/are being referred to you for
         direct response to the requester. The requester ☐ has ☐ has not been advised of this referral. Please
         furnish this Bureau a copy of your disclosure letter to the requester, and advise us if the classification
         of the document(s) changed so that we may amend our files. (See index C).

☐        classified FBI document(s) containing information (outlined in red) concerning your agency.
         ☐ We will advise the requester to expect a direct response from your agency regarding this matter.

         ☐ Please review this information and return the document(s) to us, making any deletions you deem
           appropriate, citing the exemption(s) claimed. Please advise this Bureau if the document(s) still
           warrant classification. (See index D).

☐ Please note that some of the enclosed documents contain deletions made by this Bureau. The
  appropriate exemption appears next to the redacted information. The requester may appeal these
  denials by writing to the following address within sixty days of your release: Co-Director, Office of
  Information and Privacy, U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050,
  Washington, D.C. 20530-0001.

A copy of the requester's initial letter and other significant correspondence is enclosed for your
convenience. If you have any questions concerning this referral, please contact Art Rider at (202) 324 - 9256.
The FBI FOIPA number as well as the FBI file number on the Index Listing (see reverse) should be utilized during
any consultation with the FBI concerning this referral.

Additional Remarks:

Enclosure(s)                              ( INDEX LISTING ON REVERSE)

Index A:

      183-8533-2107x6

Index B:

Index C:

Index D:

$A$

April 16, 2007
   (Date)

Vittorio "Vic" Amuso #38740-079
U.S.P. Big Sandy
P.O. Box #2068
Inez, KY  41224

Federal Bureau of Investigations
ALBANY Feild Office/FOIA Officer
200 MCarty Ave.
Albany, NY  12209

Re:  Freedom of Information/Privacy Acts Request


Dear Records Custodian:

This is a Freedom of Information and Privacy Act (FOIA/PA)
request made pursuant to Title 5 U.S.C. Sec. 552, 552a and
28 C.F.R. Sec. 16.1 et. seq.   In this case Amuso is requesting
any and all documents, records, memoranda, notes, statements and
other information or data in what ever form maintained by your
agency that relates to and/or makes reference to Amuso directly
or indirectly.  More specifically, any data or information in
the possession or control of your agency related to and/or
generated by the criminal investigation and prosecution of
Amuso by federal authorities in and around the U.S. Federal
Districts of New York.  This would include, but not be limited
to, any agency documents, records, reports, statements, notes,
case file summaries and all forms of information maintained by
your agency that makes reference to Amuso directly and indirectly.
   Amuso would specifically request a search of your agency's
Central Records System (CRS), Automated Case Support System (ACSS),
Electronic Case Files (ECF), Universal Index (UI), Legal Attaches
(Legats), Investigative Case Managment system (ICMS), Confidental
Source System (CSS) and the "I-Drive" system.  Any "main" and/or
"references" to Amuso by his known name would be responsive to
this request.  Also, any reference to Amuso as the "Boss" of the
Lucchese "Crime Family", or "soldier", or "Captian", or "Member"
of the "La Cosa Nostra" would be requested.
   This FOIA/PA request specifically requests information from
January 1980 until the present time.  To further aid your agency
in effecting this FOIA/PA request, be advised that numerous federal
criminal investigations and prosecutions have been pursued against
Amuso and "fellow members" of the "La Cosa Nostra" resulting in
volumous records and information that will make reference to
Amuso and various participants in those investigations and criminal
prosecutions.  For example, in 2006 there was reference to Amuso
related to the criminal trial of two former New York City Police
officers alleged to be employed by the Lucchese "Crime Family".
Additionally, the prosecution of various alleged members of the
"La Cosa Nostra" transpired during 2005 and 2006 which made ref-
erences to Amuso.  These records would be responsive to this

[Page 1 or 3 pages]

Freedom of Information/Privacy Acts Request
Vittorio "Vic" Amuso #38740-079
Page 2 of 3 pages

FOIA/PA request. Certian alleged "members" and/or "associates"
identified as Anthony "Gas Pipe" Casso and Alphonse D'Arco would
be relavent to any information requested by Amuso.

    Be advised that Amuso makes this FOIA/PA request for solely
personal and not commercial purposes. All information sought by
Amuso is for the public's interest insomuch as society is offended
when an innocent man remains imprisoned. A grave miscarriage of
justice is being committed by Amuso's continued incarceration and
Life sentence based on perjured testimony of certain individuals
and prosecutorial misconduct. The release of information in this
case will serve to correct this miscarriage of justice and reaffirm
the public's confidence in the American criminal justice system.

    Your agency should specifically reference any and all stat-
utory provisions relied upon to assert any exemption when denying
release of information under Secs. 552 and 552a. Amuso agrees to
pay any and all reasonable costs and fees associated with this
request, however would request that your agency make the first
100 documents available without cost under 28 C.F.R. Sec. 16.1,
et. seq.

    All of Amuso's personal information is being made available
to your agency as found at page #3 of this request. If your
agency requires any additional information to complete this FOIA
request please contact Amuso at the address indicated above. A
certificate of identity is attached herewith.

