# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

VITTORIO AMUSO,            :

        Plaintiff,       :

     v.                 :         Civil Action No. 07-1935 (RJL)

UNITED STATES DEPARTMENT    :
OF JUSTICE, *et al.*,           :

        Defendants.      :

## MEMORANDUM OPINION

This matter is before the Court on defendants' motion for summary judgment.  For the reasons discussed below, the motion will be granted in part and denied in part.

## I.  BACKGROUND

In April 2007, plaintiff submitted to the Federal Bureau of Investigation's Washington, D.C. headquarters ("FBI") a request for information under the Freedom of Information Act ("FOIA"), *see* 5 U.S.C. § 552.[1]  Compl. at 2 & Ex. A (April 10, 2007 Freedom of Information/Privacy Acts Request).  In relevant part, the request stated:

> In this case Amuso is requesting any and all documents, records, memoranda, notes, statements and other information or data in what ever form maintained by your agency that relates to and/or makes

---

[1]      Plaintiff submitted identical FOIA requests to the FBI's Washington, D.C. Headquarters and to its Albany, New York field office.  Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J., Hardy Decl. ¶ 7.  Staff at the Albany field office forwarded plaintiff's FOIA request to FBI Headquarters for processing.  Compl., Ex. B (May 3, 2007 letter from D.M. Hardy).

reference to Amuso directly or indirectly. More specifically, any data or information in the possession or control of your agency related to and/or generated by the criminal investigation and prosecution of Amuso by federal authorities in and around the U.S. Federal Districts of New York.

*Id.*, Ex. A at 1. Plaintiff sought "[a]ny 'main' and/or 'references' to Amuso by his known name . . . [and] any reference to [him] as the 'Boss' of the Lucchese 'Crime Family', or 'soldier', or 'Captain', or 'Member' of the 'La Cosa Nostra[.]'" *Id.* The relevant time period, plaintiff explained, was from January 1980 to the time of his request, noting that criminal trials involving two former New York City police officers employed by the Lucchese crime family and the prosecution of members of La Cosa Nostra in 2005 and 2006 would be responsive to his request. *Id.* In addition, plaintiff asked that the FBI search its "Central Records System (CRS), Automated Case Support System (ACS), Electronic Case Files (ECF), Universal Index (UI), Legal Attaches (Legats), Investigative Case Management [S]ystem (ICMS), Confidential Source System (CSS), and the 'I-Drive' system." *Id.*

FBI staff acknowledged receipt of the request to which was assigned Request No. 1076768-000. Compl. at 2 & Ex. B (May 3, 2007 letter from D.M. Hardy, Section Chief, Record/Information Dissemination Section, Records Management Division, FBI). FBI staff initially determined that potentially responsive records at the Albany field office had been destroyed on an unspecified date, *see id.*, Ex. C (May 21, 2007 letter from D.M. Hardy), and later determined that FBI Headquarters maintained records responsive to the request. Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mot."), Declaration of David M. Hardy ("Hardy Decl.") ¶ 23. The agency "released 147 pages with redactions pursuant to FOIA

Exemptions 2, 6, 7(C), 7(D), 7(E), and 7(F)." *Id.* ¶ 82.  In addition, it referred four pages of records to the Federal Bureau of Prisons ("BOP"). *Id.* ¶ 81.

Plaintiff is serving a sentence of life imprisonment after his conviction "in 1992 of fifty-four (54) counts of murder, extortion and labor racketeering." Hardy Decl. ¶ 5; *see United States v. Amuso*, 21 F.3d 1251, 1253 (2d Cir. 1994).  He alleges that prosecution witnesses "provided perjured testimony against [him] to cover-up their own criminal culpability," Compl. at 3, and he believes that information in the FBI records he requests will support his claims of innocence and his assertion that witnesses testified falsely at trial. *Id.* at 3-4.

## II.  DISCUSSION

### A.  Summary Judgment Standard

The court grants a motion for summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits or declarations, show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits his own affidavits or declarations or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

In a FOIA case, the court grants summary judgment based on the information provided in affidavits or declarations when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the

record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 74 (D.D.C. 2003).   Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. Central Intelligence Agency*, 692 F.2d 770, 771 (D.C. Cir. 1981)).

### B.  FBI's Searches for Responsive Records

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. United States Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)); *see Steinberg v. United States Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (placing the burden on the agency to show that its search was calculated to uncover all relevant documents).   To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search. *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam).   In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance with FOIA. *Id.* at 127.   If the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt*, 897 F.2d at 542.

### 1.  FBI's Central Records System

In its Central Records System ("CRS"), the FBI maintains its "administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes." Hardy Decl. ¶ 15.

It is "organized into a numerical sequence of files called FBI 'classifications,' which are broken down according to subject matter." *Id.* A file's subject matter may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. *Id.* In order to search the CRS, one uses a mechanism known as the Automated Case Support System ("ACS"), *id.*, which is "described as an internal computerized subsystem of the CRS." *Id.* ¶ 16. General indices, which consist of index cards arranged in alphabetical order, are the means by which CRS records are retrieved through the ACS. *Id.* ¶ 17. Entries in the general indices are either "main" entries or "reference" entries. *Id.* The former "carr[y] the name corresponding with a subject of a file contained in the CRS;" the latter "are generally only a mere mention or reference to an individual, organization, etc., contained in a document located in another 'main' file." *Id.* ¶ 17(a), (b). In order to search the general indices for records pertaining to an individual, such as Vittorio Amuso, one searches the subject in the index. *Id.* ¶ 18.

"The ACS consists of three integrated . . . applications that support case management functions for all FBI investigative and administrative cases." Hardy Decl. ¶ 19. The Investigative Case Management ("ICM") system enables an office "to open, assign, and close investigative and administrative cases as well as set, assign, and track leads." *Id.* ¶ 19(a). The field office originating an investigation (the "OO" or Office of Origin) opens a case and assigns it a Universal Case File Number ("UCFN"). *Id.* ¶ 19. The Electronic Case File ("ECF") is a "central electronic repository for the FBI's official text-based documents." *Id.* ¶ 19(b). The Universal Index ("UNI") provides "a complete subject/case index to all investigative and administrative cases" and "functions to index names to cases, and to search names and cases for use in FBI investigations." *Id.* ¶ 19(c). "Names of individuals or organizations are recorded with

5

identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event." *Id.*

The decision to index names other than subjects, suspects, and victims is left to the discretion of the assigned Special Agent, the Supervisory Special Agent at the field office conducting the investigation, and the Supervisory Special Agent at FBI Headquarters. Hardy Decl. ¶ 20. Without an index, "information essential to ongoing investigations could not be readily retrieved. The FBI files would be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI." *Id.* Thus, general indices to the CRS files "are the means by which the FBI can determine what retrievable information, if any," its files may contain on a particular subject or individual. *Id.*