    Thank you for your time and concern in this matter.

                    Respectfully submitted,

                    /s/ _Vittorio Amuso_
                    Vittorio "Vic" Amuso


Attachments


cc: Retained

Freedom of Information/Privacy Acts Request
Vittorio "Vic" Amuso #38740-079
Page 3 of 3 pages

PERSONAL INFORMATION OF VITTORIO "VIC" AMUSO

Date of Birth :    ____        —

Place of Birth:  Brooklyn, New York

SS No.:    _    _____

FBI No:    698774B _____

US Marshal No.:  38740-079 _____

Criminal Docket #: CR-90-446  Eastern District, NY

Other Information:  Alleged "member" of "La Cosa Nostra" and ___

"Lucchese Crime Family"/ Federal prosecution case names "Windows

Cases I and II"

U.S. Department of Justice        **Certification of Identity** 

**Privacy Act Statement.** In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The purpose of this solicitation is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. Failure to furnish this information will result in no action being taken on the request. False information on this form may subject the requester to criminal penalties under 18 U.S.C. Section 1001 and/or 5 U.S.C. Section 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to Director, Facilities and Administrative Services Staff, Justice Management Division, U.S. Department of Justice, Washington, DC 20530 and the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC 20503.

Full Name of Requester [1]    __Vittorio Amuso__

Citizenship Status [2]    __American__    Social Security Number [3] _____

Current Address    __Big Sandy USP P.O. Box 2068, Inez, KY 41224__

Date of Birth _      _____ Place of Birth __Brooklyn, NY__

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

Signature [4] _Vittorio Amuso_      Date _7/16/07_

## OPTIONAL: Authorization to Release Information to Another Person

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b), I authorize the U.S. Department of Justice to release any and all information relating to me to:

_____

### Print or Type Name

[1] Name of individual who is the subject of the record sought.
[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an Alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.
[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.
[4] Signature of individual who is the subject of the record sought.

FORM APPROVED OMB NO. 1103-0016
EXPIRES 2/29/04       U.S. GPO: 2001-472-520/53201       FORM DOJ-361
APR.01

# EXHIBIT

# B



U.S. Department of Justice

Federal Bureau of Prisons

JUN 20 ᵃᵇᵉ

*Washington, DC 20534*

Vittorio Amuso
Register Number 38740-079
United States Penitentiary
P.O. Box 2068
Inez, KY 41224

For Further Inquiry Contact:
Federal Bureau of Prisons
320 First Street. N.W.
Room 841, HOLC Building
Washington, D.C. 20534
Attn: FOIA/Privacy Act Office

RE:  Request for Information, FOIA Request No. 2008-06852

Dear Mr. Amuso:

Pursuant to your recent Freedom of Information Act request to the Federal Bureau of Investigation (FBI), three (3) pages of information that originated with the Bureau of Prisons were referred to this agency for processing and direct response to you.

After a careful review, it has been determined the 3 pages of information are not releasable to you and are being withheld in their entirety.  This withholding is being done pursuant to 5 U.S.C. §552(b)(7)(C) and (b)(7)(F).

Exemption (b)(7)(C) provide for the withholding of records or information compiled for law enforcement purposes which could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Exemption (b)(7)(F) provide for the withholding of records or information compiled for law enforcement purposes which could endanger the lives or physical safety of an individual.

Pursuant to 28 C.F.R. §16.9, this denial may be appealed to the Attorney General by filing a written appeal within sixty days of the date of the letter denying your request.  The appeal should be addressed to the **Office of Information and Privacy, U.S. Department of Justice, 1425 New York Ave., NW; Suite 11050, Washington, D.C. 20530-0001.**

Page 2
Vittorio Amuso
FOIA Request No. 2008-06852


Both the envelope and the letter of appeal itself must be clearly
marked:  **"Freedom of Information Act Appeal."**

    We trust this information is of assistance to you.  If you
have any questions or concerns please contact Wilson J. Moorer,
Paralegal.

                              Sincerely,



                              Wilson J. Moorer, Paralegal
                              Wanda M. Hunt
                              Chief, FOIA/PA Section



cc: File

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

VITTORIO AMUSO                                    )
# 38740-079                                       )
USP- BIG SANDY                                    )
P.O. BOX 2068                                     )
Inez, KY 41224                                    )
                                                  )       Case No: 07-1935 (RJL)
                 Plaintiff,   )
                                                  )
         v.                   )
                                                  )
                                                  )
U.S. DEPARTMENT OF JUSTICE,                       )
FEDERAL BUREAU OF INVESTIGATION,                  )
                                                  )
                                                  )
              Defendants.  )
                                                  )

**ORDER**

Upon consideration of Defendants' Motion for Summary Judgment, and any opposition thereto, for good cause shown, it is on this _____ day of _____, 2008,

ORDERED: that Defendants' Motion for Summary Judgment is GRANTED.  It is

FURTHER ORDERED: that judgment is entered for the Defendants and the case is DISMISSED WITH PREJUDICE.

.

_____
Richard J. Leon
UNITED STATES DISTRICT JUDGE