The "I" drive mentioned in plaintiff's FOIA request "is simply a shared drive in a computer network." Hardy Decl. ¶ 21. The FBI shared drive in many field offices are now identified with other letters, and are used "to hold preliminary work product investigative documents drafted by FBI [Special Agents] in order to allow [Supervisory Special Agents] to review and approve them before they are finalized, uploaded, and serialized in the official investigative file." *Id.*

FBI staff initially "conducted a search of the automated indices" for responsive records maintained at FBI Headquarters "using the name[] 'Amuso, Vittorio Benito'" and a phonetic breakdown thereof, as well as plaintiff's date of birth and social security number "to facilitate the identification of requested records." Hardy Decl. ¶ 22. After plaintiff filed this civil action, FBI staff conducted a "de novo search of the CRS indices." *Id.* ¶ 23. Staff identified "the following cross-references . . . as being responsive: 66F-HQ-A 1074181-63; 92A-HQ-1020655-C1-5; 183-

6

11597-271; 12-0-8733; 91-61044-4; 92A-HQ-1043395-I-1, 12, 13x2, 28 and 29; 89-6289-4; and

183-8533-2107X6, 4932, 4955, 4970, 5008, 5062, 5608, 5611, and 5664." *Id.*  A search of the

indices at the Albany Field Office "revealed that records which may be responsive to plaintiff's

[FOIA] request were destroyed" on an unknown date. *Id.* ¶ 24.

### 2.  Plaintiff's Challenge to the Adequacy of the Search

With respect to the destruction of Albany Field Office records, plaintiff argues that the

FBI "never advised [him] as to the nature of the records which were destroyed, and [plaintiff]

was simply advised that they were, in fact, destroyed." Pl.'s Resp. to Defs.' Mot. for Summ. J.

("Pl.'s Opp'n") at 4.  In his view, the FBI "act[s] in bad faith by failing to divulge the nature of

the records and by failing to search other available indices and records which might have

contained the destroyed records." *Id.* at 4-5.  He is unable to "suggest other ways in which the

matter might have been searched" as he is without information "as to the nature of the records."

*Id.* at 5.

An agency's search is adequate if its methods are reasonably calculated to locate records

responsive to a FOIA request, *see Oglesby v. United States Dep't of the Army,* 920 F.2d 57, 68

(D.C. Cir. 1990), and an agency is not obligated to expand the scope of its search or to search all

of its systems of records when it has searched the systems of records most likely to contain

responsive records.  *See Campbell v. United States Dep't of Justice,* 164 F.3d 20, 28 (D.C. Cir.

1998) (stating that an agency generally need not search every records system as long as it

conducts "a reasonable search tailored to the nature of a particular request") (citing *Oglesby,* 920

F.2d at 68).  The results of a search do not determine whether the search is adequate.  *See*

*Hornbostel v. United States Dep't of the Interior,* 305 F. Supp. 2d 21, 28 (D.D.C. 2003) (stating

that "[t]he focus of the adequacy inquiry is not on the results" of the search).  "[T]he issue to be

resolved is not whether there might exist any other documents possibly responsive to the request,

but rather whether the search for those documents was adequate." *Weisberg v. Dep't of Justice*,

705 F.2d 1344, 1351 (D.C. Cir. 1983) (citing *Perry v. Block*, 684 F.2d at 128).

The FBI's explanation of its automated system of records makes clear that a search for

records pertaining to an individual such as plaintiff is accomplished by means of the general

indices to the CRS files. *See* Hardy Decl. ¶¶ 16-20.  Plaintiff's speculation as to the existence of

additional records, absent support for his allegations of agency bad faith, does not render the

search inadequate. *See, e.g., Judicial Watch, Inc. v. United States Dep't of Health and Human

Servs.*, 27 F. Supp. 2d 240, 244 (D.D.C. 1998) (finding that "plaintiff's unsubstantiated

suspicions . . . therefore, are insufficient to call into question the adequacy of [the agency's]

search and the truthfulness of its affidavit").  Even if the FBI's Albany Field Office once

maintained records that may have been responsive to plaintiff's FOIA request, the FBI's failure

to locate them now does not weaken the FBI's position. *See Allen v. United States Secret Serv.*,

335 F. Supp. 2d 95, 98-100 (D.D.C. 2004) (concluding that adequacy of search not undermined

where responsive records were destroyed pursuant to agency's document retention policy).

"Nothing in the law requires the agency to document the fate of documents it cannot find."

*Roberts v. United States Dep't of Justice*, No. 92-1707, 1995 WL 356320, at *2 (D.D.C. Jan. 28,

1993).

On this record, the Court concludes that the methods by which FBI staff searched for

records responsive to plaintiff's FOIA request were reasonable under the circumstances.

### C. Segregability

Before it discusses the FBI's claimed exemptions, the Court first addresses plaintiff's

recurring assertion of agency bad faith with respect to the redaction of records actually released

to him.  Generally, plaintiff alleges that the FBI "acted in clear-cut bad faith by tendering

documents to the plaintiff with no information on them."  Pl.'s Opp'n at 5.  For example, he

states that the FBI "provided 147 pages of documents, mostly FBI 302's," including "a few

newspaper articles [but] no information whatsoever that had not been redacted and withheld."

*Id.* at 24.  In other words, plaintiff states that most of the records are so heavily redacted that he

"has been given nothing of any substance or benefit."  *Id.* at 25; *see id.* at 6 (stating that "FBI

302's with all information redacted does nothing to help the plaintiff and simply led to an

expense of copying for the government"), 16, 21.  With so little information, plaintiff asserts that

he is unable to evaluate whether the FBI properly withholds information under the claimed

exemptions.  *See id.* at 6-9,15-21, 24-25.

If a record contains information that is exempt from disclosure, any reasonably segregable

information must be released after deleting the exempt portions, unless the non-exempt portions

are inextricably intertwined with exempt portions.  *Trans-Pacific Policing Agreement v. United*

*States Customs Serv.*, 177 F.3d 1022 (D.C. Cir. 1999); 5 U.S.C. § 552(b).  FBI's declaration

states that the agency "has processed and released all segregable information from the documents

responsive to plaintiff's request" after having "reviewed [each document] page by page,

paragraph by paragraph and line by line to ensure maximum disclosure."  Hardy Decl. ¶ 82.

Attached to the FBI's motion are copies of the pages as released to plaintiff in full or in part, *see*

Def.'s Mot., Ex. I ("*Vaughn* Index"), on which are written "coded categories of exemptions"

indicating "the nature of the information withheld." Hardy Decl. ¶ 26; *see id.* ¶ 27 (Summary of Justification Categories).

Review of the records as released to plaintiff reveals that several pages are so heavily redacted that, aside from preprinted information on standard forms, little information remains. Notwithstanding the dearth of information remaining on such pages, the Court is satisfied that only the exempt records or portions of records have been withheld, and that all reasonably segregable material has been released to plaintiff. The FBI's declaration and *Vaughn* index adequately specify "which portions of the document[s] are disclosable and which are allegedly exempt."[2] *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). Plaintiff's level of satisfaction with the content of redacted records does not undermine the FBI's decisions to redact or withhold information under the claimed exemptions.

### D. Exemptions

#### 1. Exemption 2[3]

Exemption 2 shields from disclosure information that is "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The phrase "personnel rules and practices" is interpreted to include not only "minor employment matters" but also "other rules and practices governing agency personnel." *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 670 F.2d 1051, 1056 (D.C. Cir. 1981) (en banc). The "information need not actually

---

[2]    The Court makes no segregability finding at this time with respect to the records referred to the BOP on May 2, 2008 and August 14, 2008.

[3]    Discussion of the FBI's decision to withhold information pertaining to law enforcement techniques and procedures under both Exemptions 2 and 7(E) appears in the discussion of Exemption 7(E).

*be* 'rules and practices' to qualify under [E]xemption 2, as the statute provides that matter 'related' to rules and practices is also exempt." *Schwaner v. Dep't of the Air Force*, 898 F.2d 793, 795 (D.C. Cir. 1990) (emphasis in original).

Exemption 2 applies if the information that is sought meets two criteria. First, such information must be "used for predominantly internal purposes." *Crooker*, 670 F.2d at 1074; *see Nat'l Treasury Employees Union v. United States Customs Serv.*, 802 F.2d 525, 528 (D.C. Cir. 1985). Second, the agency must show either that "disclosure may risk circumvention of agency regulation," or that "the material relates to trivial administrative matters of no genuine public interest." *Schwaner*, 898 F.2d at 794 (citations omitted). "Predominantly internal documents the disclosure of which would risk circumvention of agency statutes are protected by the so-called 'high 2' exemption." *Schiller v. Nat'l Labor Relations Bd.*, 964 F.2d 1205, 1207 (D.C. Cir. 1992). If the material at issue merely relates to trivial administrative matters of no genuine public interest, it is deemed "low 2" exempt material. *See Founding Church of Scientology of Washington, D.C., Inc. v. Smith*, 721 F.2d 828, 830-31 n.4 (D.C. Cir. 1983). "Low 2" exempt materials include such items as "file numbers, initials, signature and mail routing stamps, references to interagency transfers, and data processing references," *Scherer v. Kelley*, 584 F.2d 170, 175-76 (7th Cir. 1978), *cert. denied sub nom. Scherer v. Webster*, 440 U.S. 964 (1979), and other "trivial administrative data such as . . . data processing notations[] and other administrative markings." *Coleman v. Fed. Bureau of Investigation*, 13 F. Supp. 2d 75, 78 (D.D.C. 1998) (citation omitted).

In conjunction with Exemption 7(D), the FBI withholds under Exemption 2 two types of information: informant file numbers of permanent confidential symbol number sources and the

permanent source symbol numbers themselves.  Hardy Decl. ¶¶ 33, 37.  In this section, the Court

addresses only the internal administrative purposes of this information and its status as "high 2"

exempt information.  The use of informant file numbers and permanent source symbol numbers

in connection with the FBI's use of confidential sources appears in the discussion of Exemption

7(D).

### a.  Source File Numbers

"[C]onfidential source file numbers are . . . assigned in sequential order to confidential

informants who report information to the FBI on a regular basis pursuant to an express assurance

of confidentiality."  Hardy Decl. ¶ 33.  The file number is "unique to the particular confidential

informant and is used only in documentation relating to that particular informant."  *Id.*  Here,

instead of the source's names, "confidential source file numbers were used to document

information provided by various sources."  *Id.*; *see Vaughn* Index at 53, 56, 60, 64, 67, 71, 72,

77, 117, and 126.  Disclosure of these informant file numbers "would have a chilling effect on

the activities and cooperation of other FBI confidential informants" whose cooperation is enlisted

"only with the understanding of complete confidentiality."  *Id.* ¶ 35.  Because disclosure of

informant file numbers "could reasonably be expected to identify a permanent confidential

source of the FBI," the file numbers are withheld under Exemption 2.  *Id.*

### b.  Source Symbol Numbers

"Permanent source symbol numbers are assigned to confidential informants who report

information to the FBI on a regular basis pursuant to an 'express' grant of confidentiality."

Hardy Decl. ¶ 36.  The FBI uses a source symbol number "as an administrative reporting tool to

protect the actual, sensitive identity of an informant in documents generated by the FBI."  *Id.*  A

source symbol number consists of a two-letter abbreviation of the field office from which the

source operates or has operated, followed by a sequentially assigned number. *Id.* "The symbol

number [appears] in all written reports in which [the source] provided information to the FBI.

*Id.*; *see Vaughn* Index at 56, 117, 126, 135, and 136. Disclosure of these permanent source

symbol numbers "would indicate both the scope and location of FBI informant coverage within a

particular geographic area," as the information in context "reveals [the informants'] connections

to dates, times, places, events and names from which the source's identity could be deduced." *Id.*

¶ 37.

The FBI's declaration establishes that both informant file numbers and permanent source

symbol numbers are used predominantly for internal administrative or recordkeeping purposes.

Each informant file number and source symbol number is unique to a particular informant, and

the number assigned to that informant appears in FBI records instead of the informant's name.

The declaration also establishes that disclosure of informant file numbers and source symbol

numbers would risk circumvention of statutes or agency regulations. Release of information

from which confidential sources' identities may be deduced could hamper FBI operations by

dissuading these and other informants from cooperating with FBI investigations or by revealing

FBI informant coverage in a geographic area. The Court concludes that the FBI properly

withholds informant file numbers and confidential source symbol numbers under Exemption 2 as

"high 2" exempt information.

2. Exemption 6[4]

Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Information that applies to a particular individual meets the threshold requirement for Exemption 6 protection. *See United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982). The exemption requires "a balancing of the individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'" *Dep't of the Air Force v. Rose*, 425 U.S. 352, 372 (1976); *see United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989). The privacy interest at stake belongs to the individual, not the agency. *Reporters Comm. for Freedom of the Press*, 489 U.S. at 763-65; *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989) (noting individual's significant privacy interest "in avoiding the unlimited disclosure of his or her name and address"), *cert. denied*, 494 U.S. 1078 (1990). It is the requester's obligation to articulate a public interest sufficient to

---

[4]     It appears that the FBI withholds information under Exemption 6 only with respect to "the names and/or identifying data of individuals who assisted the FBI by providing information within the records responsive to plaintiff's request." Hardy Decl. ¶ 45. Although the FBI's declaration does not so state, review of the *Vaughn* index suggests that the FBI invokes both Exemptions 6 and 7(C) to protect the same information. *See id.* ¶ 58. The Court errs on the side of caution and proceeds with its analysis under Exemption 6 only with respect to information coded "(b)(6)-2." *See Vaughn* Index at 1, 10, 49-55, 59-77, 79-116 and 137.

Even if Exemption 6 were not applicable, for the reasons stated in the discussion of Exemption 7(C), all the information coded "(b)(6)-2" would be withheld properly under Exemption 7(C), as would all the information coded "(b)(6)-1," "(b)(6)-3," "(b)(6)-4" and "(b)(6)-5." Because the Court concludes that the information withheld under Exemption 6 properly is withheld under Exemption 7(C), there is no need to consider the applicability of Exemption 6 further with respect to the information coded "(b)(6)-1," "(b)(6)-3," "(b)(6)-4" and "(b)(6)-5." *See Simon v. Dep't of Justice*, 980 F.2d 782, 785 (D.C. Cir. 1994).

outweigh an individual's privacy interest, and the public interest must be significant. *See Nat'l Archives and Records Admin. v, Favish*, 541 U.S. 157, 172 (2004).

Under Exemption 6, the FBI withholds "the names and/or identifying data of individuals who assisted the FBI by providing information . . . during an interview." Hardy Decl. ¶ 45; *Vaughn* Index at 1, 10, 49-55, 59-77, 79-116, and 137.  The declaration explains that interviews are among the most productive tools in law enforcement, and "[t]he largest roadblock in successfully obtaining . . . desired information through an interview is the fear by an interviewee that his . . . identity could possibly be exposed." *Id.*  Disclosure of the interviewee's identity could result in harassment, intimidation, or threats of reprisal or physical harm to the interviewee, *id.*, and the agency surmounts these obstacles by assuring interviewees "that their identities will be held in the strictest confidence." *Id.*  The FBI identifies no legitimate public interest in release of the interviewees' identities because such release sheds no light on the FBI's activities or operations. *Id.*  The declaration further asserts that "continued access to persons willing to provide pertinent facts bearing on a particular investigation outweighs any benefits derived from releasing the identities of these individuals." *Id.*

Plaintiff disputes the FBI's rationale for withholding information pertaining to interviewees under Exemption 6. *See* Pl.'s Opp'n at 8.  He claims "that the names of third parties have already been released in different parts of the proceedings, and [plaintiff] merely seeks documentation of the information provided." *Id.*

The release of information to plaintiff about third parties in any other context is not relevant to this FOIA action. *Cf. Schiffer v. Fed. Bureau of Investigation*, 78 F.3d 1405, 1411 (9th Cir. 1996) (treating requester's personal knowledge as irrelevant in assessing privacy

15

interests).  The sole rationale supporting release of information otherwise protected under

Exemption 6 is a legitimate public interest.  Plaintiff articulates no public interest, and instead,

suggest that his personal interest in this information is sufficient.  *See* Pl.'s Opp'n at 8.  Plaintiff

is mistaken.  Any interest in the information for purposes of proving his innocence or proving

that government witnesses perjured testimony at his criminal trial does not overcome the

individuals' privacy interest.  *See Oguaju v. United States*, 288 F.3d 448, 450 (D.C. Cir. 2002)

(finding that requester's "personal stake in using the requested records to attack his convictions

does not count in the calculation of the public interest"), *vacated and remanded*, 541 U.S. 970

(2004), *on remand*, 378 F.3d 115 (D.C. Cir.) (reaffirming prior decision), *reh'g denied*, 386 F.3d

273 (D.C. Cir. 2004), *cert. denied*, 544 U.S. 983 (2005); *see also Reporters Comm. for Freedom*

*of the Press*, 489 U.S. at 771 (stating that the requester's identity has "no bearing on the merits of

his . . . FOIA request").

 The Court concludes that the FBI properly withheld the names and identifying data

pertaining to these interviewees under Exemption 6.

### 3.  Exemption 7

#### a.  Law Enforcement Records

 Exemption 7 protects from disclosure "records or information compiled for law

enforcement purposes," but only to the extent that disclosure of such records would cause an

enumerated harm.  5 U.S.C. § 552(b)(7); *see Fed. Bureau of Investigation v. Abramson*, 456 U.S.

615, 622 (1982).  In order to withhold materials properly under Exemption 7, an agency must

establish that the records at issue were compiled for law enforcement purposes, and that the

material satisfies the requirements of one of the subparts of Exemption 7.  *See Pratt v. Webster*,

16

673 F.2d 408, 413 (D.C. Cir. 1982). In assessing whether records are compiled for law

enforcement purposes, the "focus is on how and under what circumstances the requested files

were compiled, and whether the files sought relate to anything that can fairly be characterized as

an enforcement proceeding." *Jefferson v. Dep't of Justice*, 284 F.3d 172, 176-77 (D.C. Cir.

2002) (citations and internal quotations omitted).

The FBI's declaration describes plaintiff as "a ruling figure of the Luchese LCN Family"

whose "organized crime involvement includes narcotics, labor racketeering, murder, and

extorting kickbacks." Hardy Decl. ¶ 5. Plaintiff is serving a sentence of life imprisonment after

his conviction "in 1992 of fifty-four (54) counts of murder, extortion and labor racketeering."

*Id.*; *see United States v. Amuso*, 21 F.3d 1251, 1253 (2d Cir. 1994). According to the

declaration, the records at issue in this case "were compiled for criminal law enforcement

purposes during the course of the FBI's performance of its law enforcement mission, including

the investigation of criminal activities." Hardy Decl. ¶ 51.

Plaintiff disputes the assertion that the responsive records were compiled for law

enforcement purposes. In his view, the records released to him are so heavily redacted that "one

cannot deduce whether the documents were compiled by a government agency," leaving the

Court "to simply take the defendants' word that the documents related to the enforcement of

federal laws and that the enforcement activity is within the law enforcement duty of the agency."

Pl.'s Opp'n at 12.

It is true that the FBI's supporting declaration offers little detail as to its law enforcement

function. There can be no dispute, however, that the FBI is a law enforcement agency. *See* 28

U.S.C. § 531 *et seq.* (establishing the FBI within the United States Department of Justice and its

jurisdiction to detect and investigate crimes).  Furthermore, it is clear from the supporting

declaration and from the language of plaintiff's FOIA request itself that the relevant records were

compiled for law enforcement purposes.  The request specifically refers to "the criminal

investigation and prosecution of Amuso by federal authorities," and mentions the criminal case

by number and by federal district court.  Compl., Ex. A at 2-3.

The Court concludes that the records at issue were compiled for law enforcement

purposes within the scope of Exemption 7.

### b.  Exemption 7(C)

Exemption 7(C) protects from disclosure information in law enforcement records that

"could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5

U.S.C. § 552 (b)(7)(C).  In determining whether this exemption applies to particular material, the

Court must balance the interest in privacy of the individuals mentioned in the records against the

public interest in disclosure.  *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993).

"[T]he only public interest relevant for purposes of Exemption 7(C) is one that focuses on 'the

citizens' right to be informed about what their government is up to.'"  *Davis v. United States

Dep't of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (quoting *Reporters Comm. for Freedom

of the Press*, 489 U.S. at 773).  The public interest "sought to be advanced [must be] a

significant one[,] more specific than having the information for [one's] own sake." *Favish*, 541

U.S. at 172.

FBI Special Agents, FBI Support Personnel
and Local Law Enforcement Personnel

The FBI withholds "the names and/or identifying information about FBI [Special Agents] and support personnel responsible for conducting, assisting with and/or supervising the investigative activities reported in the documents concerning plaintiff and others." Hardy Decl. ¶ 55. Among the Special Agents' responsibilities are interviewing witnesses and reviewing materials gathered in the course of the investigation of plaintiff and others. *Id.* Special Agents are not assigned to conduct investigations or to perform administrative duties by choice. *Id.* Any "[p]ublicity (adverse or otherwise) regarding [a] particular investigation to which they are assigned may seriously prejudice their effectiveness in conducting other investigations." *Id.* Further, these Special Agents "conduct official inquiries into various criminal and national security cases," putting them "into contact with all strata of society." *Id.* ¶ 56. In this capacity, they conduct searches and make arrests, "both of which constitute reasonable, but nonetheless serious[,] intrusions into peoples' lives," and some of these people "carry grudges which last for years." *Id.* These people may find an opportunity "to harass the [Special Agent] responsible for these intrusions," and release of their identities "in connection with a particular law enforcement investigation could trigger hostility toward the [Special Agent]." *Id.* Special Agents, then, "maintain a substantial privacy interest in not having their identities disclosed." *Id.* For these same reasons, the FBI withholds "the names and ranks of law enforcement officers of the New Jersey and New York City Police Departments" who "assisted in the investigation of plaintiff and others." *Id.* ¶ 61. Release of their identities may subject them to "unnecessary, unwarranted harassment." *Id.*

19

Based on a similar rationale, the FBI withholds "the names of FBI support employees" assigned to "handle tasks relating to the investigation concerning plaintiff and others." Hardy Decl. ¶ 56. These individuals are or were "in a position to access information regarding official law enforcement investigations, and therefore could become the target[s] of harassing inquiries for unauthorized access to investigations if their identities were disclosed." *Id.*

Against the recognized privacy interests of FBI Special Agents, support personnel, and local law enforcement officers, the FBI weighs the public interest in disclosure. Hardy Decl. ¶ 57. Its declaration explains that, absent allegations of misconduct on their part, disclosure of their identities would shed no light on the agency's performance. *Id.*

### Third Parties Who Provided Information to the FBI

Under Exemption 7(C), the FBI withholds "the names and/or identifying data of individuals who assisted the FBI by providing information within the records responsive to the plaintiff's request." Hardy Decl. ¶ 58. These individuals provided information in interviews, and their cooperation can be obtained by assuring them "that their identities will be held in the strictest confidence." *Id.* Release of their identities may result in their "being harassed, intimidated or threatened with legal or economic reprisal, or possible physical harm." *Id.* The FBI identifies "no legitimate public interest to be served by releasing the identities" of these private citizens interviewed by FBI agents. *Id.*

### Third Parties Merely Mention in FBI Records

The FBI also withholds "the names and personal identifying information" about third parties "who were merely mentioned in the documents responsive to plaintiff's request." Hardy Decl. ¶ 59. Recognizing the "strong negative connotation" in releasing these third parties'

identities in connection with an investigation of plaintiff, the FBI asserts that such disclosure "could subject them to possible harassment and could focus derogatory inferences and suspicion on them." *Id.* ¶ 60. The FBI determines that there is no public interest in the disclosure of these third parties' identities to outweigh their interest in personal privacy. *Id.*

Third Parties of Investigative Interest to the FBI<br/>or Other Law Enforcement Agencies

Lastly, the FBI withholds under Exemption 7(C) the "names of and identifying information of third party individuals who were of investigative interest to the FBI and/or other law enforcement agencies." Hardy Decl. ¶ 63. According to the FBI's declaration, "[b]eing linked with any law enforcement investigation carries a strong negative connotation and a stigma," such that releasing these individuals' identities "could subject them to harassment or embarrassment, as well as undue public attention." *Id.* The FBI determines that these individuals "maintain a substantial privacy interest in not having their identities disclosed," and that disclosure of their identities "would not enlighten the public on how the FBI conducts its internal operations and investigations." *Id.*

In his opposition, plaintiff generally argues that the FBI "has not performed the proper balancing function required for this exemption" because "the public interest in disclosure, in this case, overrides the privacy interests of the individuals mentioned in [the] records." Pl.'s Opp'n at 13-14. With respect to the FBI's argument that these third parties may face harassment or risk of harm, plaintiff finds such allegations "ridiculous" because he "is incarcerated in a maximum security prison some 18 years after the fact." *Id.* at 14. He opines that "the [Special Agents] concerned have probably retired long ago," *Id.* at 15. Similarly, he argues that the third parties'

identities already "were disclosed to the public many years ago" and that the "public policy

interest in withholding their identities has eroded over time." *Id.* at 11.  Further, he explains that

his sole purpose is "to collect information of a legal nature, and he has no intent to harass

anybody involved in his investigation." *Id.* at 18.  None of these points undermines the FBI's

decision to withhold this third party information.

Law enforcement personnel "have a legitimate interest in preserving the secrecy of

matters that conceivably could subject them to annoyance or harassment in either their official or

private lives" *Lesar v. United States Dep't of Justice*, 636 F.2d 472, 487 (D.C. Cir. 1980).

Similarly, "third parties who may be mentioned in investigatory files" and "witnesses and

informants who provide information during the course of an investigation" have an "obvious"

and "substantial" privacy interest in their personal information. *Nation Magazine v. United*

*States Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995); *see Rugiero v. United States Dep't of*

*Justice*, 257 F.3d 534, 552 (6th Cir. 2000) (concluding that agency properly withheld "identifying

information on agents, personnel, and third parties after balancing the privacy interests against

public disclosure), *cert. denied*, 534 U.S. 1134 (2002).

Individuals involved in law enforcement investigations, "even if they are not the subject

of the investigation[,] have a substantial interest in seeing that their participation remains secret."

*Willis v. United States Dep't of Justice*, 581 F. Supp. 2d 57, 76 (D.D.C. 2008) (citations and

internal quotation marks omitted).  Suspects, too, maintain a "substantial interest" in the

nondisclosure of their identities and connection to a particular investigation.  *See Neely v. Fed.*

*Bureau of Investigation*, 208 F.3d 461, 464-66 (4th Cir. 2000).  Privacy interests do not diminish

with the passage of time, *see, e.g., Halpern v. Fed. Bureau of Investigation*, 181 F.3d 279, 297

(2d Cir. 1999), and plaintiff cannot argue that the passage of 18 years since the investigation took place diminishes these individuals' privacy interests in any way.

Individuals have a "strong interest in not being associated unwarrantedly with alleged criminal activity." *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 91-92 (D.C. Cir. 1984). Exemption 7(C) recognizes that the stigma of being associated with any law enforcement investigation affords broad privacy rights to those who are connected in any way with such an investigation unless a significant public interest exists for disclosure. *Reporters Comm. for Freedom of the Press*, 489 U.S. at 773-775; *SafeCard Servs., Inc.*, 926 F.2d at 1205-06. Plaintiff articulates no public interest in disclosure of the names of and identifying information about FBI Special Agents and support personnel, local law enforcement officers, third parties who provided assistance to the FBI, third parties mentioned in the records, or third parties of investigatory interest. His intention to use information in these FBI records to prove his claim of innocence is not a public interest, as "an individual's personal interest in challenging his criminal conviction is not a public interest under FOIA because it 'reveals little or nothing about an agency's own conduct.'" *Willis v. United States Dep't of Justice,* 581 F. Supp. 2d 57, 76 (D.D.C. 2008) (quoting *Reporters Comm. for Freedom of the Press*, 489 U.S. at 773).

The FBI's position is amply supported, *see, e.g., Fischer v. United States Dep't of Justice,* __ F. Supp. 2d __, No. 07-2037, 2009 WL 162688, at *7 (D.D.C. Jan. 26, 2009) (concluding that the FBI properly withheld  the names and identifying information of FBI Special Agents and support personnel, the names and identifying information of third parties merely mentioned, third parties of investigative interest to the FBI or other law enforcement agencies, and the identities of

and information provided by Cooperative Witnesses under Exemption 7(C)), and the Court

concludes that the FBI properly withholds this information under Exemption 7(C).

c. Exemption 7(D)

Exemption 7(D) protects from disclosure those records or information compiled for law

enforcement purposes that:

> could reasonably be expected to disclose the identity of a confidential
> source . . . [who] furnished information on a confidential basis, and,
> in the case of a record or information compiled by a criminal law
> enforcement authority in the course of a criminal investigation. . .,
> information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).  There is no assumption that a source is confidential for purposes of

Exemption 7(D) whenever a source provides information to a law enforcement agency in the

course of a criminal investigation.  *See United States Dep't of Justice v. Landano*, 508 U.S. 165,

181 (1993).  Rather, a source's confidentiality must be determined on a case-by-case basis.  *Id.* at

179-80.  "A source is confidential within the meaning of [Exemption] 7(D) if the source

provided information under an express assurance of confidentiality or in circumstances from

which such an assurance could reasonably be inferred."  *Williams v. Fed. Bureau of*

*Investigation*, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (citing *Landano*, 508 U.S. at 170-74).

*i.* Express Assurance of Confidentiality

Confidential Source File Numbers and Source Symbol Numbers

The FBI withholds confidential source file numbers and permanent source symbol

numbers under both Exemptions 2 and 7(D).  Hardy Decl. ¶¶ 33, 36, 70, 73.  The former are

assigned "in sequential order to confidential informants who report information to the FBI on a

regular basis pursuant to an express assurance of confidentiality."  *Id.* ¶ 70.  The latter are

"assigned to confidential sources who have been developed, instructed, closely monitored and in may cases paid for [their] services . . . under an express grant of confidentiality." *Id.* ¶ 73.

The FBI's declaration explains that disclosure of confidential source file numbers "at various times and in various documents could ultimately identify these sources since it would reveal the connections of confidential informants to the information provided by them." Hardy Decl. ¶ 71. Because a "source file number is assigned to only one confidential informant," release of the numbers together with information these informants have provided "would narrow the possibilities of their true identities." *Id.*; *see id.* ¶ 34. Disclosure of confidential sources' identities "would have a chilling effect on the activities and cooperation of both current and future FBI confidential informants," as it is "only with the understanding of complete confidentiality that the aid of such informants can be enlisted." *Id.* ¶ 72; *see id.* ¶ 35. Because disclosure of the confidential source file numbers "could reasonably be expected to identify a permanent confidential source of the FBI," the FBI argues that the file numbers properly are withheld under Exemption 7(D). *Id.*

Similarly, the FBI argues that disclosure of informants' source symbol numbers and the information provided by these symbol numbered sources, Hardy Decl. ¶¶ 74-75, could result in "[c]onsiderable harm to the informants and to ongoing FBI operations." *Id.* ¶ 74. Informants to whom source symbol numbers are assigned have provided "detailed and singular" information "concerning criminal activity," and the sources' identities "could be ascertained by a person knowledgeable of the events that gave rise to the FBI's investigation of plaintiff and other subjects." *Id.* Release of the sources' identities means that both the sources and their families "could be subjected to embarrassment, humiliation, and physical [or] mental harm." *Id.* On a

wider scale, release of the identities of confidential sources "could have a chilling effect on the activities and cooperation of other FBI confidential sources" because it is "only through assurances of [confidentiality] that these sources can be persuaded to continue providing valuable assistance in the future." *Id.* For these reasons, the FBI asserts that source symbol numbers properly are withheld under Exemption 7(D). *Id.*

"As a matter of policy and practice, all symbol numbered sources are given an express grant of confidentiality." Hardy Decl. ¶ 75. Their identities are known only to "very few FBI employees . . . on a 'need to know' basis," and FBI documents to not refer to these sources by name. *Id.* The FBI receives information from these sources "only under conditions which guarantee the contact will not be jeopardized." *Id.* The FBI secures these sources' assistance "only with the understanding of complete confidentiality," and, for this reason, the FBI argues that "identifying data and information received from symbol numbered sources is withheld properly under Exemption 7(D). *Id.*

The FBI establishes that the confidential sources to whom the agency has assigned file numbers and permanent source symbol numbers, and the information provided by these symbol numbered sources, properly are withheld under Exemption 7(D). Its declaration explains that these sources provided information under an express grant of confidentiality, and that disclosure of this information could reasonably be expected to disclose their identities.

Foreign Government Agency Information

In file 92A-HQ-1020655-C1-5 there is "information provided to the FBI from a foreign agency or authority with an explicit understanding of confidentiality." Hardy Decl. ¶ 76. Although the declaration asserts that the FBI "solicits and receives information regularly from . .

26

. foreign agencies and authorities," *id.*, the Court has before it only the declarant's bare assertion that such information is shared under a "mutual understanding that the identity of such a source and the information provided by it will be held in confidence by the FBI, and not relased pursuant to FOIA . . . requests." *Id.* Absent a more substantive description of the nature or scope of the agreement with this foreign source, the FBI does not establish that this information properly is withheld under Exemption 7(D) on the ground that the foreign source provided information under an express grant of confidentiality.

### ii.  Implied Assurance of Confidentiality

The declaration explains that third parties with "knowledge of the activities that gave rise to the investigation of the plaintiff and others" were interviewed, and that these individuals "provided valuable information that is detailed and singular in nature." Hardy Decl. ¶ 69. The FBI withholds under Exemption 7(D) "the names, identifying information, and information provided by third parties to the FBI under an implied grant of confidentiality during the course of the FBI's investigation of the plaintiff and others . . . but only to the extent that the information could identify the interviewee." *Id.* ¶ 68. The agency justifies its decision based on "the violent nature of the crimes reportedly committed by plaintiff," *id.* ¶ 69, including murder, extortion and labor racketeering, *id.* ¶ 5, and on the fact that the interviewees reported on the "activities of organized crime families." *Id.* ¶ 68.

The declaration states that release of the interviewees' names or other identifying information "could have disastrous consequences," particularly by subjecting these individuals "to violent reprisals." Hardy Decl. ¶ 69. "The FBI has found that only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this

confidence that these sources can be persuaded to continue providing valuable assistance in the future." *Id.*

In determining whether the sources provided information under an implied assurance of confidentiality, the Court considers "whether the violence and risk of retaliation that attend this type of crime warrant an implied grant of confidentiality for such a source." *Mays v. Drug Enforcement Admin.*, 234 F.3d 1324, 1329 (D.C. Cir. 2000). The nature of the crime investigated and informant's relation to it are the most important factors in determining whether implied confidentiality exists. *Landano*, 508 U.S. at 179-80; *Quiñon v. FBI*, 86 F.3d 1222, 1231 (D.C. Cir. 1996). The question has been answered in the affirmative with respect to "the violence and danger that accompany the cocaine trade," *id.*, gang-related murder, *Landano*, 508 U.S. at 179, and other violent acts committed in retaliation for witnesses' cooperation with law enforcement. *See Shores v. Fed. Bureau of Investigation*, No. 98-2728, 2002 WL 230756, at *4 (D.D.C. Feb. 2, 2002) (withholding identities and identifying information of three cooperating witnesses with knowledge of the murder of which plaintiff was convicted, where plaintiff "subsequently attempted to procure the murder of a family member of one of the witnesses"); *Coleman*, 13 F. Supp. 2d at 82 (finding that plaintiff's conviction "of numerous violent crimes including rape and kidnaping," as well as the nature of the crimes and "the relation of the witnesses thereto is precisely the type that the implied confidentiality exemption expressed in *Landano* is designed to encompass"). In this case, where plaintiff is a member of an organized crime family who has been convicted of racketeering, extortion and murder, it is reasonable for these sources to fear retaliation if the FBI were to release their names or any other information that might reveal their identities.

The Court concludes that these interviewees provided information to the FBI with an expectation that their identities would not be disclosed. This information properly is withheld under Exemption 7(D).

### c. Exemption 7(E)

Exemption 7(E) protects from disclosure law enforcement records "to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Courts have held that information pertaining to law enforcement techniques and procedures properly is withheld under Exemption 7(E) where disclosure reasonably could lead to circumvention of laws or regulations. *See, e.g., Piper v. United States Dep't. of Justice*, 294 F. Supp. 2d 16, 30 (D.D.C. 2003) (withholding polygraph test information on the ground that disclosure "has the potential to allow a cunning criminal to extrapolate a pattern or method to the FBI's questioning technique," and anticipate or thwart FBI's strategy); *Fisher v. United States Dep't of Justice*, 772 F. Supp. 7, 12 (D.D.C. 1991) (upholding FBI's decision to withhold information about law enforcement techniques where disclosure would impair effectiveness and, within context of documents, "could alert subjects in drug investigations about techniques used to aid the FBI"), *aff'd*, 968 F.2d 92 (D.C. Cir. 1992).

In conjunction with Exemption 2, the FBI withholds "procedures and techniques used by FBI Special Agents during the investigation of plaintiff." Hardy Decl. ¶ 78. With respect to Exemption 2, the FBI's declaration explains that "information [such] as instructions to cooperating witnesses, the amount of money used to purchase evidence, and specific

29

investigatory techniques used during the investigation . . . relate[] solely to the FBI's internal

practices." *Id.* ¶ 38.  In addition, the FBI withholds information regarding "the logistical details

of an FBI undercover operation" under Exemption 2 on the ground that disclosure of such

"internal administrative information . . . could provide insight into how the FBI conducts

undercover operations." *Id.*  If this information were publicly available, it could be used "to

predict how the FBI will conduct similar operations in the future" or "to exhaust the FBI's

funding of a particular investigation," thus "imped[ing] the effectiveness of the FBI's internal

law enforcement procedures." *Id.*  Insofar as "[r]elease of these techniques could reasonably be

expected to alert the subjects in other criminal investigations to how the FBI conducts

undercover operations," potential subjects could circumvent the law or otherwise jeopardize

future investigations or undercover operations. *Id.* ¶ 78.  For this reason, the FBI invokes

Exemption 7(E). *Id.*

  Plaintiff counters that "the blank 302 forms released to the plaintiff give no evidence that

any techniques and procedures used in law enforcement investigations or prosecutions were

involved." Pl.'s Opp'n at 22.  Rather, to plaintiff, "the forms appear to be documentations of

somewhat ordinary interviews," such that the FBI has "no basis for withholding anything that

would disclose any techniques or procedures employed by the FBI." *Id.*

  An agency may withhold information from disclosure where, as here, it would provide

insight into its investigatory or procedural techniques. *See Morley v. Central Intelligence

Agency*, 508 F.3d 1107, 1129 (D.C. Cir. 2007) (concluding that the CIA properly withheld

information revealing security clearance procedures because release "could render those

procedures vulnerable and weaken their effectiveness at uncovering background information on

potential candidates"). Based on the FBI's representations and absent evidence from plaintiff to rebut the presumption of good faith afforded to the FBI's declaration, the Court concludes that the FBI properly withholds information pertaining to procedures and techniques used by FBI Special Agents during the investigation of plaintiff under Exemptions 2 and 7(E).

### d. Exemption 7(F)

Exemption 7(F) protects from disclosure information contained in law enforcement records that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). "While courts generally have applied Exemption 7(F) to protect law enforcement personnel or other specified third parties, by its terms, the exemption is not so limited; it may be invoked to protect 'any individual' reasonably at risk of harm." *Long v. United States Dep't of Justice*, 450 F. Supp. 2d 42, 79 (D.D.C. 2006) (quoting 5 U.S.C. § 552(b)(7)(F)), *order amended on recons.*, 457 F. Supp. 2d 30 (D.D.C.), *and order amended*, 479 F. Supp. 2d 23 (D.D.C. 2007) (same). In reviewing matters under Exemption 7(F), courts may inquire "whether there is some nexus between disclosure and possible harm." *Linn v. United States Dep't of Justice*, No. 92-1406, 1995 WL 631847, at *8 (D.D.C. Aug. 22, 1995). Within limits, the Court defers to the agency's assessment of danger. *See Garcia v. United States Dep't of Justice*, 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) (quoting *Linn*, 1995 WL 631847, at *9).

The FBI withholds "source symbol number informants and the names and identifying information concerning cooperating witnesses who provided information to the FBI concerning the criminal activities of plaintiff and/or other individuals of investigative interest in the records responsive to plaintiff's request." Hardy I Decl. ¶ 80. Because the crimes "reportedly committed by plaintiff and other members of organized crime families," the FBI asserts that release of

information about these informants and witnesses "could reasonably be expected to endanger the life and/or physical safety of these cooperating individuals." *Id.*

Plaintiff counters that the FBI incorrectly "assumes that the plaintiff is a member of an organized crime family" and is without a "basis for making such an assumption." Pl.'s Opp'n at 23. Rather, he asserts that the "only evidence that the plaintiff is a member of an organized crime family is derived from the testimony of murderers and sewer dwellers who have never spent a day in prison." Pl.'s Aff. ¶ 30. He argues that there "would not be a great risk to release the identities of cooperating witnesses because the plaintiff is merely seeking information for his own legal purposes." Pl.'s Opp'n at 23.

According to the Second Circuit's opinion, plaintiff indeed is associated with an organized crime family. *See United States v. Amuso*, 21 F.3d at 1254 (summarizing witness testimony as to "the extensive nature of organized crime's control over the window replacement industry in New York and Amuso's involvement in the enterprise" and "a murderous campaign by Amuso between 1988 and 1991 to eliminate anyone he suspected of disloyalty, including an entire faction of the Luchese family"). The FBI's declaration, the assertions of which are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents," *SafeCard Servs., Inc.*, 926 F.2d at 1200 (internal quotation marks omitted), establish that plaintiff was "a ruling figure of the Luchese LCN Family" whose "organized crime involvement includes narcotics, labor racketeering, murder, and extorting kickbacks." Hardy Decl. ¶ 5.

Based on the FBI's declaration, including its statements regarding plaintiff's criminal background, the Court concludes that the FBI properly withholds source symbol number

informants and the names and identifying information concerning cooperating witnesses under

Exemption 7(F).  It is reasonable in these circumstances to conclude that disclosure of this

information could threaten the lives of or otherwise endanger their safety.

### E.  Referral to the BOP

On May 2, 2008, the FBI referred three pages of records to the BOP.  Hardy Decl., ¶¶ 3-4,

81 & Ex. A (Referral re: FOIA Request Number 2008-06852), Ex. J ("Moorer Decl.").  The FBI

sent a second referral package to the BOP on August 14, 2008.  Hardy Decl. ¶ 81.  It included the

three pages referred on May 2, 2008, *see Vaughn* Index at 46-48, and one additional page.  *See*

*Vaughn* Index at 45.  As of the filing of the instant motion, the outcome of the August 14, 2008

referral, that is, the decision to withhold or to release the one additional page, was unknown.

Moorer Decl. ¶ 5 n.1.

The records referred on May 2, 2008 "contained the names, register numbers, locations,

FBI numbers, Social Security numbers, dates of birth, and organized crime affiliation of inmates

incarcerated in the [BOP]," Moorer Decl. ¶ 7, and the BOP withheld them under Exemptions

7(C) and 7(F).  *Id.* ¶ 5.  According to the BOP's declaration, release of this information not only

would confirm each individual's status as "a significant organized crime member" but also

would endanger his life or physical safety.  *Id.*  The agency declined to offer a "more detailed

description of the information withheld" because it "could identify the protected material."  *Id.* ¶

6.  Because non-exempt material "was so intertwined with protected material," the BOP released

no segregable material and, instead, withheld these records in their entirety.  *Id.*

Plaintiff opposes the BOP's decision, arguing that the BOP "made an improper, unilateral

decision to withhold the three pages of information which it had relevant to the plaintiff's

inquiry," Pl.'s Statement of Material Facts in Genuine Dispute ¶ 2, without any "evidence . . . as

to the nature of the information withheld and the legal basis therefor." *Id.* ¶ 21; Pl.'s Aff. ¶ 32.

Absent additional information from the BOP as to its rationale for withholding in full the three

pages of records referred on May 2, 2008, the Court cannot determine whether its decision is

proper.  Nor can the Court determine whether the BOP withheld or released the additional page

referred by the FBI on August 14, 2008

### III.  CONCLUSION

The Court finds that the FBI conducted an adequate search for records responsive to

plaintiff's FOIA request and that it properly withheld information under Exemptions 2, 6, 7(C),

7(E), and 7(F).  Under Exemption 7(D), the FBI properly withholds confidential source file

numbers, permanent source symbol numbers, information provided by symbol numbered

informants under an express grant of confidentiality, and the names of and identifying

information about interviewees who provided information in circumstances under which

confidentiality is implied.  In these respects the FBI's summary judgment motion will be granted.

The FBI does not establish that it received foreign government agency information under

an express assurance of confidentiality, and the Court cannot determine whether it properly

withheld this information under Exemption 7(D).  Nor can the Court determine whether the BOP

properly withheld the three pages referred on May 2, 2008, and the results of the August 14, 2008

referral are unknown.  In these respects the motion will be denied.

An Order consistent with this Memorandum Opinion is issued separately.

RICHARD J. LEON
United States District JudgeDDate:

Date:

3/4/09